MARK E. THOMPSON, ESQ. (MET6144)
LAW OFFICES OF
THOMAS A. BUONOCORE, P.C.
1719 Route 10, Suite 301
Parsippany, New Jersey 07054
Tele:  (973) 984-2588
Fax:   (973) 984-6640
mthompson@bt-law.com
Attorneys for Plaintiff,
The Eric Ryan Corporation

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

THE ERIC RYAN CORPORATION, a
Pennsylvania corporation,

      Plaintiff,

v.

WORLDWIDE SOURCING SOLUTIONS, INC.,
a Delaware corporation,

      Defendant.

Civil Action No.

**COMPLAINT**

Plaintiff, The Eric Ryan Corporation, a Pennsylvania corporation ("Eric Ryan"), by and through its undersigned counsel, Law Offices of Thomas A. Buonocore, P.C., and files the within Complaint against Worldwide Sourcing Solutions, Inc., a Delaware corporation ("WSSI" or "Defendant"), alleging as follows:

### PRELIMINARY STATEMENT

1.    This is an action seeking damages, including attorneys' fees, from WSSI arising from WSSI's design, development and implementation, in its sole discretion, of Eric Ryan's marketing activities, programs and promotions which were found by the United States District Court for the District of Connecticut to be in violation of the Telephone Consumer Protection Act of 1991, as amended by the Junk Prevention Act of 2005, 47 U.S.C. § 227 ("TCPA").

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

2.      At the outset of WSSI and Eric Ryan's business relationship, WSSI was a direct wholly owned subsidiary of Wyndham Worldwide Corporation ("WWC") which was, upon information, one of the world's largest hospitality companies.

3.      As more fully set forth below, on October 15, 2010, Eric Ryan and WSSI, among others, entered into the Worldwide Sourcing Agreement ("WS Agreement"). A true and correct copy of the WS Agreement is attached hereto as **Exhibit A** and incorporated herein by reference as if stated in full.

4.      As part of the WS Agreement, Eric Ryan entrusted WSSI with the design, development and implementation of a marketing program that would comply with all applicable federal and state laws, ordinances and administrative rules and regulations, including the TCPA. The marketing program was to allow Eric Ryan to take advantage of the WWC network by marketing its services to Participants (as defined in the WS Agreement). Instead, Eric Ryan was compelled to defend a lawsuit seeking certification of a class and initiated by a Participant who received allegedly unsolicited facsimile transmissions that were a part of the Eric Ryan marketing program in an alleged violation of the TCPA.

5.      The actions of WSSI with respect to the Eric Ryan marketing program, which caused severe harm to Eric Ryan, constitute a breach of the WS Agreement and supports WSSI's liability and/or obligation to indemnify Eric Ryan for its damages in defending and paying the judgment with respect to the Participant lawsuit.

## PARTIES

6.      Plaintiff, Eric Ryan, is a Pennsylvania corporation with a principal place of business located at 1 Early Street, Ellwood City, PA 16117.

7.      Defendant, WSSI, is a Delaware corporation with a principal place of business located at 22 Sylvan Way, Parsippany, New Jersey 07054.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

2

## JURISDICTION AND VENUE

8.      Federal diversity jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. § 1332.  Plaintiff, Eric Ryan, is a Pennsylvania corporation with its principal place of business in Pennsylvania and Defendant, WSSI, is a Delaware corporation with its principal place of business in New Jersey; accordingly, complete diversity of citizenship exists.  Further, the matter in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue in this Honorable Court is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions on which the claims asserted herein are based occurred in this District.  In addition, the parties to the WS Agreement agreed that, "[A]ny legal action, suit or proceeding against either of them arising out of, relating to or in connection with this [WS Agreement] or disputes relating hereto (whether for breach of contract, tortuous conduct or otherwise) shall be brought only in the United States District Court for the District of New Jersey...." Ex. A, ¶ 32.

## GENERAL FACTUAL BACKGROUND

10.      Eric Ryan is a company that provides telecommunications and utility services, including auditing utility and telephone bills and providing consulting services relating to those bills.

11.      Upon information, WSSI is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and an affiliate of Wyndham Hotel Group ("Wyndham").  At the time the parties entered into the WS Agreement, upon information and belief, WSSI was a direct wholly owned subsidiary of WWC.

12.      Through its Approved Suppliers program WSSI supports Wyndham franchisees by negotiating prices, volume discounts, and commissions for products and services of third parties designated as Approved Suppliers.

13.      WSSI would often enter into an agreement with service providers like Eric Ryan whereby the service provider would be designated as an Approved Supplier.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

14.     As an Approved Supplier, a service provider could offer services for purchase by Wyndham franchisees for a commission and/or fee to WSSI.

15.     As part of the Approved Supplier program, Approved Suppliers were to participate in a marketing program designed, developed and implemented by WSSI in its sole discretion for each Approved Supplier.

## THE WORLDWIDE SOURCING AGREEMENT

16.     On October 15, 2010, Eric Ryan and WSSI, among others, entered into the WS Agreement.

17.     Pursuant to the WS Agreement, Eric Ryan became an Approved Supplier and WSSI agreed to promote Eric Ryan's goods and services to Wyndham franchisees and/or other Participants as defined in the WS Agreement. Ex. A, ¶ 1.

18.     Among other things, the WS Agreement provides that a marketing program for Eric Ryan would be established, designed and, at times, enhanced by WSSI at its sole discretion in order for Eric Ryan to market its services to Wyndham franchisees and/or other Participants. *Id.*, ¶ 7(b)(i).

19.     The WS Agreement states that "WSSI will establish a general marketing program for vendors to market their products and/or services to Participants, which marketing program WSSI may modify or enhance from time to time in its sole discretion (the 'Marketing Program')." *Id.*

20.     WSSI also agreed that it "will design and identify Marketing Programs available for purchase by [Eric Ryan] and determine the corresponding costs associated with each program." *Id.*

21.     The WS Agreement also provides that Eric Ryan "shall participate in the basic Marketing Program, and may elect to purchase a combination of additional customized programs…" *Id.*

22.     Further, WSSI acknowledged and agreed that it would create, design and implement the Marketing Program and that there are costs associated with these activities.  "The fees and/or costs, expenses and other charges incurred by WSSI in creating, designing and implementing the marketing activities, programs, and promotions selected by [Eric Ryan], as these selections comprise

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

the marketing Program to be launched and supported on behalf of [Eric Ryan], will all be undertaken and carried out at [Eric Ryan's] sole cost and expense. *Id.*

23.     Throughout Eric Ryan's Marketing Program, WSSI was obligated to "provide reasonable access, as appropriate, to WSSI's internal marketing channels relating to its Participants." *Id.*, ¶ 7(b)(ii).

24.     In the WS Agreement, WSSI once again acknowledge its obligation do develop Eric Ryan's Marketing Program, "During the Term, [Eric Ryan] shall offer the Products and/or Services to Participants through the Marketing Program developed by WSSI." *Id.*, ¶ 7(b)(iii).

25.     The WS Agreement further provides that, "The parties hereby agree to comply with all applicable federal and state laws, ordinances, and administrative rules and regulations in the performance of their obligations under this Agreement." *Id.*, ¶ 32(a).

26.     Accordingly, in performing its obligations under the WS Agreement in creating, designing, establishing, developing, enhancing and/or implementing Eric Ryan's Marketing Program, WSSI agreed not to violate, among other things, any federal and state laws including the TCPA.

27.     Finally, the WS Agreement also provides that "[I]n any legal proceeding brought by either party to enforce any part of this Agreement, the prevailing party shall be entitled to receive, in addition to all other relief, its reasonable attorneys' fees, costs, and expenses.

## THE GORSS MOTELS, INC. LAWSUIT

28.     As part of Eric Ryan's Marketing Program designed and implemented by WSSI, WSSI allowed Eric Ryan to provide advertising information for placement on Wyndham's website and sponsored catalog, as well as content for certain faxes to be sent by WSSI and/or Wyndham, through a hired third party, to Wyndham franchisees and/or other Participants.

29.     In January 2013, WSSI and/or Wyndham requested that Eric Ryan provide content for a "Fax Blast" where WSSI and/or Wyndham would send multiple faxes to Wyndham's franchisees and/or other Participants at one time.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

5

30.     As requested, Eric Ryan provided content to WSSI which included summaries of its services and its contact information.  Eric Ryan forwarded this content to WSSI for approval  and with the understanding that WSSI would turn the content into flyers which would be appropriately sent to Wyndham's franchisees and/or other Participants in accordance with the WS Agreement.

31.     WSSI added opt out language and other legal terms to the flyers it created using the content provided by Eric Ryan.

32.     WSSI and/or Wyndham caused these flyers promoting Eric Ryan's services to be faxed to various Wyndham franchisees and/or Participants on March 1, 2013, November 1, 2013, and December 1, 2013 (collectively, the "Faxes").

33.     WSSI and/or Wyndham utilized Western Printing, a commercial printing company, to send the Faxes.  On behalf of and at the direction of WSSI and/or Wyndham, Western Printing arranged for the Faxes to be broadcast in Fax Blasts.

34.     In its sole discretion, WSSI decided which fax numbers, franchisees and/or other Participants would be targeted for each of the three Faxes.

35.     Eric Ryan had no role whatsoever in determining which fax numbers, franchisees and/or other Participants would be targeted and/or eventually receive the Faxes at issue.

36.     In fact, WSSI never provided Eric Ryan with databases and/or contact lists of Wyndham franchisees and/or other Participants.

37.     The Faxes were successfully sent and received by Gorss Motels, Inc. ("Gorss Motels"), upon information and belief, a longtime franchisee of Wyndham.

38.     On January 27, 2017, Gorss Motels initiated a lawsuit against Eric Ryan by filing a Complaint in the United States District Court for the District of Connecticut at case number: 3:17-cv-00126-DJS, alleging that on March 1, 2013, November 1, 2013, and December 1, 2013,  it received three (3) unsolicited advertisement facsimiles from Eric Ryan promoting its services (the Faxes), all in violation of the TCPA (the "Gorss Lawsuit").  The Gorss Lawsuit Complaint is attached hereto as **Exhibit B**.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

6

39.     By letter, Eric Ryan demanded that WSSI and/or Wyndham indemnify it for any costs and/or liability incurred including, but not limited to, attorneys' fees, as a result of the Gorss Lawsuit and invited WSSI and/or Wyndham to participate in settlement negotiations so that they may protect their interests.  A true and correct copy of the Eric Ryan indemnification demand letter is attached hereto as **Exhibit C**.

40.     By letter dated January 2, 2019, counsel for Wyndham and WSSI responded to the Eric Ryan indemnification demand letter by refusing to provide indemnification or participate in settlement discussions with Gorss Motels' counsel.  A true and correct copy of Wyndham and WSSI's January 2, 2019 letter is attached hereto as **Exhibit D**.

41.     In the Gorss Lawsuit, Gorss Motels also sought to represent a class of similarly situated people who received similar unsolicited faxes as a part of Eric Ryan's Marketing Program.

42.     After Eric Ryan expended time and expense defending against class certification, on March 28, 2019, the court denied Gorss Motels' Motion for Class Certification. A true and correct copy of the docket from the Gorss Motels Lawsuit is attached hereto as **Exhibit E** and incorporated as if fully set forth at length herein. Ex. E, Doc. 65.

43.     Eric Ryan also expended time and expense defending against the claims asserted in the Gorss Motels Lawsuit as indicated by the corresponding docket. See generally, Ex. E.

44.     In the Gorss Motels Lawsuit, Eric Ryan expended time and expense defending and taking depositions and participating in a voluminous motions, discovery, and appellate practice.

45.     In the Gorss Motels Lawsuit, Gorss Motels filed a motion for summary judgment and Eric Ryan filed a cross motion for summary judgment.

46.     On May 21, 2020, the court in the Gorss Motels Lawsuit granted Gorss Motels' Motion for Summary Judgment while denying Eric Ryan's Motion for Summary Judgment. Ex. E, Doc. 99.

47.     In finding violations of the TCPA and ordering judgment in the amount of $1,500 to be entered against Eric Ryan, the Court in the Gorss Motels Lawsuit found that each one of the three

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

Faxes was an unsolicited advertisement sent to Gorss Motels, that Eric Ryan was considered the sender of the Faxes under the TCPA, and that Gorss Motels did not provide prior express invitation or permission to receive any of the Faxes (the "Gorss Lawsuit Judgment"). *Id.*

## COUNT I
## BREACH OF CONTRACT

48.     Eric Ryan incorporates by reference all of the preceding paragraphs of its Complaint as though fully set forth herein.

49.     At all times relevant to Eric Ryan's Marketing Program, Eric Ryan and WSSI were parties to the WS Agreement.

50.     The WS Agreement is a valid contract.

51.     Eric Ryan has fulfilled all conditions precedent and at all times complied with all applicable duties owed to WSSI under the WS Agreement.

52.     The WS Agreement requires WSSI, among other things, to promote Eric Ryan services to Wyndham franchisees and/or other Participates by, in its sole discretion, designing, establishing, implementing, and enhancing the Eric Ryan Marketing Program in such a way as to comply with all applicable federal and state laws, ordinances, and administrative rules and regulations, including the TCPA.

53.     As indicated by the Gorss Lawsuit Judgment, WSSI materially breached its contractual duties under the WS Agreement in several ways, including but not limited to:

        a.    Failing to design, establish, implement, and/or enhance the Eric Ryan Marketing Program to comply with all applicable federal and state laws, ordinances, and administrative rules and regulations, including the TCPA; and

        b.    Failing to acquire prior express invitation or permission from Gorss Motels indicating Gorss Motels' willingness to receive any of the Faxes.

54.     As a direct and proximate result of WSSI's breach of the WS Agreement, WSSI caused damage to Eric Ryan in the amount of its attorneys' fees and costs in defending against the

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

8

claims in the Gorss Lawsuit including, but not limited to, defending against class certification, as well as having to pay the judgment entered against Eric Ryan by the Court.

WHEREFORE, Plaintiff, Eric Ryan Corporation, respectfully requests judgment in its favor and against Defendant, Worldwide Sourcing Solutions, Inc., as follows:

        a.      Direct damages in excess of $75,000;

        b.      All costs, attorneys' fees, and expenses incurred by Plaintiff, The Eric Ryan Corporation, in bringing this action pursuant to paragraph 33 of the WS Agreement; and

        c.      Interest and such other further relief as the Court deems just and proper.

## COUNT II
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

55.     Eric Ryan incorporates by reference all of the preceding paragraphs of its Complaint as though fully set forth herein.

56.     There is implied in every contract a covenant of good faith and fair dealing.

57.     The actions and inactions of WSSI as aforesaid constitute a breach of said covenant.

58.     As a result of said breach, Eric Ryan has been damaged.

WHEREFORE, Plaintiff, Eric Ryan Corporation, respectfully requests judgment in its favor and against Defendant, Worldwide Sourcing Solutions, Inc., as follows:

        a.      Direct damages in excess of $75,000;

        b.      All costs, attorneys' fees, and expenses incurred by Plaintiff, The Eric Ryan Corporation, in bringing this action pursuant to paragraph 33 of the WS Agreement; and

        c.      Interest and such other further relief as the Court deems just and proper.

## COUNT III
## IMPLIED INDEMNIFICATION

59.     Eric Ryan incorporates by reference all of the preceding paragraphs of its Complaint as though fully set forth herein.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

60.     Eric Ryan was caused to incur substantial litigation related expenses defending or otherwise participating in the litigation process with respect to the Gorss Motels Lawsuit.

61.     Eric Ryan had no role whatsoever in determining which fax numbers, franchisees and/or other Participants would be targeted by WSSI and/or eventually receive each of the Faxes at issue.

62.     In fact, WSSI never provided Eric Ryan with databases and/or contact lists of Wyndham franchisees and/or other Participants.

63.     Rather, WSSI, at its sole discretion designed, established, implemented, and enhanced Eric Ryan's Marketing Program which included the Faxes that were the subject of the Gorss Motels Lawsuit.

64.     Any liability found for violation of the TCPA against Eric Ryan in the Gorss Motels Lawsuit is vicarious, constructive and/or imputed in that Eric Ryan, although entirely free from fault and active wrongdoing, is being held responsible for the unlawful actions of WSSI in causing unsolicited advertisements to be faxed to Gorss Motels, a Wyndham franchisee and/or Participant under the WS Agreement, in violation of the TCPA as determined by the Court in the Gorss Lawsuit.

65.     Prior to the Court's determination in the Gorss Lawsuit, Eric Ryan sought indemnification from Wyndham and WSSI regarding the Gorss Lawsuit.  Ex. C.

66.     Wyndham and WSSI responded to Eric Ryan's demand for indemnification by letter dated January 2, 2019, wherein Wyndham and WSSI refused to provide indemnification to Eric Ryan. Ex. D.

67.     Wyndham and/or WSSI's refused to indemnify Eric Ryan even though (1) Eric Ryan was entirely free from fault and active wrongdoing and (2) WSSI would be the primary and/or sole cause of any potential court determined violation of the TCPA.

68.     Eric Ryan has at all times complied with all applicable duties owed to WSSI.

69.     Eric Ryan has incurred losses in connection with defending against the claims asserted in the Gorss Motels Lawsuit.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

10

70.    Eric Ryan has incurred substantial attorneys' fees, court costs, and other costs in order to defend itself in the Gorss Motels Lawsuit, including appellate issues.  As such, Eric Ryan is entitled to indemnification from WSSI.

71.    WSSI's duty to indemnify has arisen because Eric Ryan has not only incurred but has also paid attorneys' fees, a judgment, and other costs and fees in connection with the Gorss Motels Lawsuit.

72.    These expenses and costs are reasonable and necessary losses incurred by Eric Ryan in connection with the Gorss Motels Lawsuit and Eric Ryan demands indemnification from WSSI.

WHEREFORE, Plaintiff, Eric Ryan Corporation, respectfully requests judgment in its favor and against Defendant, Worldwide Sourcing Solutions, Inc., as follows:

a.    Direct damages in excess of $75,000, including all attorneys' fees, the judgment,  and other litigation expenses incurred with respect to the Gorss Motels Lawsuit;

b.    All costs, attorneys' fees, and expenses incurred by Plaintiff, The Eric Ryan Corporation, in bringing this action pursuant to paragraph 33 of the WS Agreement; and

c.    Interest and such other further relief as the Court deems just and proper.

### TRIAL COUNSEL DESIGNATION

Plaintiff hereby designates Thomas A. Buonocore, Esq. as trial counsel in the above matter.

### CERTIFICATION OF NO OTHER ACTIONS OR PARTIES

Plaintiff hereby certifies there are no other parties known at this time who should be joined in this action or such other actions involving the same dispute.

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

11

LAW OFFICES OF
THOMAS A. BUONOCORE, P.C.
Attorneys for Plaintiff,
The Eric Ryan Corporation

By: _____
      MARK E. THOMPSON, ESQ.

Dated: March 29, 2021

AND

(To be Admitted Pro Hac Vice)

Cafardi Ferguson Wyrick Weis & Gabriel, LLC
Christopher A. Cafardi, Esq.
PA Bar No.: 90904
Dennis R. Very, Esq.
PA Bar No.: 76489
Meghan Matscherz, Esq.
PA Bar No.: 325088

2605 Nicholson Road
Suite 2201
Sewickley, PA  15143
(412) 515-8900
ccafardi@cfwwg.com
dvery@cfwwg.com
mmatscherz@cfwwg.com

Attorneys for Plaintiff, The Eric Ryan Corporation

LAW OFFICES OF
THOMAS A. BUONOCORE
A Professional Corporation
Counsellors at Law
1719 Route 10, Suite 301
Parsippany, NJ 07054

12

## **EXHIBIT A**

WORLDWIDE SOURCING AGREEMENT

This **WORLDWIDE SOURCING AGREEMENT** (the "Agreement"), dated as of this 15th day of October 2010, is made by and between:

**WORLDWIDE SOURCING SOLUTIONS, INC.**, a Delaware corporation, and/or from time to time as their interests may appear, each WSSI Affiliate (each as defined below)(the foregoing collectively, "WSSI"), with an office located at 22 Sylvan Way, Parsippany, New Jersey 07054; and

**THE ERIC RYAN CORPORATION** a Pennsylvania corporation ("Vendor"), with an office located at Early Street, Suite A, Ellwood City, PA 16117.

## WITNESSETH:

WHEREAS, Wyndham Worldwide Corporation, a Delaware corporation ("WYN") is one of the world's largest hospitality companies;

WHEREAS, WSSI, a direct wholly owned subsidiary of WYN, desires to obtain certain products and/or services for the benefit of WYN and its Affiliates and Participants (each as defined below) at various locations throughout the United States, Canada, and the Caribbean; and

WHEREAS, Vendor is in the business of providing services ("Services") and/or products and goods as described on the applicable Schedule (defined below) attached hereto and made a part hereof (such goods, together with such products, collectively, "Products"); and

NOW THEREFORE, in consideration of the promises and covenants contained in this Agreement and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1. **DEFINITIONS.**

"Affiliate(s)" means, with respect to WSSI, any and all of the subsidiaries and affiliates, including without limitation each of the corporations, limited liability companies, partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediate entities) control, are controlled by, or are under common control with WYN, including, but not limited to, Wyndham Hotel Group, LLC, Wyndham Exchange and Rentals, Inc. formerly known as Group RCI, Inc. and Wyndham Vacation Ownership, Inc. Unless specifically stated herein, references to WSSI shall include such Affiliate(s) unless the context indicates otherwise.

"Calendar Quarter" means the three month period of time ending, respectively, on March 31, June 30, September 30th and December 31st of each Calendar Year.

243953v3

DEPOSITION EXHIBIT 2

12/9/15

1

ERC 001

"Calendar Year" means the twelve (12) consecutive calendar month period commencing on January 1st of a given year and ending on December 31st.

"Commission" means the amounts as further described in each respective Schedule attached hereto and made a part hereof.

"Designated Purchaser" means any entity, such as a corporation, limited liability company, partnership, limited partnership, firm, association, business, organization or other entity that WSSI or any of its Affiliates shall designate in writing as authorized to purchase the Products and/or Services under this Agreement. For purposes of this Agreement, a Designated Purchaser shall be deemed to include the following entities: (i) a general contractor of a Project, such as a general contractor with an agreement with WSSI or any of its Affiliates or with a third party relating to such Project, provided that if such general contractor has an agreement with a third party relating to such Project, such third party shall have an agreement with WSSI or an Affiliate relating to such Project, (ii) any subcontractor, sub-subcontractor, vendor or supplier of such general contractor where either WSSI or any of its Affiliates serves as the general contractor for a Project, any subcontractor, sub-subcontractor, vendor or supplier of WSSI or such Affiliate, (iii) a franchisee of any Lodging Brand which is an Affiliate of WSSI or any of its Affiliates, (iv) an owner or operator of a hotel, resort, or other property managed by WSSI or any of its Affiliates and (v) any third party developer licensed by or acting on behalf of WSSI or any of its Affiliates. For the avoidance of doubt, a Designated Purchaser includes any current and/or future customer of Vendor, whether such customer re-establishes, continues or initiates a relationship with Vendor as a result of this Agreement.

"Effective Date" means the date of this Agreement.

"Gross Revenue(s)" [intentionally deleted]

"Lodging Brand" means any of the following branded guest lodging franchise systems, as the number and name of such lodging system which are Affiliates of WSSI may change or be amended from time to time (a "Lodging Brand", and collectively the "Lodging Brands"): Wyndham®, Ramada®, Days Inn®, Baymont®, Wingate by Wyndham®, Hawthorne by Wyndham®, Microtel®, Super 8®, Howard Johnson®, Travelodge® Tryp® and Knights Inn®.

"Manual" means the Standard Operating Procedures Manual, and all other written statements, directives and any other manuals and materials issued by the relevant Lodging Brand franchisor to any franchisee, and any modifications to such materials, containing the standards, specifications, policies, and procedures for the establishment and operation of system hotels, Affiliate properties, or any Project.

"Overcharge" means any amount identified by Vendor and improperly charged to WSSI, an Affiliate or a Designated Participant, whether for tariffs, taxes, services or deliveries on a utility invoice.

"Participant" means any of WSSI, its Affiliates, or a Designated Purchaser.

243953v3

2

ERC 002

"Products" means the Products and/or Services set forth in the Schedules provided by the Vendor to a Participant.

"Project" means a project relating to the construction or renovation of a hotel, resort, or timeshare for WSSI or an Affiliate, or such other hospitality project identified by WSSI or its Affiliates.

"Purchase Order" means one or more purchase orders contracted by a Participant directly with Vendor, on documents, forms and terms mutually satisfactory to Vendor and such Participant. A Purchase Order may incorporate by reference or be based upon a Schedule. Each Purchase Order shall (i) identify the Designated Purchaser, (ii) state the Products and/or Services to be purchased, provide pricing and any other charges; and (iii) identify the delivery location, delivery date and any other information or term or condition in connection with the transaction which the parties to the Purchase Order determine to include. The Purchase Order may also specify the terms of payment or any financing as agreed by Vendor and Participant.

"Recovered Overcharge" means the actual amount received in cash by WSSI, an Affiliate or Designated Participant.

"Sales Tax(es)" means any sales, use, product or service related tax, surcharge, use fee, or permit or licensing cost or other expense relating to a Product and/or Service, imposed by any federal, state or local governmental or administrative unit, and required to be collected and paid by the Vendor to a governmental unit.

"Schedules" means any of the schedules more particularly described in Section 5(b).

"Systems Standards" means the standards, specifications, policies and procedures set forth in the relevant Manual, or otherwise in writing from time to time, by the Lodging Brand franchisor.

"Term" has the meaning set forth in Section 2.

"Tier Two" means spend data that includes supplier names, classifications and ethnic backgrounds. Tier Two data shall include direct and indirect spend. Direct spend includes Vendor purchases from a minority vendor for WSSI's benefit, such that the product purchased is used exclusively for WSSI's benefit. Indirect spend includes Vendor purchases from a minority vendor for items needed to sustain their business requirements.

"WER Group" means Wyndham Exchange and Rentals, Inc., together with its subsidiaries and Designated Purchasers.

"WHG Group" means Wyndham Hotel Group, LLC together with its subsidiaries and Designated Purchasers.

"WVO Group" means Wyndham Vacation Ownership, Wyndham Vacation Resorts, Inc., and Wyndham Resort Development Corporation, together with each of their subsidiaries and Designated Purchasers.

2. TERM OF AGREEMENT.

The Term of this Agreement shall commence on the Effective Date and unless terminated in accordance with the terms of this Agreement, continue for a period of thirty-six (36) consecutive calendar months thereafter, terminating on the last day of the month following the third anniversary of the Effective Date.

3. AFFILIATES OF WSSI.

All rights, powers, benefits, and privileges set forth in this Agreement, and all performances and obligations required by this Agreement, shall inure to the benefit of and may be performed by, as appropriate, each of WBR Group, WHG Group, WVO Group, or the specified Affiliate (who is or may become from time to time a party to this Agreement in accordance with each of the Schedules, attached hereto, made a part hereof and by reference incorporated herein) to the terms and tenor of the relevant Schedule.

4. OBLIGATIONS.

(a) Provision of Products and Services. Vendor shall provide, or cause to be provided, the Products and/or Services to WSSI and any of its Affiliates and/or the Participants in accordance with the terms of this Agreement and all relevant Exhibits and/or Schedules (defined below). WSSI makes no commitment or guarantee with respect to volume or revenue with respect to the Products and/or Services that may or may not be purchased under this Agreement and any applicable Schedules, and Vendor acknowledges and agrees that no such commitment or guarantee has been or will be made.

(b) Non-Exclusive Appointment WSSI hereby appoints Vendor as a non-exclusive provider of the Products and/or Services. Vendor shall provide, or cause to be provided, the Products and/or Services to WSSI and any of its Affiliates and/or the Participants in accordance with the terms of this Agreement and all relevant Exhibits and/or Schedules (defined below). WSSI makes no commitment or guarantee with respect to volume or revenue with respect to the Products and/or Services that may or may not be purchased under this Agreement and any applicable Schedules, and Vendor acknowledges and agrees that no such commitment or guarantee has been or will be made.

(c) Account Representative. If applicable or requested by WSSI, Vendor shall designate a national account representative(s) to handle WSSI's accounts. Vendor's designated representative(s) shall promptly respond to any inquiry from WSSI relating to customer service issues, account and billing questions and instructions. All personnel, including but not limited to national account representatives, assigned to or working on the WSSI account, shall be qualified, skilled and experienced. Vendor, through its designated national account representative or appointed employee, agrees to meet quarterly with WSSI and/or the applicable Affiliate to review the status of the account.

(d) Contracts with Participants. In the event WSSI, any Affiliate, or a Participant wish to obtain Services and/or Products, Vendor shall enter into a separate Schedule or Purchase Order, as appropriate, with each such party. With respect to any Participant, consent of the Affiliate with whom the Participant is associated must first be provided. WSSI and the Affiliates shall not be responsible for any obligations owed to Vendor by any Participant. As such, it is agreed and understood that any and all orders or other agreements between Vendor and a Participant shall be solely between Vendor and such Participant and WSSI and the Affiliates shall not be held liable for, nor be deemed to be a guarantor of, any obligations under such order or agreement, including but not limited to, any obligation related to payment.

(e) Time of Performance. Vendor shall provide the Products and/or Services to WSSI and any Affiliate or Participant with due diligence, consistent with the highest industry standards and practices and in accordance with the terms and conditions of this Agreement and any Schedule. Unless otherwise agreed by the parties, time is of the essence in the observance and performance of its Services and the delivery of the Products by Vendor pursuant to this Agreement.

5.   ORDERING OF PRODUCTS; EXHIBITS; SCHEDULES.

(a) Exhibits. Each exhibit (an "Exhibit") which from time to time may be attached here, is agreed by the parties signatory hereto to be incorporated by reference into, and made a part of this Agreement. Each Exhibit contains specified additional terms and conditions whereby Vendor will provide the Services and/or the Products to Participants.

(b) Schedules. Each schedule (a "Schedule") which from time to time may be attached here is agreed by each party signatory thereto to be incorporated by reference in and made a part of this Agreement. Vendor shall provide the Products and/or Services specified in the respective Schedule(s) to WSSI or any Affiliate executing a Schedule as agreed to by the parties. If terms and conditions of any Schedule conflict with this Agreement, the terms and conditions of this Agreement shall govern unless specifically stated in the respective Schedule.

(c) Products; Services. Vendor shall only offer Products and/or Services to WSSI or a Participant that has been authorized in writing by WSSI under this Agreement or a respective Schedule.

(d) Changes and Modifications. Vendor shall not commence the provision of, and neither WSSI nor any Participant shall be required to pay for, any Products and/or Services unless and until a Schedule or Purchase Order has been completed and signed by the authorized representative for each party. During any time period for which a relevant Schedule or Purchase Order is in effect, WSSI may at any time request changes or modifications to the Products and/or Services set forth in this Agreement or on the Schedule by making a written request to Vendor specifying in detail the desired changes or modifications. Within seven (7) days of receiving the written request, Vendor shall submit a written proposal regarding the cost related to Vendor's implementation of such changes and modifications, as well as a written description of any adverse affect(s) that such changes or modifications may have on the Products and/or Services, or delivery and performance periods. If Vendor's proposal is acceptable to WSSI, the requested changes and/or modifications shall be incorporated into a written amendment to the applicable

Schedule (which amendment shall be signed by the parties' authorized representatives) and shall be performed pursuant to the terms and conditions of this Agreement.

(e) <u>Designated Representative</u>. If applicable, in the provisioning of Products and/or Services pursuant to the applicable Schedule, Vendor shall coordinate exclusively with the designated representative, project lead or applicable Stakeholder, as designated in such Schedule.

(f) <u>Designation of WSSI</u>. For the convenience of the Affiliates and the Participants, respectively, by joining in the execution and delivery of a Schedule or Purchase Order in connection with this Agreement, each Affiliate and Participant (x) consents to the terms, covenants, and conditions of this Agreement; (y) agrees to the exercise and enforcement, if so elected by WSSI, of all rights, powers and privileges contained in this Agreement, and (z) agrees to be bound by all determinations and amendments or modifications of this Agreement made from time to time by WSSI as it may determine in its sole discretion. Vendor may rely upon any action taken, consent given or demand made by WSSI as binding upon and enforceable against each Affiliate and Participant without further action of the parties.  In the event that any Affiliate or Participant shall separately desire to undertake to enforce its rights or remedies under this Agreement or any Schedule or Purchase Order, or to modify, amend or terminate a Schedule or Purchase Order, or pursue any other action permitted or required by this Agreement and the relevant Schedule or Purchase Order, then such action may be taken at any time and written notice of such determination (as between WSSI, such Affiliate or Participant) shall be given in writing to Vendor in accordance with Section 23, or if appropriate, given by amendment or termination of the relevant Schedule or Purchase Order.

6.   PRICING; PAYMENT.

(a) <u>Pricing</u>.  Vendor's pricing for the Products and/or Services shall be set forth in the respective Schedule between WSSI and Vendor, including alternative pricing or any applicable pricing concessions. Each Schedule attached hereto, sets forth the prices offered for Products and Services as of the Effective Date and will remain in effect for the Term and thereafter unless otherwise agreed to in writing by the parties. Prices are inclusive of all freight and delivery charges. Prices are exclusive of any applicable Sales Taxes, all of which shall be the collection and payment responsibility of the Vendor unless otherwise allocated between Vendor and any Participant in the specified Schedule or Purchase Order. Vendor acknowledges and agrees that the terms, prices and arrangements offered hereunder will be at least as low as (or otherwise as beneficial and attractive to) the terms, prices and arrangements offered by Vendor to its best customer receiving similar Products and/or Services in similar amounts ("Similarly Situated Customer").  If at any time during the Term, Vendor offers Products and/or Services to any Similarly Situated Customer,  which when evaluated on their financial, economic, or product quality and market terms, have  the potential to produce a business or economic arrangement with the Similarly Situated Customer which is more beneficial and/or advantageous in any manner to the Similarly Situated Customer than the current transaction and/or pricing arrangements granted to WSSI, in the sole reasonable business judgment of WSSI,  then Vendor shall offer such terms and conditions to WSSI for its review and inspection, and if requested, will provide such arrangements and terms to WSSI in addition to, or in replacement of (as the case may be) the previous arrangements and pricing in place between Vendor and WSSI.

(b) Payment. WSSI and/or each Affiliate and Designated Purchaser may elect to pay for the Products with a WYN purchasing card. Vendor will cooperate with WSSI to establish a direct invoice and direct pay system for card payments. Vendor will agree to provide a point of contact within Vendor's A/R organization to set up, process, and complete payments via the WYN card, including an electronic and email system to distribute, acknowledge, remit and credit payments made through the WYN system. For all purchases made other than through a purchasing card, or with respect to Affiliates or Designated Purchasers, Vendor shall invoice WSSI, or a Designated Purchaser at the end of each calendar month for all services rendered during that month, unless otherwise stated in the applicable Schedule. Payment shall be made within thirty (30) days from receipt of an accurate invoice, unless otherwise agreed by the parties in writing. All invoices shall be itemized, detailing the Products and/or Services requested and provided, the prices and the amount due and payable, and the Purchase Order number, if one has been assigned. Vendor shall include with each invoice the appropriate applicable supporting documentation and any other information as may be reasonably requested by WSSI.

(c) Rejected Delivery. Neither WSSI nor any Participant shall be required to pay for any Products and/or Services that, in the recipient's reasonable opinion, do not conform to the terms of this Agreement and the applicable Schedule or Purchase Order. Upon the conclusion of provisioning Products and/or Services under a particular Schedule or Purchase Order, all applicable charges outstanding must be invoiced no later than forty-five (45) days.

(d) Travel. Travel expenses incurred by Vendor in connection with the Products and/or Services subject to sale under this Agreement, shall be reimbursed only if they are approved in writing prior to being incurred and shall be subject to WSSI's travel policy, which is incorporated herein by reference and a copy of which Vendor hereby acknowledges previous receipt. Vendor shall be required to submit to WSSI original receipts and bills for such expenses prior to reimbursement therefore.

(e) Security; Liens. Vendor shall not file or otherwise record any form of lien or financing statement pursuant to the Uniform Commercial Code, or any other federal or state document or instrument securing an installment sale or the extension of credit, absent the delivery and exchange of fully executed agreements evidencing the extension of credit to or installment sale with WSSI and each specific Affiliate. In the event that Vendor shall seek to enforce any right to collect or levy any lien or other action for payment against WSSI, such lien(s) or cause of action shall be waived and forever released by Vendor upon receipt of payment, in full or in part, from WSSI. Vendor shall bear any costs incurred by WSSI for removing such a lien or dismissing such cause of action not otherwise properly and timely removed.

## 7.  COMMISSIONS and MARKETING FEES.

(a) Commissions.

Vendor shall pay a Commission in the amounts as set forth in each Schedule. All Commissions and Marketing Fees payable to WSSI shall be remitted to the lock box address below and shall be sent via check or wire transfer. All payments shall be made in U.S. currency. Vendor shall indicate, on the check or wire, the period for which payment is being remitted.

For check payments, please send all payments to:
Worldwide Sourcing Solutions, Inc.
15024 Collections Center Drive
Chicago, IL 60693

For Fed wire credits, please use the following wire instructions:

WHG Hospitality, Inc.
Bank: Bank of America, N.A.
ABA# 026009593
Acct# 4426451116

For ACH credits please use the following wire instructions:

WHG Hospitality, Inc.
Bank: Bank of America N.A.
ABA# 111000012
Acct# 4426451116

(Address if required on wire or ACH: Bank of America, 100 West 33rd Street, New York, NY 10001)

(b) Marketing Programs.

(i)  WSSI will establish a general marketing program for vendors to market their products and/or services to Participants, which marketing program WSSI may modify or enhance from time to time in its sole discretion (the "Marketing Program"). WSSI will design and identify Marketing Programs available for purchase by Vendor and determine the corresponding costs associated with each program. Vendor shall participate in the basic Marketing Program, and may elect to purchase a combination of additional customized programs specific to Vendor on a fee-for-service basis. The Marketing Fee (as described below) will be applied to the basic Marketing Program; all other selections made by Vendor will be on an "a la carte" basis with activities and pricing determined at the time of selection. The fees and/or costs, expenses and other charges incurred by WSSI in creating, designing and implementing the marketing activities, programs, and promotions selected by Vendor, as these selections comprise the Marketing Program to be launched and supported on behalf of Vendor, will all be undertaken and carried out at Vendor's sole cost and expense.

(ii)  No later than thirty (30) days after the Effective Date, Vendor shall appoint an account manager to serve as the primary point of contact and to coordinate marketing activities through the Marketing Program with WSSI. Vendor and WSSI shall: (i) coordinate in developing strategies for meeting Vendor's marketing objectives; and (ii) coordinate in providing recommendations for effective marketing methods. WSSI will provide reasonable access, as appropriate, to WSSI's internal marketing channels relating to its Participants. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, in no event

shall any form of assistance or activity provided by or conducted through WSSI or made available by WSSI pursuant this Agreement be interpreted or understood to mean any form of financial or monetary support or assistance.

(iii)  During the Term, Vendor shall offer the Products and/or Services to Participants through the Marketing Program developed by WSSI.  Vendor may develop and produce marketing materials for use in connection with the Marketing Programs, and these materials shall be subject to the approval of WSSI prior to distribution to the Participants.  Development, production and distribution of such marketing materials shall be at Vendor's sole cost and expense. All marketing materials shall conspicuously display a Vendor toll-free telephone number and/or a Vendor URL for WSSI orders and inquiries.

(iv)  Vendor warrants that any representations, express or implied claims or other statements it or any of its affiliates or subcontractors may make concerning Vendor, its goods, methods of service or quality, and/or the Products and/or Services, whether in catalogues, promotional mailings or other forms of advertising materials and promotional materials directed to WSSI or any Participants shall be true, accurate and complete when made.  Vendor shall affirmatively undertake to modify and publicize any statement or representation made in regard to its goods, methods of service or quality, and/or the Products and/or Services at any time and from time to time when Vendor becomes aware that any statement or representation is not true, accurate and complete.  Vendor acknowledges and agrees with WSSI that WSSI may rely on Vendor's statements and representations pertaining to its goods, methods of service or quality, and/or the Products and/or Services without the obligation to investigate independently the truth, accuracy of completeness of such statements or representations.  Vendor further acknowledges that WSSI, in referring Vendor's goods, methods of service or quality of the Services, and/or the Products to the Participants, makes no representations or warranties in any form to such Participants and expressly disclaims any liability for any form of representation or warranty.

(a)  Marketing Fees.

(i)  Concurrently with execution of this Agreement and annually thereafter on each anniversary of the Effective Date during the Term, Supplier will pay to WSSI, in immediately available funds, the sum of Five Thousand Dollars ($5,000.00) (the "Marketing Fee") as compensation to WSSI for providing access to the Marketing Programs. The Marketing Fee may be increased or decreased each year to reflect changes to the marketing programs as mutually agreed upon by the parties.

(ii)  Marketing Fees are non-refundable. Vendor shall promptly reimburse WSSI for any and all actual costs and expenses including, without limitation, any court costs and reasonable attorneys' fees incurred by WSSI to collect any amounts, fees or Marketing Fees payable to WSSI pursuant to this Agreement.

(iii)  All Marketing Fees paid to WSSI by Vendor in accordance with Section 7(b)(i), above, shall become the property of WSSI and shall be held by WSSI in a marketing account maintained by WSSI for application to the costs and expenses incurred by WSSI in connection with its overall Marketing Program and the Marketing Program specific to the Vendor, with

Vendor's amounts contributed to such account available for application to the costs and expenses of Vendor's selected Marketing Program as required ("Marketing Account").

(vi) Monies in the Marketing Account may be commingled with the marketing accounts of other vendors. All interest accruing on such accounts shall be the sole property of WSSI.

(d) Conferences.

~~Vendor shall participate in~~ support of the 2010 Global Brand Conference. Vendor shall follow all rules and procedures established for each conference. Vendor's participation in any such conferences shall be at Vendor's sole cost and expense, which costs and expenses are not a part of and will not be covered or supported by the Marketing Fees referenced above. Participation at such programs and conferences may be subject to a separate agreement with WSSI. Without limitation, Vendor shall be responsible for each and all of the following costs and expenses as they may relate to Vendor's participation at the conferences: (i) booth, exhibit fees and structural costs; (ii) all other costs relating to its participation in the conferences and booth set-up and; (iii) all travel, hotel, food and incidental expenses it incurs.

8.    **MONTHLY PROJECTIONS; REPORTING.**

(a) Monthly Projections. To assist WSSI in managing and maintaining its Marketing Program, Vendor will provide to WSSI, on or before the first day of the first month of each Calendar Quarter, a projection of Gross Revenues for each month of the current Calendar Quarter.

(b) Quarterly Reporting. Vendor shall maintain complete and accurate records in a form consistent with generally accepted accounting principles with respect to each Product and/or Service provided pursuant to this Agreement. Vendor shall also implement and maintain throughout the Term a system to track and record all orders and sales of the Products and/or Services and Gross Revenues earned in connection with such orders and sales in accordance with generally accepted accounting principles. Within thirty (30) days after the end of each Calendar Quarter during the Term, Vendor shall furnish to WSSI a written and/or electronic summary report, in form specified by WSSI (which form may be amended from time to time by WSSI), detailing the Products and/or Services rendered, charges assessed, total sales, and Gross Revenues earned by, through, or in connection with WSSI, its Affiliates or Designated Purchasers. The report shall be itemized on "a per WSSI," "per Affiliate," or "per Designated Purchaser" basis in order to identify the source of the Gross Revenues and include any other pertinent information as may be reasonably requested by WSSI. Each Calendar Quarter report submitted to WSSI shall be certified to WSSI by the chief financial officer of Vendor as true, correct and complete.

(c) Performance Reports. Vendor shall also provide to WSSI performance reports ("Performance Reports"), on a Calendar Quarter basis, as requested by WSSI. Performance Reports shall include, but are not limited to (i) status of the Products and/or Services, (ii) progress of the Products and/or Services, (iii) DBE Tier two usage data, (as defined below), (iv) necessary substitutions made and (v) number of contingencies remaining. WSSI may prescribe the form to be completed for such Performance Reports for the convenience of the parties.

(d) <u>Written Report</u>. No later than January 31st following the end of each Calendar Year of the Term, Vendor shall furnish to WSSI a written report specifying the information described in Section 8(a) – (c), above, on an aggregate basis for the preceding Calendar Year as well as a calculation of the total amount of Commission earned, Marketing Fees paid, and charges to WSSI and its Affiliates for Products provided in the preceding Calendar Year.

(e) <u>Additional Reports</u>. As reasonably requested by WSSI, Vendor shall also provide any other reporting in accordance with the specific Affiliate and applicable Schedule. Vendor shall retain, all records required for the preparation of the reports set forth in this Section during the Term and for a period of at least three (3) years following Termination of this Agreement.

9.      <u>AUDIT RIGHTS</u>.

During the Term, Vendor will upon not less than fourteen (14) days' prior written request (the "<u>Audit Notice</u>"), make available to WSSI, during normal business hours, the data and reports generated by, through, or in connection with Vendor's price, revenue and cash administration and/or internal accounting platform (together with any other additional information required by WSSI in connection with the required Reporting set forth in this Agreement (the "<u>Records</u>")) for the purpose of conducting an audit of such Records. The scope of the audit includes, without limitation, all purchases of Products and/or Services pursuant to this Agreement during the prior periods specified in the Audit Notice. WSSI may employ an independent auditor or WSSI may choose to conduct such audit on its own behalf. Vendor shall have the right to approve the independent auditor, which approval shall not be unreasonably withheld. Upon approval and after the auditor has executed an appropriate confidentiality agreement, Vendor will permit the auditor to review the relevant Records, together with such additional information or records as WSSI may reasonably request. WSSI shall be responsible for paying the auditor's fees unless such audit discloses an under-reporting of greater than two and one-half percent (2.5%) of the amount previously reported to WSSI for such period; Vendor shall reimburse WSSI for all reasonable costs of WSSI's audit and examination. If the audit discloses any over-reporting from the then-current product price list (i.e., Vendor reported Gross Revenues in an amount greater than 2.5% of the original Gross Revenues, and paid Commissions thereon), then WSSI shall promptly reimburse Vendor for such over-payment. Marketing Fees shall not be subject to adjustment as set forth above. Neither WSSI's acceptance of any information or WSSI's audit or examination of Vendor's records shall waive WSSI's right to dispute the accuracy or completeness of any information supplied by Vendor.

10.     <u>WYNSOURCE; VENDOR WEBSITE</u>.

(a) WWO has established and intends to further develop, expand and maintain a web based purchase order platform to support the acquisition and delivery of the Products and/or Services provided by Vendor to Participants. This platform, operated under the proprietary name and mark, WynSource®, will be made available to each Participant via a secure, password protected website (such as My Portal) supported by WYN for its Lodging Brands. WWO requires and Vendor agrees to cooperate with WWO and its Affiliates in the design and implementation of WynSource®.

243953v3

11
ERC 011

(b) WWO assumes no responsibility for the pricing, representations, content or product descriptions provided by Vendor to WWO for inclusion and boarding on the WynSource® website (whether on WynSource® exclusively or with a punchout site or Vendor Website), all of which shall be at the Vendor's sole risk and expense. Vendor further agrees that the Products and/or Services offered through WynSource® shall at all times comply with the Systems Standards for the WYN family of brands, and all Product and/or Services offered shall be the Products and/or Services identified for and specific to the individual Lodging Brands (i.e. no cross over product applications will be permitted). Vendor recognizes that Systems Standards will change and evolve over time, and that the Vendor bears the risk of change or discontinuance with respect to Products and/or Services required by the Systems Standards from time to time.

(c) Commencing with calendar year 2011, or for any portion thereof, WWO will determine with Vendor, its equitable proportionate allocation of the costs and expenses to be shared by Vendor in establishing and maintaining the WynSource® purchasing web based tool. This allocation will take into account the costs (internal and actual out of pocket costs), expenses, and other charges incurred by WWO and its Affiliates in designing and establishing the WynSource® application for utilization by Vendor, and the costs and expenses which are incurred and will continue to be incurred to maintain, revise, refresh and update the WynSource® platform as Vendor's Products, pricing, schedules, and other arrangements evolve during the Term of this Agreement.

11 TRADEMARKS.

(a) Intellectual Property. Vendor specifically agrees and acknowledges that this Agreement does not confer upon Vendor any interest in or right to use any Marks (as defined below) or other intellectual property right (such property together with the Marks are collectively referred to as "Intellectual Property Rights") of WSSI, unless Vendor receives the prior written consent of the owner of the Intellectual Property Rights ("IP Owner"), which consent the IP Owner may grant or withhold in its sole discretion. Vendor further agrees that upon termination of this Agreement, Vendor shall immediately cease and discontinue all use of the Intellectual Property Rights. Further, if Vendor wishes to utilize the Intellectual Property Rights in advertising or promotional materials or any type of publicity, it must submit such materials to the IP Owner for final written approval before utilizing them. In no event may Vendor or any affiliated or associated person or entity utilize the Intellectual Property Rights in connection with products or services other than the Products.

(b) Publicity. Each party shall (a) submit to the other for approval prior to its use, all advertising, written sales promotions, press releases, and other publicity matters relating to this Agreement in which the other party's name or Mark is mentioned or which contains language from which a relationship with the other party may be inferred, and (b) not publish or use such advertising, sales promotions, press releases or publicity matters without the other party's prior written consent. For purposes of the Agreement, "Marks" means a word, name, symbol, designations, slogans, character names, distinctive features emphasized in advertising, or device or any combination thereof used to identify and distinguish goods or services and to indicate their source, including, but not limited to, trademarks, service marks, or collective marks.

12. CONFIDENTIALITY.

(a) Confidential Information. Each party acknowledges that any information disclosed, conveyed to or obtained by either party (the "Receiving Party") regarding the other party (the "Disclosing Party") or their business plans and operations, customer information or any materials or information marked confidential, restricted or proprietary by the Disclosing Party ("Confidential Information") is confidential and proprietary to the Disclosing Party, provided, however, that the failure of the Disclosing Party to so mark any material shall not relieve the Receiving Party of the obligation to maintain the confidentiality of any unlegended material which the Receiving Party knows or should reasonably know contains Confidential Information. The Receiving Party shall not disclose any Confidential Information to any third party without the prior written consent of the Disclosing Party. The Receiving Party shall not utilize any Confidential Information for any purpose whatsoever other than for the purpose of performing its obligations under this Agreement. The Receiving Party shall only make available the Confidential Information to its employees and agents on a need-to-know basis and shall advise such employees and agents of the restriction set forth with respect to the use of such Confidential Information. The Receiving Party shall be responsible for the unauthorized disclosure of any Confidential Information by its employees or agents. Upon the termination of this Agreement or upon the earlier written request by the Disclosing Party, the Receiving Party shall return the Confidential Information to the Disclosing Party including any copies relating thereto on whatever media (or alternatively destroy the Confidential Information if so instructed by the Disclosing Party).

(b) Personal Information. All information provided by the Disclosing Party to the Receiving Party, including but not limited to names, addresses, telephone numbers, and demographic, financial and transaction information is "Confidential Personal Information." The Receiving Party shall use Confidential Personal Information only as necessary to perform the Services and provide the Products or its obligations under this Agreement. The Receiving Party shall not disclose Confidential Personal Information as may be required by law or court order, to any third parties without making good faith reasonable efforts to first obtain the Disclosing Party's written consent. Unless otherwise prohibited by law, the Receiving Party shall (i) promptly notify the Disclosing Party of any legal order, or any request for a legal order, to disclose Confidential Personal Information and (ii) cooperate with the Disclosing Party's efforts to block or limit disclosure. These provisions are in addition to and not in limitation of the provisions of Section 16.

(c) Non-Public Information. The non-disclosure restrictions set forth in this Section shall not apply to information which (i) is or becomes generally available to the public other than as a result of a disclosure by the Receiving Party; (ii) was within the Receiving Party's possession prior to its being furnished by the Disclosing Party, provided that the source of such information was not known by Vendor to be bound by a confidentiality agreement or non-disclosure restrictions with respect to such information; (iii) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party provided that the source of such information was not known by the Receiving Party to be bound by a confidentiality agreement or non-disclosure restrictions with respect to such information; or (iv) is independently developed by the Receiving Party prior to the date of this Agreement and such

243953v3

independent development can be shown by documentary evidence. With respect to disclosures of the Confidential Information as may be required by law or court order, such disclosures shall be permitted without the consent of the Disclosing Party provided that the Receiving Party furnishes the Disclosing Party prior written notification (as soon as practicably possible after the request for disclosure is made).

(d) <u>Remedies for Breach</u>. The Receiving Party acknowledges that the Confidential Information is a valuable asset of the Disclosing Party and that the breach of this Section may cause the Disclosing Party irreparable harm for which there is no adequate remedy at law. Accordingly, in the event of a breach or alleged breach of this Section, the Disclosing Party shall be allowed to seek injunctive relief and any other equitable remedies in addition to remedies afforded by law. The obligations of the parties pursuant to this Section shall survive the termination of this Agreement.

13. <u>WORK PRODUCT; OWNERSHIP RIGHTS</u>.

(a)      Any and all reports, computer programs, documentation, specifications, deliverables, programs, work product, software, source code, algorithms, routines, graphics, files, software patches, enhancements, modifications, blueprints, diagrams, charts, functional descriptions, photographs, surveys, or other materials, writings, or works of authorship (and any drafts of the foregoing) created, developed, or prepared by Vendor, its employees or subcontractors in the course of performing the Services and providing the Products under this Agreement (collectively, "<u>Work Product</u>") shall be deemed a "work for hire" for the sole benefit of and belonging exclusively to WSSI and/or its Affiliates (regardless of whether WSSI or any of its Affiliates uses the Work Product). Vendor and each subcontractors hereby assigns, and shall be deemed to have expressly disclaimed, any and all right, title, or interest in and to such Work Product. To the extent any Work Product is not deemed a "work for hire" by operation of law, Vendor hereby irrevocably assigns, transfers and conveys to WSSI all of its right, title and interest in such Work Product, including, but not limited to, all rights of patent, copyright, trade secret or other proprietary rights in such Work Product. Vendor (and its subcontractors, if applicable) shall provide to WSSI all reasonable assistance, execute such documents, and take all such other actions, which may be reasonably required to perfect the foregoing rights to the Work Product (including, but not limited to, directing its employees to execute all applications for patents and/or copyrights, assignments, and other papers necessary to secure and enforce WSSI's rights to such Work Product).

(b)      Notwithstanding the foregoing, Vendor (or its third party licensors or subcontractors) shall retain sole and exclusive ownership rights in and to, any (i) Confidential Information of Vendor and/or pre-existing proprietary software, items, or elements of Vendor or its third party licensors or subcontractors, and/or (ii) any tools or scripting applications developed or created by Vendor or its subcontractors during the performance of Services hereunder. In the event and to the extent that the Work Product contains any Confidential Information of Vendor and/or pre-existing proprietary software, items, elements, tools, and/or scripting of Vendor or its third party licensors or subcontractors, Vendor shall specifically identify such information, software, items, elements, tools, and/or scripting in the applicable Schedule(s), and Vendor (or its licensors or subcontractors, if applicable) shall be deemed to

have granted to WSSI (including its Affiliates and third party contractors, which contractors have signed confidentiality agreements with WSSI) a nonexclusive, perpetual, royalty-free, irrevocable, worldwide, and enterprise-wide license to use, reproduce, alter, adapt, modify, display, perform, distribute, and make derivative works of such information, software, items, elements, tools, and/or scripting in accordance with the terms of the applicable Schedule(s).

(c)     Notwithstanding the foregoing, nothing in this Agreement or any Schedule(s) hereunder shall preclude Vendor from using any general information, ideas, concepts, know-how, techniques, programming routines and subroutines, methodologies, processes, skills, or expertise (collectively, "Residual Information") which Vendor's employees or subcontractors retain in their memory and derive from the performance of Services hereunder, and which are no more than skillful variations of general processes known to the computer data processing and/or information technology industries (and, as such, are neither proprietary, confidential, nor trade secret information of Vendor or its subcontractors), provided, however, that Vendor does not (i) use in connection with, and/or incorporate into, such Residual Information any Work Product or Confidential Information of WSSI or its Affiliates, and/or (ii) breach its confidentiality obligations hereunder.

14. INDEMNIFICATION.

(a) Vendor Indemnity. Vendor shall defend, indemnify, protect, release and hold harmless WSSI, its Affiliates, parent and subsidiaries and each and every of their directors, officers, employees, agents, servants and their successors and assigns from and against any and all claims, costs (including, but not limited to, litigation and settlement costs), injuries, damages, demands, suits, actions, proceedings, fees (including, but not limited to, attorneys' fees), fines, charges, judgments, penalties, liabilities, losses and expenses (all of the foregoing, a "Claim"), arising from or in connection with (i) any breach of this Agreement; (ii) the negligence or willful misconduct of Vendor and/or its or their respective employees and agents, (iii) bodily injury or death or damage to real or personal property by Vendor; or (iv) any Product or Service violates or infringes upon any United States or foreign patent, copyright, trade secret or other proprietary rights or any third party, or (v) any breach of any contract by which Vendor is bound.

(b) Claim Procedure. In the event that WSSI is required to respond to any Claim, for which Vendor is required to indemnify under this Section, Vendor will respond and defend against such claim or demand upon the receipt of notice from WSSI. WSSI agrees to (i) promptly notify Vendor in writing of any indemnifiable Claim; and (ii) give Vendor the opportunity to (y) defend or negotiate a settlement of any such Claim at Vendor's expense, and (z) cooperate fully with Vendor, at Vendor's expense, in defending or settling such Claim. In the event Vendor fails to defend WSSI when required under this Section or in the event WSSI determines, in its sole discretion, that Vendor is not providing an adequate defense, and WSSI may take all actions to defend itself, and Vendor shall promptly reimburse WSSI for all costs of such defense. Vendor will reimburse WSSI for all reasonable costs and expenses, including reasonable attorneys' fees, incurred by WSSI. Notwithstanding anything contained herein to the contrary, Vendor will not consent to the entry of a judgment or enter into a settlement which either (1) does not include an unconditional release of WSSI by the claimant for all liabilities with respect to the Claim, or (2) otherwise adversely affects the rights of WSSI, without WSSI's consent, which shall not be

unreasonably withheld. The obligations of the parties pursuant to this Section shall survive the termination of this Agreement.

15. PATENT AND COPYRIGHT INDEMNITY.

(a) Neither the Products or Services, nor any portion thereof (collectively, the "Materials"), nor any use of the Materials for their permitted or intended purposes, shall violate, infringe upon, or misappropriate any patent, copyright, trade secret, trade name, or other intellectual property rights, moral rights, or proprietary rights of any third party, (b) the Materials are not the subject of any contract by which Vendor is bound and of which Vendor would be in breach as a result of the provision or use of such Materials hereunder, (c) the Materials are not the subject of any allegation or claim that, if true, would conflict with Vendor's obligations under this Agreement or the applicable Schedule(s), (d) the Materials are not subject to any agreements or licenses to or from third parties that impose any obligations on WSSI beyond WSSI's obligations under this Agreement, and (e) Vendor has neither assigned nor otherwise entered into an agreement by which it purports to assign or transfer to a third party any right, title or interest in or to any technology or intellectual property right that would conflict with Vendor's obligations under this Agreement (collectively, any breach of this Section 15(a) shall be referred to hereinafter as "Infringement"). Vendor will indemnify WSSI from any and all Claims finally awarded or agreed upon in any settlement of a Claim of any United States patent or copyright or in any suit resulting from a Claim related to Infringement. This indemnification is in addition to and not in limitation of the indemnifications and protections afforded by Section 14.

(b) With respect to Section 15 (a) hereof, in the event that the Materials become (or, in Vendor's opinion, are likely to become) the subject of an Infringement claim, Vendor shall, at its option and sole expense (and at no additional charge to WSSI), and in addition to any and all other remedies that may be available to WSSI, (i) procure for WSSI the right to continue using the Materials as contemplated hereunder without payment of royalty or premium in any form, (ii) modify the Materials to eliminate any Infringement provided that the modified Materials' functionality shall remain the same as set forth in the applicable specifications, or (iii) replace the Materials with non-Infringing services, deliverables, and/or work product, provided that the suitability, compatibility, and functionality of the replacement software, services, deliverables, and/or work product shall remain the same as set forth in the applicable specifications. If Vendor fails or is unable to provide any of the remedies set forth above in this Section 15(a), and/or if WSSI is preliminarily enjoined from using the Materials, (a) any payment obligations of WSSI or and Participant hereunder shall be excused for the duration of such failure, inability and/or injunction, and (b) WSSI may (at its sole election) terminate the applicable Schedule pursuant in accordance with this Agreement. This indemnification is in addition to and not in limitation of the indemnifications and protections afforded by Section 14.

16. PROTECTION OF INFORMATION/DATA.

(a) Procedure. Vendor shall disclose to WSSI the nature and functions of any electronic means (including, but not limited to, electronic mail, website, and/or the Internet) by which Vendor intends to assist WSSI in the performance of the Services and or the delivery of the Products. To the extent that Vendor performs any of the Services and/or delivery of the Product

via such electronic means, and/or has access to WSSI's electronic mail, website, and/or other Internet systems, Vendor shall implement industry-standard security to protect WSSI's computer systems, network devices and/or the data processed thereon against the risk of penetration by, or exposure to, a third party via any system or feature utilized by Vendor in performing such work and/or accessing such systems. Unless otherwise specified in the applicable Schedule(s), such protections shall include, but not be limited to, (w) protecting against client side intrusions, (x) encrypting Confidential Information, (y) securing the computer systems and network devices, and (z) protecting against intrusions of operating systems or software. Additionally, if Services are performed and/or Products are created through electronic means, Vendor shall comply with the following:

(i) In performing the Services and/or manufacturing or delivering the Products hereunder, Vendor shall not tamper with, compromise, or attempt to circumvent any physical or electronic security or audit measures employed by WSSI in the course of its business operations. Vendor shall not, without WSSI 's express prior written consent, or as otherwise provided in this Agreement, and without complying with WSSI 's security policies and procedures, access or remove from WSSI's premises any Confidential Information, computer systems, and/or other property of WSSI, its employees or customers.

(ii) Vendor shall not with Vendor's prior knowledge introduce into WSSI's computer systems, databases, or software, any virus or any other contaminants (including, but not limited to, codes, commands, instructions, devices, techniques, bugs, web bugs, or design flaws) that may be used to access, alter, delete, threaten, infect, assault, vandalize, defraud, disrupt, damage, disable, inhibit, or shut down WSSI's computer systems, databases, software, or other WSSI information or property.

(b) WSSI Policy. Vendor shall comply with WSSI's and its Affiliates' reasonable policies, standards, procedures, practices and guidelines for privacy, information protection, and data and systems security (which policies, standards, procedures, practices and guidelines can be made available upon Vendor's reasonable request), and with all applicable privacy and data protection laws and regulations. Vendor shall maintain security controls over resources it provides on behalf of WSSI and WSSI's Affiliates, which controls shall protect the confidentiality, privacy, integrity and availability of WSSI's and its Affiliates' information (including the information of its and their employees, franchisees, sales associates, brokers, and customers). Unless otherwise specified in the applicable Schedule(s), such controls (and the measures to be employed by Vendor with respect thereto) include, but are not limited to, (i) requiring unique identification and authorization of all users, (ii) limiting administrator-level control to only authorized persons, (iii) implementing access controls on all data, software or other file-system objects limiting access to only authorized users, (iv) allowing only the data protocols required for the function and management of the solution to be transmitted or utilized, (v) ensuring the integrity of all data stored or processed, and (vi) preventing the loss of data processed or transferred.

(c) Security Plan.    Prior to the commencement of delivery of Products and provision of Services, Vendor shall provide to WSSI a written security plan that is reasonably acceptable to WSSI, which plan describes and documents (among other things) the security on the technology used, the use of information in test and deployment, and the security controls in place

(including, but not limited to, firewalls, web security, email protection, intrusion detection, incident response process, virus protection, and physical security), and which plan may (in part) consist of Vendor completing WSSI's Technical, Administrative and Physical Security Policy Assessments & Questionnaires. Vendor shall monitor all service, equipment, test environment, and communication links for security breaches, violations and suspicious activity, and shall notify WSSI of such breaches, violations, and activity on a timely basis in a manner to be mutually agreed upon in writing between the parties. Logs, system records, and test plans and results will be maintained by Vendor for an agreed-upon time for review by WSSI. WSSI reserves the right to audit the Services and the Service sites for Vendor's compliance with this provision, which audit shall be performed by employees or agents of WSSI on a periodic basis throughout the term of this Agreement. WSSI has the right to monitor the systems and equipment used (and communications made) by Vendor to provide the Services on behalf of WSSI. Vendor agrees to monitor industry-standard information channels for newly identified vulnerabilities and for required legal compliance initiatives concerning the confidentiality and privacy of information of customers of WSSI and its Affiliates. Vendor shall use its best efforts to employ strong, industry-standard encryption (or similar WSSI-approved) mechanisms to protect WSSI's (including its Affiliates', employees', franchisees', sales associates', brokers', and customers') Confidential Information (especially personally identifiable information and/or other information which is classified as confidential by applicable statutes or regulations) which is transmitted over any wireless connection or across any untrusted connection (including, but not limited to, the public Internet).

(d) To the extent that Vendor has access to personally identifiable information (including, but not limited to, names, phone numbers, addresses, credit card information, social security numbers, and/or account or financial information) of WSSI's or its Affiliates' employees, franchisees, sales associates, brokers, or customers, Vendor acknowledges and agrees that such information is highly confidential and private in nature and agrees to (i) hold such information in the strictest of confidence, (ii) protect such information, in accordance with WSSI's privacy policies, the aforementioned confidentiality provisions, and applicable law, and (iii) for those Products or Services involving (in whole or in part) the storage, processing or transmission of credit card data or primary account numbers, comply with the requisite Payment Card Industry Data Security Standard, Payment Application Data Security Standard, and Payment Brand Rules. Consultant shall not use or disclose such personally identifiable information without the prior written consent of WSSI (and, to the extent applicable, of the applicable individual(s) to whom the information belongs). In the event that WSSI and the applicable individual(s) so consent, Vendor may disclose such personally identifiable information only to the extent expressly permitted by WSSI and such individual(s) and only in accordance with the terms of this Agreement and applicable law.

## 17. LIMITATION OF LIABILITY.

NEITHER WSSI NOR VENDOR SHALL BE RESPONSIBLE TO THE OTHER FOR INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES UNDER ANY TORT (INCLUDING NEGLIGENCE), CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY IN CONNECTION WITH EACH PARTY'S PERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT INCLUDING

LOST PROFITS OR INTERRUPTION OF BUSINESS (REGARDLESS OF WHETHER A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE FORESEEN SUCH DAMAGES). THE LIMITATION OF LIABILITY PROVIDED UNDER THIS SECTION SHALL NOT APPLY WITH RESPECT TO A PARTY'S INDEMNITY OBLIGATIONS OR TO ANY BREACH OF SECTIONS 12 (CONFIDENTIALITY), 13 (WORK PRODUCT/OWERSHIP RIGHTS), 15 (PATENT AND COPYRIGHT INDEMNITY) OR 16 (PROTECTION OF INFORMATION/DATA). THE PROVISIONS OF THIS SECTION SHALL SURVIVE ANY TERMINATION OF THIS AGREEMENT.

18.    **INSURANCE.**

(a) Required Coverages; Forms. Unless otherwise agreed to in the applicable Schedule(s), at all times during the provisioning of Products under this Agreement, Vendor shall keep in full force and effect and maintain, at no additional cost to WSSI, the following policies of insurance:

(i)    Commercial (Comprehensive) General Liability Insurance, including coverage for independent contractors, contractual liability, personal or bodily injury, products liability, premises/operations, completed operations, contractual liability and broad form property damage) with combined single limits of not less than two million dollars ($2,000,000.00) per occurrence and general aggregate limit of ($4,000,000); Products & completed operations coverage shall extend to the earlier of the State statute of repose or ten (10) years.

(ii)    Umbrella Liability Insurance with an Occurrence Limit of $3,000,000, general aggregate Limit $3,000,000. Products & Completed Operations Coverage aggregate Limit $3,000,000. Products & Completed Operations coverage shall extend to the earlier of the Statute of Repose or 10 years.

(iii)    Workers' Compensation Insurance (in compliance with State and Federal laws) covering all of Vendor's (and/or its subcontractors') employees engaged in the performance of Products and/or Services hereunder, and Employers' Liability Insurance with a limit of not less than one million dollars ($1,000,000.00);

(iv)    Commercial Business Automobile Liability Insurance covering all owned, non-owned, leased, and hired vehicles, and providing coverage for bodily injury and property damage liability with combined single limits of not less than two million dollars ($2,000,000.00) per occurrence;

(v)    Professional Liability and Errors and Omissions Liability Insurance covering acts, errors, omissions, and equipment/machine malfunctions arising out of Vendor's (or its subcontractors') operations, Products or Services in an amount not less than five million dollars ($1,000,000.00) per occurrence; If such policy has an eroding limit, inclusive of defense costs, then the total dollar amount of claims reserved under such policy at time of contract review shall be provided to WSSI;

(vi)    Crime Insurance (including Fidelity Bond, Employee Dishonesty, and Computer Fraud Coverage) covering losses arising out of or in connection with any fraudulent or dishonest acts committed by Vendor's (or its subcontractors') personnel, acting alone or with others, with a limit of not less than two million dollars ($2,000,000.00).

(b) Additional Insured. Such policies shall name WSSI, and their respective officers, directors, employees and agents as additional insureds as their interests may appear, and the insurance afforded to WSSI thereunder shall be primary for all purposes. All policies required by this Agreement shall be written by insurance carriers approved by and satisfactory to WSSI, having a rating of A- or better with a financial rating of VII or better in the most recent A. M. Best's Rating Guide. All policies shall be endorsed with a statement that the coverage may not be canceled, altered or permitted to lapse or expire without thirty (30) days' advance written notice to WSSI. Any insurance carried by WSSI shall be excess of the above-referenced primary insurance coverage and non-contributory to such coverage. If an umbrella policy is used to satisfy any required coverage of this Section, such policy shall be at least "Follow-Form" with the requirements described in this Section, and shall not limit the coverage of any other policies used to provide coverage under this Section.

(c) Certificate. Simultaneously with the execution of this Agreement, annually thereafter during the Term of this Agreement, and each time a change is made in any insurance policy or insurance carrier, Vendor will furnish to WSSI a certificate of insurance evidencing compliance with this Section (including evidence of renewal of insurance) and the named insured and additional insureds. The Certificate of Insurance for each policy must state that "the issuing company will mail 30 days' written notice of cancellation or modification to the certificate holder." Failure of WSSI to demand such certificates or other evidence of full compliance with these insurance requirements, or failure of WSSI to identify a deficiency from evidence that is provided, shall not be construed as a waiver of obligation to maintain such insurance.

(d) Waiver of Subrogation; Other Insurance Clause. All policies shall provide that the insurer waives any right of subrogation against WSSI, and/or their officers, directors, employees and agents. The policy shall also contain an endorsement amending the "other Insurance" clause as follows: "The insurance afforded to Additional Insureds under this policy is primary insurance and the insurer will not seek contribution from other insurance available to the Additional Insureds." By requiring insurance as provided in this Section, WSSI does not represent that coverage and limits will be necessarily adequate to protect WSSI, and their officers, directors, employees and agents, and such limits shall not be deemed as a limitation of Vendor's liability under this Agreement.

19. TERMINATION.

(a) Mutual Termination. Both WSSI and Vendor shall have the right to immediately terminate this Agreement upon the material breach of this Agreement by the other party, if such other party fails to remedy such breach within thirty (30) days of having been so notified in writing thereof. The provisions of the foregoing to the contrary, in the event that such material breach is incapable of cure within such thirty (30) day period, however the party having committed the

breach has commenced to cure such breach and is diligently employing commercially reasonable efforts to remedy such breach, then the time period for cure shall be extended an additional period of sixty (60) days to afford the opportunity for a complete cure of such material breach.

(b) *Termination for Convenience*. WSSI may terminate this Agreement in its entirety or an individual Schedule at any time, with or without cause and for any reason or no reason, upon providing at least thirty (30) days' prior written notice of such termination to the Vendor.

(c) *Termination of Designated Purchaser*. Vendor may terminate a Purchase Order as it relates to a Designated Purchaser:

(i) if a Designated Purchaser fails to make payments within the payment terms specified in the relevant Purchase Order or fails to comply in any other material respect with the covenants, agreements or conditions in the relevant Purchase Order, and such failure continues for thirty (30) days after written notice to Designated Purchaser and otherwise beyond all applicable grace and cure periods; *provided, however*, WSSI shall have an additional ten (10) calendar days' prior written notice of such intention to terminate with respect to such Designated Purchaser; and/or

(ii) immediately by written notice to WSSI and the applicable Designated Purchaser if said Designated Purchaser becomes insolvent, makes a general assignment for the benefit of its creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to or initiates a proceeding under any bankruptcy or insolvency law or has wound up or liquidated its business. For the avoidance of doubt, the termination of this Agreement with respect to any Designated Purchaser shall not terminate this Agreement with respect to WSSI, its Affiliates or other Participants who are not Designated Purchasers.

(d) *Bankruptcy or Insolvency*. Both WSSI and Vendor reserve the right to terminate this Agreement immediately, without notice, in the event (i) a bankruptcy, reorganization, receivership, insolvency or other similar proceeding for the arrangement of such party's obligations is instituted by such party, or involuntarily against such party and not dismissed within ninety (90) days; (ii) the other party is unable to pay its debts as they become due or admits in writing its inability to pay its debts generally; or (iii) the other party becomes subject to any statutory, administrative or court order or other official action which prevents either from continuing to fulfill their obligations under this Agreement.

(e) *Effect of Termination*. In the event that either WSSI or Vendor terminates this Agreement in accordance with subsections (a), (b) or (d), above, then (i) the parties will use all commercially reasonable efforts to cease immediately their respective efforts under this Agreement, and (ii) the parties will immediately stop making any statements or taking any actions that might cause third parties to infer that the business relationship in this Agreement continues to exist between the parties, and where necessary and advisable, inform third parties that the parties no longer have the business relationship described in this Agreement.

20. NON-EXCLUSIVITY.

The parties acknowledge and agree that WSSI makes the appointment of Vendor under this Agreement on a non-exclusive basis and, as such, WSSI may, at its sole option, enter into similar agreements with other vendors.

21. REPRESENTATIONS AND WARRANTIES.

(a) Power and Authority. Each party represents and warrants that it is duly organized, validly existing and in good standing in the jurisdiction of its organization, and is qualified to conduct business in each jurisdiction in which such qualification is requisite. Each party has full power and authority and has been duly authorized, to enter into and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement by each party will not violate, create a default under or breach of any agreement or other contract to which such party is a party or is subject. Neither party is the subject of any current or pending dissolution, receivership, bankruptcy, reorganization, insolvency, nor similar proceeding on the date this Agreement is executed by such party and was not within the three years preceding such date. This Agreement, assuming due authorization, execution and delivery by each of WSSI and Vendor, constitutes a legal, valid and binding obligation of each of WSSI and Vendor respectively, enforceable against each in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights in general and by general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(b) Licensing. Vendor warrants that Vendor is a legal and rightful provider of the Services (to the extent required) and it is legally licensed and/or authorized to perform the Services and collect the fees and Commissions as set forth herein. WSSI is not required to obtain or hold any form of license or other permission from any federal, state, or local authority to receive the Commissions or fees from Vendor contemplated by this Agreement. All Services delivered under this Agreement will be free and clear of any and all encumbrances of any kind. The Products shall conform in all material respects to the specifications, performance standards and criteria, and other terms and conditions set forth in the applicable Schedule(s).

(c) Vendor Qualification. Vendor possesses the requisite expertise, knowledge, and skills necessary to perform the Services and/or create the Products in accordance with the terms and conditions of this Agreement and the applicable Schedules and Vendor is aware that WSSI is relying upon Vendor's skill and judgment in provisioning the Products. In recognition of the critical nature of completing and/or delivering the Products in a timely manner, Vendor (and its subcontractors, if any) shall have and maintain sufficient resources, facilities, capacity, and manpower to ensure that all Products are provided in a timely and workmanlike manner.

(d) Copyright and Trademark. The Products and/or any portion thereof, shall not violate, infringe upon, or misappropriate any patent, copyright, trade secret, trade name, or other proprietary rights of any third party, or breach any contract by which Vendor is bound, and that Vendor has neither assigned nor otherwise entered into an agreement by which it purports to

assign or transfer to a third party any right, title or interest in or to any technology or intellectual property right that would conflict with Vendor's obligations under this Agreement.

(e) VENDOR WARRANTS THAT THE PRODUCTS WILL BE IN WORKING ORDER CONSISTENT WITH MANUFACTURERS' SPECIFICATIONS, WHEN RECEIVED AND ACCEPTED BY THE RELEVANT PARTICIPANT, OR FOLLOWING INSTALLATION FOR VENDOR INSTALLED PRODUCTS. UPON VENDOR'S RECEIPT OF FULL PAYMENT FOR THE PRODUCTS, VENDOR WILL TRANSFER TO SUCH PARTICIPANT ANY AND ALL TRANSFERABLE WARRANTIES VENDOR HAS IN SUCH PRODUCTS. ALL VENDOR WARRANTY INFORMATION SHALL BE INCORPORATED BY REFERENCE IN THE APPLICABLE SCHEDULE OR PURCHASE ORDER, AS NECESSARY, AND ATTACHED HERETO AND MADE A PART HEROF AS EXHIBIT 21(e). VENDOR SHALL TAKE ALL COMMERCIALLY REASONABLE STEPS TO ASSURE THAT ANY AND ALL TRANSFERABLE WARRANTIES ARE TRANSFERRED TO PARTICIPANT OR A THIRD PARTY END USER DESIGNATED BY WSSI, OR A PROPERTY OWNERS ASSOCIATION, IF REQUESTED BY WSSI.

22. WAIVER OF WARRANTIES.

(a) EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN OR IN EXHIBIT A, WITH RESPECT TO THE PRODUCTS AND ANY RELATED SERVICES, VENDOR MAKES (i) NO WARRANTIES, EXPRESS OR IMPLIED, AND (ii) NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(b) NO EXPRESS OR IMPLIED WARRANTY IS MADE BY WSSI WITH RESPECT TO THE PRODUCTS AND/OR SERVICES AND/OR WORK PRODUCT TO BE PROVIDED BY VENDOR HEREUNDER, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. TO THE EXTENT THAT THEY EXIST, VENDOR WILL TRANSFER TO WSSI ANY AND ALL TRANSFERABLE WARRANTIES VENDOR HAS THAT TOUCH UPON SUCH PRODUCTS RENDERED UNDER THIS AGREEMENT OR WITH RESPECT TO ANY APPLICABLE PRODUCTS THEREUNDER.

23. NOTICES.

Notices will be effective hereunder when and only when they are reduced to writing and delivered, by next day delivery service, with proof of delivery, or mailed by certified or registered mail, return receipt requested, to the appropriate party at its address stated below or to such person and at such address as may be designated by notice hereunder. Notices shall be deemed given on the date delivered or date of attempted delivery, if service is refused,

| Vendor: | WSSI: |
|---------|-------|
| The Eric Ryan Corporation<br>1 Early Street, Suite A<br>Ellwood City, PA 16117<br>Attn: CFO | Worldwide Sourcing Solutions, Inc.<br>22 Sylvan Way<br>Parsippany, New Jersey 07054<br>Attn: SVP, Strategic Sourcing |
| With copy to:<br>The Eric Ryan Corporation<br>1 Early Street, Suite A<br>Ellwood City, PA 16117<br>Attn: Contract Administrator | With copies to:<br>Wyndham Worldwide Corporation<br>22 Sylvan Way<br>Parsippany, New Jersey 07054<br>Attn: VP, Corporate Legal |
| | Per the applicable Schedule:<br>Attn: Project Lead |

### 24. RELATIONSHIP OF PARTIES.

Vendor is an independent contractor. Neither party is the legal representative or agent of, or has the power to obligate the other for any purpose whatsoever. WSSI and Vendor expressly acknowledge that the relationship intended by them is a business relationship based entirely on and circumscribed by the express provisions of this Agreement and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

### 25. PUBLICITY.

Vendor shall not make any use of WSSI's name, Marks, logos, or intellectual property without WSSI's prior written consent.

### 26. SUBCONTRACTING.

Vendor shall not retain any subcontractor to assist it in the provisioning of Products and/or Services pursuant to this Agreement, or any applicable Schedule, without the prior written consent of WSSI or the relevant Participant, per the specific Schedule; provided, however, Vendor may utilize subcontractors in connection with fulfillment of delivery obligations without WSSI's consent so long as any such delivery subcontractor is a delivery company that is owned by a nationally recognized delivery company, such as Federal Express, United Parcel Service or the United States Postal Service. All subcontractors shall work under the control and direction of Vendor, who shall be solely responsible for the supervision and work of and payment to any subcontractor, as well as for any breaches of this Agreement and/or the applicable Schedule by such subcontractor. WSSI shall have no responsibility whatsoever with respect to any payments to subcontractors, and Vendor shall indemnify, defend, and hold harmless WSSI from and against any and all subcontractor claims or demands relating to any such payments. In the event that WSSI, in its sole and reasonable judgment, determines that such persons are unsatisfactory or unqualified to provision Products hereunder, WSSI shall so notify Vendor and such persons or entities shall be removed forthwith and replaced by Vendor without any degradation in the delivery of Products to WSSI.

27. DIVERSITY.

(a) WSSI Participation. Vendor acknowledges that WSSI participates in a Supplier Diversity Program to offer diverse business enterprises ("DBE") the opportunity to develop business relationships with WSSI. Further, WSSI encourages our vendors to extend equal opportunities to DBEs. Accordingly, Vendor agrees to use commercially reasonable effort to supply to WSSI on a quarterly basis information regarding Vendor if it is a DBE or information regarding economic expenditures with DBEs for any third party entities with which Vendor conducts business relating to this Agreement. WSSI will advise Vendor of the process by which this information should be reported.

(b) EEOC Compliance. WSSI supports the Equal Opportunity Clause. No person will be discriminated against on the basis of race, religion, color, age, sex, national origin, marital status, disability, veteran status or any other protected class in matters related to this Agreement or in any area of employment or subcontracting.

(c) Data Compilation. WSSI seeks to obtain detailed tier two ("Tier") spend data that includes supplier names, classifications and ethnic backgrounds. Tier two data shall include direct and indirect spend. Direct spend includes Vendor purchases from a minority vendor for WSSI's benefit, such that the product purchased is used exclusively for WSSI's benefit. Indirect spend includes Vendor purchases from minority vendor for items needed to sustain their business requirements.

28. FORCE MAJEURE.  Neither WSSI nor Vendor shall be liable, nor shall it be a breach of this Agreement, in the event that either party is delayed in performing or is unable to perform its obligations hereunder because of any act of nature, accident, fire, strike or other labor dispute, riot or civil insurrection, act of public enemy, terrorist act, war, order or act of government, any other cause beyond the reasonable control of the parties hereto or other similar events; provided that, in order to be excused from such delay or failure to perform was not caused by the negligence of the non-performing party.

29. SUCCESSORS AND ASSIGNS,. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns. The foregoing sentence to the contrary notwithstanding, Vendor may not assign this Agreement without the prior written consent of WSSI, which consent shall not be unreasonably withheld. Either party may assign this Agreement to an affiliate without the other party's prior written consent, provided that prior to any such assignment, the assigning party delivers written notice to the other party not less than thirty (30) days prior to entering into any such proposed assignment, detailing the reasons for the requested assignment, a description of the ability of the assignee to perform the requirements of this Agreement, and the proposed effective date of the assignment.  Completion of the foregoing conditions to the reasonable satisfaction of the necessary party is required to effect an assignment to an affiliate in accordance with this Agreement. Any assignment not compliant with the provisions is void as between the parties.

30. DISPUTE RESOLUTION.  The parties agree that, before any formal legal action is commenced, any dispute between the parties shall be the subject of a meeting between

management representatives authorized to negotiate, in good faith, a mutually acceptable resolution of such dispute. The parties agree to seek appropriate resolution of the dispute within thirty (30) days of the dispute being raised. If these efforts are not successful, either party shall have the right to pursue available remedies at law or equity. This provision may not be construed so as to prohibit either party from seeking preliminary or permanent injunctive relief in any court of competent jurisdiction.

31. GOVERNING LAW/JURISDICTION. This Agreement and any claim or dispute arising out of or related to this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws in effect in the State of New Jersey, without giving effect to its conflicts of law principles. Each party irrevocably consents and agrees that any legal action, suit or proceeding against either of them arising out of, relating to or in connection with this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought only in United States District Court for the District of New Jersey, or if such court does not have jurisdiction, in the courts of the State of New Jersey located in Morris County, and hereby irrevocably accepts and submits to the exclusive jurisdiction of the aforesaid courts in personam, with respect to any such action, suit or proceeding. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, CLAIM OR PROCEEDING BROUGHT TO ENFORCE, DEFEND OR INTERPRET ANY RIGHTS OR REMEDIES ARISING HEREUNDER, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT.

32. COMPLIANCE WITH LAW.

(a) The parties hereby agree to comply with all applicable federal and state laws, ordinances, and administrative rules and regulations in the performance of their obligations under this Agreement.

(b) Without in any manner limiting the foregoing, all Products provided by Vendor shall be produced, packaged, labeled, and shipped in compliance with, and otherwise shall comply with, all applicable domestic, local, regional and foreign laws, including, without limitation (with regard to Products shipped within, into, or from the United States), all applicable statutes, regulations, orders, and other requirements administered or issued by the U.S. Food & Drug Administration ("FDA"), the U.S. Consumer Product Safety Commission ("CPSC"), the U.S. Department of Transportation ("DOT"), the U.S. Department of Commerce ("DOC") and the U.S. Environmental Protection Agency ("EPA").

(c) Vendor acknowledges its present and ongoing compliance with the Foreign Corrupt Practices Act and the Patriot Act and agrees to require the same of its subcontractors, if any and its subcontractor's subcontractors thereunder. Vendor further acknowledges that WSSI, in its sole discretion, may be required under laws governing the offer, sale and relationships of franchises to disclose certain information about this Agreement in franchise offering circulars and filings with public agencies. WSSI may also be required to include copies of any purchase agreements or leasing forms to be used by Vendor in the sale or provision of the Products in their respective franchise offering circulars. Vendor will cooperate with the requests of WSSI for relevant information and documentation as reasonably necessary to enable WSSI to comply with such laws.

33. ATTORNEYS' FEES/EXPENSES: Unless a specific provision of this Agreement states that attorneys' fees, costs, and expenses are the responsibility of a particular party, in any legal proceeding brought by either party to enforce any part of this Agreement, the prevailing party shall be entitled to receive, in addition to all other relief, its reasonable attorneys' fees, costs, and expenses.

34. NO WAIVER. No failure or delay in requiring strict compliance with any obligation of this Agreement (or in the exercise of any right or remedy provided herein) and no custom or practice at variance with the requirements hereof shall constitute a waiver or modification of any such obligation, requirement, right or remedy or preclude exercise of any such right or remedy or the right to require strict compliance with any obligation set forth herein. No waiver of any particular default or any right or remedy with respect to such default shall preclude, affect or impair enforcement of any right or remedy provided herein with respect to any subsequent default.

35. SEVERABILITY. If any part of this Agreement, for any reason, is declared invalid, this declaration shall not affect the validity of any remaining portion of this Agreement.

36. SURVIVAL. Any provision of or obligation under this Agreement, which contemplates performance or observance subsequent to any termination or expiration of this Agreement, shall survive any such termination or expiration, and shall continue in full force and effect. In addition, all provisions of this Agreement shall survive the termination or expiration of this Agreement to the fullest extent necessary to give the parties the full benefit of the bargain expressed herein and of the intent contemplated hereunder.

37. SECTION HEADINGS. The headings of the sections and subsections in this Agreement are for the purposes of convenient reference only and are not intended to be part of this Agreement, or to limit or affect the meaning or interpretation of any of the terms hereof.

38. FAX AND ELECTRONIC SIGNATURES. Facsimile copies of this Agreement signed by the parties shall be considered for all purposes, including delivery, as originals. Transmission of documents by electronic means (email) shall be considered for all purposes, including delivery, as originals if transmitted through Adobe or such other electronic transmission facility which provides a photographic image of the document as signed and delivered by the signatory thereto. WSSI reserves the right to require the subsequent delivery of fully executed original documents within a specified time frame after electronic receipt.

39. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

40 COMPLETE AGREEMENT. This Agreement, together with all attachments, including, but not limited to Schedule(s) and Exhibits, attached hereto, constitutes the entire agreement of the parties hereto with respect to the matters set forth herein and supersedes all prior agreements or understandings pertaining to such matters, whether oral or in writing, and shall not be modified or amended in any respect except in writing executed by all such parties.

41.  TIME IS OF THE ESSENCE. Time is of the essence in the observance and performance of all of the terms, covenant and conditions of this Agreement.

42.  DRAFTING CONVENTION. The Parties confirm that each party has obtained counsel to represent its interests with respect to the negotiations, drafting and execution of this Agreement. Accordingly, no provision of this Agreement shall be construed against any party on the premise that a particular party drafted the provision or caused the provision to be drafted and included in this Agreement.

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date set forth above.

| WORLDWIDE SOURCING SOLUTIONS, INC. | THE ERIC RYAN CORPORATION |
|---|---|
| By: | By: |
| Print Name: PAUL DAYS | Print Name: Keith Venesee |
| Title: SVP, Procurement | Title: C.E.O. |

EXHIBITS
A – Special Terms and Conditions for providing Products/Services
B – Scope of Services
Exhibit 8(c) – Vendor Reporting Template
Exhibit 21(e) – Vendor Warranties

SCHEDULES
WSSI Schedule
WHG Schedule
WER Schedule
WVO Schedule

## EXHIBIT A

### SPECIAL TERMS AND CONDITIONS
### FOR PROVIDING PRODUCTS/SERVICES

In addition to the terms and conditions of the Worldwide Sourcing Agreement, the Vendor shall comply with the following terms when providing Services and/or supplying the Products to WSSI pursuant to the applicable Schedule.

Acceptance Criteria: The Services and/or Products shall be subject to acceptance testing by WSSI. Any acceptance criteria and/or performance. standards (including, but not limited to, acceptance periods) related to the Products and/or Services shall be set forth in the applicable Schedule(s) ("Acceptance"). Unless otherwise specified in the applicable Schedule(s), the Products and/or Services shall be deemed to have been accepted by WSSI upon WSSI's written notification thereof to Vendor, in accordance with the following procedures:

(i) WSSI, with the full cooperation and assistance of Vendor, shall review, test, and/or evaluate (as the case may be) the Services and/or Products in a manner it deems appropriate for a period not to exceed thirty (30) days from the completion, installation, and/or delivery (as the case may be) thereof to determine whether the Services and/or Product conform to the terms and conditions of this Agreement, the applicable specifications, if any, and the applicable Schedule;

(ii) Upon completion of such review, test and/or evaluation, WSSI shall promptly notify Vendor in writing either that (a) the Services and/or Products are Accepted, or (b) the Services and/or Products (in WSSI's reasonable opinion) are not in conformance with this Agreement, the applicable specifications, if any, and/or the applicable Schedule, in which case, WSSI shall provide Vendor a written description of any such nonconformities;

(iii) WSSI may, at its sole option, either (a) terminate the applicable Schedule pursuant to the termination Section of the Agreement hereof, in which case Vendor shall (in addition to any and all other remedies that may be available to WSSI) promptly refund to WSSI any and all payments made to Vendor under the terminated Schedule, or (b) request that Vendor correct and/or modify (at Vendor's sole expense) the non-conforming Services and/or Product within fifteen (15) days thereof (or such other period of time as mutually agreed upon in writing between the parties). If Vendor fails or is unable to correct or modify the non-conforming Services and/or Product within such fifteen (15)-day period, WSSI may (at its sole election and in addition to any and all other remedies that may be available to WSSI) terminate the applicable Schedule pursuant to the termination Section of the Agreement hereof, in which case Vendor shall promptly refund to WSSI any and all payments made to Vendor under the terminated Schedules. The payment by WSSI of any amounts hereunder shall not constitute WSSI's Acceptance of the Services and/or Products.

Cancellation/Changes: WSSI may request changes or cancel any order prior to delivery. In the event of a change, Vendor will process the change, notify WSSI of any increase or decrease to the

cost and, if the applicable WSSI approves the change, that WSSI will be responsible for any additional costs associated with the change. WSSI will not be responsible for any charges in connection with a cancellation prior to delivery.

<u>Shipping Specifications</u>: TBD

<u>Title and Risk of Loss</u>: Title and risk of loss and damage to Products and/or Services purchased by WSSI under this Agreement shall vest in WSSI when the Product has been delivered at the destination point designated by WSSI. If this Agreement or a Schedule issued pursuant to this Agreement calls for additional services related to the Products and/or Services, such as and including but not limited to, unloading, installation or testing, to be performed after delivery, Vendor shall retain title and risk of loss and damage to the Products and/or Services until the additional services have been performed and accepted. Notwithstanding the foregoing sentence, if Vendor is expressly authorized to invoice WSSI for Products and/or Services upon shipment or prior to the performance of additional services, title to such Products and/or Services shall vest in WSSI upon payment of the invoice, but risk of loss and damage shall pass to WSSI as provided in the foregoing sentence.

<u>Service Level Agreement and Guarantees</u>: [To be provided by the Vendor]

## EXHIBIT B

## SCOPE OF SERVICES

**Utility Audits:**

Vendor agrees to review and analyze all utility invoices (billings) provided by Participant, and to serve as a consultant with respect to those billings, as defined in the Scope of Services listed below. Potential utilities to analyze include natural gas, electricity, water, sewer, heating oil, and waste. Participant shall select the locations and utilities which Vendor will analyze. Participants are encouraged to provide all billings for their selected utilities at the same time. Doing so increases audit efficiency and effectiveness, and maximizes potential savings to the Participant. Audits are conducted per location. Participants with multiple properties will receive separate audit reports for each location. Properties with multiple meters, regardless of utility, will be treated as a single audit.

- **Utility Bill Auditing**
  Vendor will review and analyze all billings provided by Participant for billing errors on past billings that may result in refunds or credits and to also look at the information provided to see if there are potential future savings. During the utility audit process, Vendor will check for, but not be limited to, the following opportunities: billing errors; time of use rates; governmental economic riders; utility riders; off-tariff rates; cost per kWh variations; cost per square foot variations; minimum billing/contract issues; utility tariff rate changes, modification of service pricing; services, equipment or metering that is no longer needed; correcting leaks, or operational related issues; reductions in contracted demands or ratchet demands; correcting unauthorized usage of utility or services; reduction in pricing as a result of leveraging utility provider.

- **Utility Contract Analysis**
  Vendor will review any existing contracts with the utility company or energy supplier to determine if the pricing is being billed correctly and to make recommendations as to the feasibility of continuing the contract arrangement. Vendor will offer creative recommendations to help take advantage of renewal or out clauses that may be available in the contract.

- **Utility Audit Report**
  Vendor will provide a detailed audit report at the end of the analysis that will document any savings or refund opportunities. Also included will be spreadsheet information that shows trending information with regard to consumption, cost, cost per unit, etc. Vendor will provide ongoing reports on a monthly basis or a lesser frequency as instructed by Participant.

- **Utility Bill Scanning Services**
  Vendor scans all billings for auditing purposes and can make them available to the Participant on a CD/DVD.

- **Waste Bill Auditing**
  Vendor will review and analyze all billings provided by Participant for billing errors on past billings that may result in refunds or credits and also review those billings to determine if there is any potential for reducing future cost. Part of the audit process requires a detailed site visit to evaluate the current pickup schedules, dumpster sizes and placement location. The audit process also evaluates other waste companies that may be in that market area who may offer competitive pricing.

- **Tax Analysis and Recovery**
  Vendor will review state tax laws to determine if the facility would qualify for tax exemptions. If so, Vendor will perform a site survey, establish the percentage of exemption and petition the

state for refunds for past taxes paid in error. Vendor will also work with the utility company to ensure the correct exemption is on future bills.

**Telecommunications Audits:**

Vendor agrees to review and analyze all telecommunications invoices (billings) provided by Participant, and to serve as a consultant with respect to those billings, as defined in the Scope of Services listed below. Participant shall select the locations which Vendor will analyze. Participants are encouraged to provide telecommunications billings at the same time they submit billings for other utilities (electricity, natural gas, water, sewer, waste, and/or heating oil) for Vendor to audit. Doing so increases audit efficiency and effectiveness, and maximizes potential savings to the Participant. Audits are conducted per location. Participants with multiple properties will receive separate audit reports for each location. Properties with multiple phone numbers will be treated as a single audit.

- **Telecommunications Bill Auditing**
  Vendor will review and analyze all billings provided by Participant for billing errors on past billings that may result in refunds or credits and to also look at the information provided to see if there are potential future savings. During the Telecommunications audit process, Vendor will check for, but not be limited to, the following opportunities: billing errors; lines that are not in use; contract anomalies; government taxing errors; casual billing; cramming; slamming; minimum billing/contract issues; tariff rate changes, modification of service pricing; services or equipment that is no longer needed; operational related issues; correcting unauthorized usage of services; reduction in pricing as a result of leveraging telecommunication provider.

- **Telecommunications Contract Analysis**
  Vendor will review any existing contracts with the telecommunication company or long distance supplier to determine if the pricing is being billed correctly and to make recommendations as to the feasibility of continuing the contract arrangement. Vendor will offer creative recommendations to help take advantage of renewal or out clauses that may be available in the contract.

- **Telecommunications Audit Report**
  Vendor will provide a detailed audit report at the end of the analysis that will document any savings or refund opportunities. Also included will be spreadsheet information that shows trending information with regard to consumption, cost, cost per unit etc as well as a breakdown of lines and charges.

- **Telecommunications Bill Scanning Services**
  Vendor scans all billings for auditing purposes and can make them available to the client on a CD/DVD.

- **Telecommunications Pricing**
  Vendor will provide pricing alternatives for Participant's local, long distance, data, and wireless services.

**Additional Telecommunications Services (Non-Audit) for Wyndham Hotel Group ONLY:**

Vendor may provide the following, additional telecommunications services to Wyndham Hotel Group (WHG) Participants only. These optional services are not related to the telecommunications audit services described above.

- **Help Desk without Vendor Maintenance Contract/Trouble Reporting Assistance**
  Vendor will provide 24 hour 7 day per week phone coverage to assist WHG Participants and all its remote locations with telecommunications related problems and/or questions. Vendor will troubleshoot all telecommunications related problems as reported by WHG Participant and bring

243953v3

such problem to resolution. Vendor will notify appropriate parties such as telecommunications providers or suppliers of reported problems and work with all parties to completion. Vendor will use its best effort to resolve the problem. In the event an equipment or telecommunications supplier is needed to resolve the problem, Participant recognizes that this fee is separate from the fees charged by Vendor and that payment to those supplier(s) is the obligation of the WHG Participant.

- o  Internet-Related Assistance

  Vendor will assist WHG Participant with internet-related issues or requests including, but not limited, to trouble shooting internet issues, requests for new internet services, or modifications to existing internet services.

- o  Telecommunications Line Installations or Removals

  Vendor will, upon written notification from authorized representative of WHG Participant, place order(s) for any telecommunications lines to be installed, changed, or removed at specific locations. Vendor will review billings for appropriated adjustments or changes from either installs or removals.

- o  Telecommunication Site Surveys

  Vendor will perform onsite telecommunication surveys and offer a detailed report as to the telecommunication equipment, which will include drawings and photos of the equipment room and network layout. Vendor will also document any lines noted on d-marks or other pieces of communications technology so that WHG Participant can tie back that information to their billings.

**Procurement Services:**

While performing utility audits in deregulated states (for electricity, natural gas, and/or heating oil), Vendor will conduct an RFP or use a reverse auction to obtain pricing from third party energy suppliers in those market areas that are applicable for the locations provided by the Participant. Vendor shall include alternative energy suppliers (wind, solar, geo-thermal, etc.), wherever possible to provide renewable "green" options to Participants. Vendor will evaluate pricing from those third party energy suppliers and make recommendations to Participant with regard to that pricing. Vendor's recommendation shall include:

- Name of the third party energy supplier
- Contract term (i.e., duration)
- Type of contract (fixed or indexed) based on Participant's risk tolerance
- Percentage of the commodity to be locked up on a fixed price, and what amount should float monthly based on market pricing

If Participant acts on Vendor's recommendation(s), Vendor will coordinate paperwork and implement new contracts with the third party energy supplier or utility. Procurement Services for electricity and natural gas are not offered in regulated states, as Participants cannot switch energy suppliers.

**Energy Audits:**

Energy Audits consist of an on-site property visit by Vendor engineers who meet with Participant's facility personnel to discuss current energy usage, operational issues, and conduct a property walk-thru to gather equipment types and nameplate data. Vendor engineers will compile the collected data into the following categories:

- o  All energy consuming equipment (lighting, HVAC, motors, boilers, chillers, heat pumps, refrigeration, etc.)
- o  Water usage
- Building envelope, including windows, doors, insulation, heat loss/heat gain issues, etc.
- Operational/maintenance issues

Upon completion of the on-site energy audit, Vendor engineers will prepare a detailed energy audit report, summarizing findings and recommended alternatives to current equipment and processes. Such alternatives may include, but are not limited to:

- Retrofitting with energy efficient equipment
- Utilizing renewable energy projects
- Replacement of equipment that is at end of life cycle
- Utilization of water saving equipment
- Peak curtailment programs
- Operational options, such as, installation of whole building energy management system, turning off equipment not in use, utilizing programmable thermostats, hours of operation, etc.

Any recommended alternatives to current equipment/operations will include projected annual energy and dollar savings due to implementation. The energy audit report will also include estimated material costs to implement engineering recommendations along with a payback analysis for each recommendation to help Participants determine their Return on Investment. Any applicable rebates, incentives, grants, etc. will be included in the report. All recommendations and savings estimates will be accompanied by engineering analysis, formulas and calculations.

Vendor also offers post audit services to assist Participants in implementing recommended energy saving measures. Participant's maintenance staff or designated sub-contractors must perform the physical installation. Vendor tasks include:

- Identify vendors to provide the recommended equipment
- Purchase the equipment on Participant's behalf
- Coordinate equipment delivery
- Coordinate with maintenance staff through completion.

Vendor can work with suppliers identified by Participant, or the Vendor's Participant normally works with to provide such equipment. Vendor can also work with Participant designated subcontractors, if desired. If there are equipment suppliers who include installation in their quoted cost, Vendor would coordinate that process too. These post audit services would be charged in addition to the energy audit.

EXHIBIT 8(e)

VENDOR REPORTING TEMPLATE

# Report Summary

| Vendor Name: | |
|---|---|
| Vendor Address: | |
| Vendor City: | |
| Vendor State: | |
| Vendor Zip Code: | |
| Period: | |
| Date Prepared: | |

REPORTING SUMMARY

| WYNDHAM HOTEL GROUP: | SALES | COMMISSIONS | MARKETING FEES |
|---|---|---|---|
| Baymont | | | |
| Days Inn | | | |
| Hawthorn Suites | | | |
| Howard Johnson | | | |
| Knights Inn | | | |
| Microtel | | | |
| Ramada | | | |
| Super 8 | | | |
| Travelodge | | | |
| Wingate | | | |
| Wyndham Garden | | | |
| Wyndham Hotels and Resorts | | | |
| TOTAL WHG: | $ | $ | $ |

| WYNDHAM VACATION OWNERSHIP: | SALES | COMMISSIONS | MARKETING FEES |
|---|---|---|---|
| Wyndham Vacation Resorts | | | |
| Worldmark by Wyndham | | | |
| TOTAL WVO: | $ | | |

| WYNDHAM EXCHANGE & RENTALS: | SALES | COMMISSIONS | MARKETING FEES |
|---|---|---|---|
| All Affiliates | | | |
| TOTAL WER: | $ | $ | $ |

| TOTAL WYNDHAM WORLDWIDE | $ | $ | $ |

35
ERC 035

Detailed Reporting



EXHIBIT 21(e)

VENDOR WARRANTIES

Not applicable

## WSSI SCHEDULE

This Schedule ("Schedule"), effective the 15th day of October 2010, is a contract entered into by Worldwide Sourcing Solutions, Inc. ("WSSI" or "Affiliate") and The Eric Ryan Corporation ("Vendor") and is a contract by and between WSSI and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between WSSI and Vendor.

| Key Contacts | Project Lead:<br>Gus Manz<br>(973) 753-8174 | Stakeholders<br>Marianne Zeller<br>Frank Campana |
|---|---|---|
| | Address:<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 | |

| Services to be ordered/provided | Description of Goods to be provided<br>o   Utility Audits – electricity, natural gas, heating oil, water, sewer, waste<br>o   Telecommunications Audits<br>o   Procurement Services – electricity, natural gas, and heating oil<br>o   Energy Audits – property level<br><br>See Exhibit B – Scope of Services for full details |
|---|---|

| Location | Where will Goods be delivered: Services will be provided or performed at locations determined by WSSI or Affiliate. |
|---|---|

| Financials | Pricing:<br>o   Utility & Telecommunications Audits<br>The following fees will apply to all Vendor recommendations that are approved by WSSI or Affiliate for implementation:<br>   ■   35% of Recovered Overcharges.  If no Overcharges are identified, no monies are owed to Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.<br>   ■   Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in Exhibit B, Scope of Services, then Vendor shall be paid 20% of future billing reductions for a period of 12 months. |
|---|---|

- Procurement of new energy supplier (deregulated states only – electricity, natural gas, heating oil):

  If the awarded energy supplier does not have a commission program available to pay Vendor, WSSI or Affiliate agrees to reimburse Vendor via one of the following two options, the selection of which shall be made by WSSI or Affiliate:

  - 20% monies saved between the old and new rates (Option A)
  - 0.75 mils ($0.00075 cents) per kWh adder fee (Option B)
  - $0.10 per dekatherm adder fee (Option B – natural gas only)

- Savings duration to be determined by WSSI or Affiliate
  - Utility and Telecommunications Audit – 12 months
  - Procurement (Option A) - 12 months
  - Procurement (Option B) - 24 months

- Savings billing frequency - Quarterly

- Energy Audits If WSSI or Affiliate elect to have Vendor perform all three of the following Services, then a one time fee of $750.00 plus travel expenses will apply for the property-level Energy Audit Service:

  Utility Audit (electricity)
  Procurement Services (electricity)
  Energy Audit

If WSSI or Affiliate elect to have Vendor perform only the Energy Audit, a one-time fee of $1,500.00 plus travel expenses for limited-service properties and $2,500.00 plus travel expenses for full-service properties will apply for the Energy Audit Service.

In addition, Vendor agrees to provide three (3) FREE Energy Audits to WSSI or Affiliate corporate locations who choose both the Utility Audit and Procurement Service options at the contracted rates.

Vendor will charge 10% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by WSSI or Affiliate maintenance staff or designated sub-contractors.

**Payment Terms:** Payment shall be made within thirty (30) days from receipt of an accurate invoice



Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.

WSSI and Affiliates agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed.  ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON WSSI OR AFFILIATE, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY PARTICIPANT AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned WSSI or Affiliate initiatives.   Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by WSSI or Affiliates.

WSSI or Affiliates shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. WSSI or Affiliates shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date set forth above.

Worldwide Sourcing Solutions, Inc.

By: _____
Print Name: _____
Title: _____

The Eric Ryan Corporation

By: _____
Print Name: _____
Title: _____

## WVO SCHEDULE

This Schedule ("Schedule"), effective the 15th day of October 2010, is a contract entered into by Wyndham Vacation Ownership, Inc. on behalf of a Designated Purchaser and The Eric Ryan Corporation ("Vendor") and is a contract by and between WVO and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between Worldwide Sourcing Solutions, Inc. ("WSSI") and Vendor.

| Key Contacts | Project Lead:<br>Gus Manz<br>(973) 753-8174 | Stakeholders<br>Gary Byrd |
|---|---|---|
| | Address:<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 | |

| Services to be ordered/ provided | Description of Goods to be provided<br>● Utility Audits – electricity, natural gas, heating oil, water, sewer, waste<br>● Telecommunications Audits<br>● Procurement Services – electricity, natural gas, and heating oil<br>● Energy Audits – property level<br><br>See Exhibit B – Scope of Services for full details |
|---|---|

| Location | Where will Goods be delivered: Services will be provided or performed at locations determined by WSSI or Affiliate. |
|---|---|

| Financials | Pricing:<br>● Utility & Telecommunications Audits<br>   The following fees will apply to all Vendor recommendations that are approved by WSSI or Affiliate for implementation:<br>     ■ 35% of Recovered Overcharges. If no Overcharges are identified, no monies are owed to Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.<br>     ■ Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in Exhibit B, Scope of Services, then Vendor shall be paid 20% of future billing reductions for a period of 12 months. |
|---|---|

- Procurement of new energy supplier (deregulated states only – electricity, natural gas, heating oil):
  If the awarded energy supplier does not have a commission program available to pay Vendor, WSSI or Affiliate agree to reimburse Vendor via one of the following two options, the selection of which shall be made by WSSI or Affiliate:
  - 20% monies saved between the old and new rates (Option A)
  - 0.75 mils ($0.00075 cents) per kWh adder fee (Option B)
  - $0.10 per dekatherm adder fee (Option B – natural gas only)

- Savings duration to be determined by WSSI or Affiliate
  - Utility and Telecommunications Audit – 12 months
  - Procurement (Option A) - 12 months
  - Procurement (Option B) - 24 months

- Savings billing frequency - Quarterly

- Energy Audits
  If WSSI or Affiliate elect to have Vendor perform all three of the following Services, then a one time fee of $750.00 plus travel expenses will apply for the property-level Energy Audit Service:
  Utility Audit (electricity)
  Procurement Services (electricity)
  Energy Audit

If WSSI or Affiliate elect to have Vendor perform only the Energy Audit, a one-time fee of $1,500.00 plus travel expenses for limited-service properties and $2,500.00 plus travel expenses for full-service properties will apply for the Energy Audit Service.

In addition, Vendor agrees to provide three (3) FREE Energy Audits to WSSI or Affiliate corporate locations who choose both the Utility Audit and Procurement Service options at the contracted rates.

Vendor will charge 10% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by WSSI or Affiliate maintenance staff or designated sub-contractors.

**Payment Terms:** Payment shall be made within thirty (30) days from receipt of an accurate invoice



Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.

WSSI and Affiliates agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed. ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON WSSI OR AFFILIATE, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY PARTICIPANT AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned WSSI or Affiliate initiatives. Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by WSSI or Affiliates.

WSSI or Affiliates shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. WSSI or Affiliates shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

**IN WITNESS WHEREOF**, the parties hereto have set forth their signatures as of the date set forth above.

Wyndham Vacation Ownership, Inc.

By: _____
Print Name: _PAUL DAVIS_
Title: _GM, Procurement_

The Eric Ryan Corporation

By: _____
Print Name: _Keith Brazel_
Title: _CEO_

## WHG SCHEDULE

This Schedule ("Schedule"), effective the 15th day of October 2010, is a contract entered into by Wyndham Hotel Group, LLC on behalf of a Designated Purchaser and The Eric Ryan Corporation ("Vendor") and is a contract by and between WHG and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between Worldwide Sourcing Solutions, Inc. ("WSSI") and Vendor.

| Key Contacts | **Project Lead**<br>Gus Manz<br>(973) 753-8174<br>**Address:**<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 | **Stakeholders**<br>Jeff Wagoner<br>Keith Pierce<br>Duane Elledge |
|---|---|---|
| Goods or other material provided | **Description of Goods to be provided**<br><br>• Utility Audits -- electricity, natural gas, heating oil, water, sewer, waste<br>○ Telecommunications Audits<br>• Procurement Services -- electricity, natural gas, and heating oil<br>• Additional Telecommunications Services (Non-Audit)<br>○ Energy Audits -- property level<br><br>See Exhibit B -- Scope of Services for full details | |
| Location | **Where will Goods be delivered**<br>Services will be provided or performed at locations determined by the Designated Purchaser. | |
| Financials | **Pricing:**<br><br>○ **Utility & Telecommunications Audits**<br>  The following fees will apply to all Vendor recommendations that are approved by Designated Purchaser for implementation:<br>  ▪ 45% of Recovered Overcharges. If no Overcharges are identified, no monies are owed to Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.<br>  ▪ Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in Exhibit B, Scope of Services, then Vendor shall be paid 30% of future billing reductions for a period of 12 months. | |

- Procurement of new energy supplier (deregulated states only – electricity, natural gas, heating oil):

  If the awarded energy supplier does not have a commission program available to pay Vendor, Designated Purchaser agrees to reimburse Vendor via one of the following two options, the selection of which shall be made by Designated Purchaser:

  - o   30% monies saved between the old and new rates (Option A)
  - o   1 mil ($0.001 cents) per kWh adder fee (Option B)
  - o   $0.11 per dekatherm adder fee (Option B – natural gas only)

Additional Telecommunications Services (Non-Audit)

- Fixed monthly consulting fee of one dollar ($1.00) per room per month. The consulting fee will be billed on the first day of the month.
- If Designated Purchaser elects to have Vendor perform all four (4) additional Telecommunications Services (Non-Audit) detailed in Exhibit B, then an additional one-time fee of one thousand dollars ($1000.00) plus travel will apply for the Telecommunications Site Survey. If Designated Purchaser elects to have Vendor perform ONLY the Telecommunications Site Survey, then Designated Purchaser agrees to pay to Vendor a one-time fee of one thousand eight hundred dollars ($1,800.00) plus travel expenses. Designated Purchaser agrees to pay such fee(s) upon receipt of an accurate invoice from Vendor.

Savings Duration to be determined by Designated Purchaser:

- Utility and Telecommunications Audit – 12 months
- Procurement (Option A) - 12 months
- Procurement (Option B) - 24 months
- Add'l Telecommunications Services (Non-Audit) – 24 months

Savings Billing Frequency – Quarterly

COMMISSION WILL BE PAID TO WSSI UPON THE FOLLOWING CIRCUMSTANCES:

(a) For Recovered Overcharges on utility invoices on Regulated/Deregulated states, Vendor shall pay to WSSI 10% of Vendor's 45% of Recovered Overcharges within thirty (30) days.

(b) If a Designated Purchaser directs, in writing, Vendor to procure the services of a new energy supplier on Designated Purchasers behalf, then Designated Purchaser shall elect that:

(Option A) Vendor pay to WSSI a Commission in the amount of 10% based on the 30% commission received by Vendor for a 12 month period.

(Option B) Vendor pay to WSSI, 0.25mil ($0.00025 cents) of the 1.0 mil adder fee for electricity, or $0.01 of the $0.11/dekatherm adder fee for natural gas back to WSSI as a Commission for a period of 24 months. Vendor will keep the remaining 0.75mil for electricity or $0.10 for natural gas.

(c) If the Designated Purchaser elects the additional Telecommunications Services, Vendor shall pay $0.15 of the $1.00 per room fee back to WSSI as a Commission for 24 months. Vendor will keep the remaining $0.85.

(d) If the Designated Purchaser elects to have a Telecommunications Site Survey conducted, Vendor shall pay $200 to WSSI as a Commission. Vendor will keep the remaining $800 or $1600, depending on the site survey selected by the Designated Purchaser.

- Energy Audits
  If a Designated Purchaser elects to have Vendor perform all three of the following services, then a one time fee of $1,250.00 plus travel expenses will apply for the property-level Energy Audit:
  Utility Audit (electricity)
  Procurement Services (electricity)
  Energy Audit

If Designated Purchaser elects to have Vendor perform only the Energy Audit, a one-time fee of $2,000.00 plus travel expenses for limited-service properties and $3,000.00 plus travel expenses for full-service properties will apply for the Energy Audit.

Vendor will charge 13% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by Designated Purchaser maintenance staff or designated sub-contractors.

*NOTE — Vendor shall pay $500 to WSSI as a Commission for each Energy Audit performed on behalf of Designated Purchaser, and keep the remaining balance of the audit fee. If Designated Purchaser employs Vendor to project manage installation of energy saving recommendations, Vendor shall pay a 3% Commission to WSSI of the 13% project management fee and keep the remaining 10%.*

**Payment Terms:** Payment shall be made within thirty (30) days from receipt of an accurate invoice

243953v3

46

ERC 046



Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.

Designated Purchaser agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed.  ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON DESIGNATED PURCHASER, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY DESIGNATED PURCHASER AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned Designated Purchaser initiatives.  Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by Designated Purchaser.

Designated Purchaser shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. Designated Purchaser shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date set forth above.

Wyndham Hotel Group, LLC

By: _____
Print Name: _Paul Davis_
Title: _Srl Procurer_

The Eric Ryan Corporation

By: _____
Print Name: _Kevin Vanzil_
Title: _CEO_

## WER SCHEDULE

This Schedule ("Schedule"), effective the 15th day of October 2010, is a contract entered into by Wyndham Exchange and Rentals, Inc. on behalf of a Designated Purchaser and The Eric Ryan Corporation ("Vendor") and is a contract by and between WER and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between Worldwide Sourcing Solutions, Inc. ("WSSI") and Vendor.

| Key Contacts | Project Lead<br>Gus Manz<br><br>**Address:**<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 | Stakeholders<br>Not applicable |
|---|---|---|
| Goods and/or the<br>services<br>provided | • Utility Audits – electricity, natural gas, heating oil, water, sewer, waste<br>• Telecommunications Audits<br>• Procurement Services – electricity, natural gas, and heating oil<br>• Energy Audits – property level<br><br>See Exhibit B – Scope of Services for full details | |
| Location | **Where will Goods be delivered**<br>Services will be provided or performed at locations determined by the Designated Purchaser. | |
| Financials | **Pricing:**<br>• <u>Utility & Telecommunications Audits</u><br>The following fees will apply to all Vendor recommendations that are approved by Designated Purchaser for implementation:<br>  ■ 45% of Recovered Overcharges. If no Overcharges are identified, no monies are owed by Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.<br>  ■ Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in Exhibit B, Scope of Services, then Vendor shall be paid 30% of future billing reductions for a period of 12 months. | |

○ Procurement of new energy supplier (deregulated states only — electricity, natural gas, and heating oil):

If the awarded energy supplier does not have a commission program available to pay Vendor, Designated Purchaser agrees to reimburse Vendor via one of the following two options, the selection of which shall be made by Designated Purchaser:

- o 30% monies saved between the old and new rates (Option A)
- o 1.0 mils ($0.001 cents) per kWh adder fee (Option B)
- o $0.11 per dekatherm adder fee (Option B – natural gas only)

○ Savings Duration to be determined by Designated Purchaser
- o Utility and Telecommunications Audit – 12 months
- o Procurement (Option A) – 12 months
- o Procurement (Option B) – 24 months

○ Savings Billing Frequency - Quarterly

**COMMISSION WILL BE PAID TO WSSI UPON THE FOLLOWING CIRCUMSTANCES:**

(a) For Recovered Overcharges on utility invoices on Regulated/Deregulated states, Vendor shall pay to WSSI 10% of Vendor's 45% of Recovered Overcharges within thirty (30) days.

(b) If a Designated Purchaser directs, in writing, Vendor to procure the services of a new energy supplier on Designated Purchasers behalf, then Designated Purchaser shall elect that:

**(Option A)** Vendor pay to WSSI a Commission in the amount of 10% based on the 30% commission received by Vendor for a 12 month period.

**(Option B)** Vendor will pay to WSSI, 0.25mil ($0.00025 cents) of the 1.0 mil adder fee for electricity, or $0.01 of the $0.11/decatherm adder fee for natural gas to WSSI as a Commission for a period of 24 months. Vendor will keep the remaining 0.75mil for electricity or $0.10 for natural gas.

- Energy Audits

If a Designated Purchaser elects to have Vendor perform all three of the following services, then a one time fee of $1,250.00 plus travel expenses will apply for the property-level Energy Audit:

Utility Audit (electricity)
Procurement Services (electricity)
Energy Audit

If Designated Purchaser elects to have Vendor perform only the Energy Audit, a one-time fee of $2,000.00 plus travel expenses for limited-service properties and $3,000.00 plus travel expenses for full-service properties will apply for the Energy Audit.

Vendor will charge 13% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by Designated

*NOTE – Vendor shall pay $500 to WSSI as a Commission for each Energy Audit performed on behalf of Designated Purchaser, and keep the remaining balance of the audit fee. If Designated Purchaser employs Vendor to project manage installation of energy saving recommendations, Vendor shall pay a 3% Commission to WSSI of the 13% project management fee and keep the remaining 10%.*

*Payment Terms: Payment shall be made within thirty (30) days from receipt of an accurate invoice*

**Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.**

Designated Purchaser agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed. ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON DESIGNATED PURCHASER, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY DESIGNATED PURCHASER AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned Designated Purchaser initiatives. Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by Designated Purchaser.

Designated Purchaser shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. Designated Purchaser shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date set forth above.

Wyndham Exchange and Rentals, Inc.

By: _____
Print Name: PAUL DAVIS
Title: EVP Procurement

The Eric Ryan Corporation

By: _____
Print Name: KEITH VENESS
Title: C.E.O

243953v3

50
ERC 050

## WVO SCHEDULE 3
## FREE PROPERTY LEVEL ENERGY AUDIT SCHEDULE
### (Occupancy 200+)

This Schedule ("Schedule"), and the free Property Level Energy Audit if elected, shall only apply to properties that elect to have BOTH the Utility Audit and the Procurement Services completed, and have occupancy of two hundred (200) or more rooms. This Schedule effective the _9/1/2011_, is a contract entered into by Wyndham Vacation Ownership, Inc. on behalf of a Designated Purchaser and The Eric Ryan Corporation ("Vendor") and is a contract by and between WVO and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between Worldwide Sourcing Solutions, Inc. ("WSSI") and Vendor.

| | |
|---|---|
| | **Project Lead:**<br>Gus Manz<br>(973) 753-8174<br>**Address:**<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 | **Stakeholders**<br>Gary Byrd |
| | **Description of Goods to be provided**<br>• Utility Audits – electricity, natural gas, heating oil, water, sewer, waste<br>• Telecommunications Audits<br>• Procurement Services – electricity, natural gas, and heating oil<br>• Energy Audits – property level<br><br>See Exhibit B – Scope of Services for full details |
| | **Where will Goods be delivered:** Services will be provided or performed at locations determined by WSSI or Affiliate. |
| | **Pricing:**<br>• <u>Utility & Telecommunications Audits</u><br>The following fees will apply to all Vendor recommendations that are approved by WSSI or Affiliate for implementation:<br> ✱ 30% of Recovered Overcharges. If no Overcharges are identified, no monies are owed to Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.<br> ✱ Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in **Exhibit B, Scope of Services**, then Vendor shall be paid 30% of future billing reductions for a period of 24 months. |

- Procurement of new energy supplier (deregulated states only – electricity, natural gas, heating oil):

  If the awarded energy supplier does not have a commission program available to pay Vendor, WSSI or Affiliate agree to reimburse Vendor via one of the following two options, the selection of which shall be made by WSSI or Affiliate:

  - 30% monies saved between the old and new rates (Option A)
  - 1.5 mils ($0.0015 cents) per kWh adder fee (Option B)
  - $0.20 per dekatherm adder fee (Option B – natural gas only)

- Savings duration to be determined by WSSI or Affiliate
  - Utility and Telecommunications Audit – 24 months
  - Procurement (Option A) - 24 months
  - Procurement (Option B) - 24 months.

- Savings billing frequency – Quarterly

- Energy Audits

  If WSSI or Affiliate elect to have Vendor perform all three of the following Services, then no charge will be applied to the property-level Energy Audit (including travel expenses):

  Utility Audit (electricity)
  Procurement Services (electricity)
  Energy Audit

Vendor will charge 10% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by WSSI or Affiliate maintenance staff or designated sub-contractors.

**Payment Terms:** Payment shall be made within thirty (30) days from receipt of an accurate invoice

**Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.**

WSSI and Affiliates agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed.   ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON WSSI OR AFFILIATE, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY PARTICIPANT AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned WSSI or Affiliate initiatives.  Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by WSSI or Affiliates.

WSSI or Affiliates shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. WSSI or Affiliates shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

[Signatures appear on following page]

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date
set forth above.

Wyndham Vacation Ownership, Inc.                    The Eric Ryan Corporation

By: _____                       By: _____
Print Name: _____                        Print Name: _Mary A Delaney_
Title: _____EVP_____                         Title: _____CEO_____

ERC 053




## Eric Ryan Corporation

**Eric Ryan Corporation (ERC) Billing Audits Help You Find & Fix Both Utility & Telecom Billing Errors!**

Find and resolve utility and telecom billing issues that others often miss, which could result in refunds, credits, and future savings!

We charge no cost up-front. We share only in the savings achieved.

## Try the new ERC service of a "Bills-No-Contract" pre-audit review!

Before signing contracts and providing bills for an audit, ERC will conduct a quick review of your current month's utility and telecom bills.

If possible opportunities for savings are identified, ERC will recommend to proceed with a full contracted audit.

**www.ericryan.com**
**info@ericryan.com**
**Call us 1-800-837-6406**




This facsimile contains confidential information intended only for the use by Wyndham Worldwide entities. If the reader of this facsimile is not the intended recipient, the employee, or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile by error, please notify us immediately via email at strategic.sourcing@wyn.com. To opt out from future faxes, email strategic.sourcing@wyn.com or call this toll-free number: (877) 764-4212.

ERC 054

## WVO SCHEDULE 3
## FREE PROPERTY LEVEL ENERGY AUDIT SCHEDULE
### (Occupancy 200+)

This Schedule ("Schedule"), and the free Property Level Energy Audit if elected, shall only apply to properties that elect to have BOTH the Utility Audit and the Procurement Services completed, and have occupancy of two hundred (200) or more rooms. This Schedule effective the _9/1/2011_, is a contract entered into by Wyndham Vacation Ownership, Inc. on behalf of a Designated Purchaser and The Eric Ryan Corporation ("Vendor") and is a contract by and between WVO and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between Worldwide Sourcing Solutions, Inc. ("WSSI") and Vendor.

| | |
|---|---|
| **Project Lead:**<br>Gus Manz<br>(973) 753-8174 | **Stakeholders**<br>Gary Byrd |
| **Address:**<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 | |

**Description of Goods to be provided**

- Utility Audits — electricity, natural gas, heating oil, water, sewer, waste
- Telecommunications Audits
- Procurement Services — electricity, natural gas, and heating oil
- Energy Audits — property level

See Exhibit B — Scope of Services for full details

**Where will Goods be delivered:** Services will be provided or performed at locations determined by WSSI or Affiliate.

**Pricing:**

- Utility & Telecommunications Audits
  The following fees will apply to all Vendor recommendations that are approved by WSSI or Affiliate for implementation:
  - 30% of Recovered Overcharges. If no Overcharges are identified, no monies are owed to Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.
  - Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in **Exhibit B, Scope of Services**, then Vendor shall be paid 30% of future billing reductions for a period of 24 months.

- Procurement of new energy supplier (deregulated states only – electricity, natural gas, heating oil):

  If the awarded energy supplier does not have a commission program available to pay Vendor, WSSI or Affiliate agree to reimburse Vendor via one of the following two options, the selection of which shall be made by WSSI or Affiliate:
  - 30% monies saved between the old and new rates (Option A)
  - 1.5 mills ($0.0015 cents) per kWh adder fee (Option B)
  - $0.20 per dekatherm adder fee (Option B – natural gas only)

- Savings duration to be determined by WSSI or Affiliate
  - Utility and Telecommunications Audit – 24 months
  - Procurement (Option A) – 24 months
  - Procurement (Option B) – 24 months

- Savings billing frequency – Quarterly

- Energy Audits

  If WSSI or Affiliate elect to have Vendor perform all three of the following Services, then no charge will be applied to the property-level Energy Audit (including travel expenses):

  Utility Audit (electricity)
  Procurement Services (electricity)
  Energy Audit

Vendor will charge 10% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by WSSI or Affiliate maintenance staff or designated sub-contractors.

**Payment Terms:** Payment shall be made within thirty (30) days from receipt of an accurate invoice

**Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.**

WSSI and Affiliates agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed. ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON WSSI OR AFFILIATE, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY PARTICIPANT AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned WSSI or Affiliate initiatives. Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by WSSI or Affiliates.

WSSI or Affiliates shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. WSSI or Affiliates shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

[Signatures appear on following page]

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date set forth above.

Wyndham Vacation Ownership, Inc.                    The Eric Ryan Corporation

By: _____                         By: _____
Print Name: _____                          Print Name: _Mary A Delrow_
Title: _____EVP_____                              Title: _____CFO_____

**WVO SCHEDULE 2**
**FREE PROPERTY LEVEL ENERGY AUDIT SCHEDULE**
**(Room Occupancy < 200)**

This Schedule ("Schedule"), and the free Property Level Energy Audit if elected, shall only apply to properties that elect to have BOTH the Utility Audit and the Procurement Services completed, and have occupancy of less than two hundred (200) rooms. This Schedule effective the ___9/1/2011___, is a contract entered into by Wyndham Vacation Ownership, Inc. on behalf of a Designated Purchaser and The Ric Ryan Corporation ("Vendor") and is a contract by and between WVO and Vendor, issued pursuant to, in accordance with, incorporates by reference, the terms and conditions of the Worldwide Sourcing Agreement ("Agreement"), dated October 15, 2010 by and between Worldwide Sourcing Solutions, Inc. ("WSSI") and Vendor.

| | |
|---|---|
| Key Contact | **Project Lead:**<br>Gus Manz<br>(973) 753-8174<br>**Address:**<br>22 Sylvan Way<br>Parsippany, New Jersey 07054 — **Stakeholders**<br>Gary Byrd |
| Service to be provided overview | **Description of Goods to be provided**<br>• Utility Audits – electricity, natural gas, heating oil, water, sewer, waste<br>• Telecommunications Audits<br>• Procurement Services – electricity, natural gas, and heating oil<br>• Energy Audits – property level<br><br>**See Exhibit B – Scope of Services for full details** |
| Location | **Where will Goods be delivered:** Services will be provided or performed at locations determined by WSSI or Affiliate. |
| Discounts | **Pricing:**<br>• <u>Utility & Telecommunications Audits</u><br>The following fees will apply to all Vendor recommendations that are approved by WSSI or Affiliate for implementation:<br>  ▪ 35% of Recovered Overcharges. If no Overcharges are identified, no monies are owed to Vendor. Should Overcharges be recovered in the form of credits or refunds then no payments with respect to future savings will be owed to Vendor for those recommendations with which credits or refunds are obtained.<br>  ▪ Should Vendor be unable to obtain a refund or credit on a particular recommendation but is able to reduce cost going forward through actions as described in Exhibit B, Scope of Services, then Vendor shall be paid 35% of future billing reductions for a period of 24 months. |

- a. Procurement of new energy supplier (deregulated states only—electricity, natural gas, heating oil):

  If the awarded energy supplier does not have a commission program available to pay Vendor, WSSI or Affiliate agree to reimburse Vendor via one of the following two options, the selection of which shall be made by WSSI or Affiliate:
  - 35% monies saved between the old and new rates (Option A)
  - 1.5 mils ($0.0015 cents) per kWh adder fee (Option B)
  - $0.20 per dekatherm adder fee (Option B – natural gas only)

- a. Savings duration to be determined by WSSI or Affiliate
  - o Utility and Telecommunications Audit – 24 months
  - o Procurement (Option A) - 24 months
  - o Procurement (Option B) - 24 months

- b. Savings billing frequency - Quarterly

- b. Energy Audits

  If WSSI or Affiliate elect to have Vendor perform all three of the following Services, then no charge will be applied to the property-level Energy Audit (including travel expenses):

  Utility Audit (electricity)
  Procurement Services (electricity)
  Energy Audit

Vendor will charge 10% of the overall project cost if asked to coordinate or project manage equipment installation of energy saving recommendations by WSSI or Affiliate maintenance staff or designated sub-contractors.

**Payment Terms:** Payment shall be made within thirty (30) days from receipt of an accurate invoice

**Special Terms and Conditions in addition to the terms and conditions of the Global Procurement Agreement referenced above.**

WSSI and Affiliates agrees to provide copies of any utility invoices or bills, and/or energy supplier contracts as requested by Vendor no later than thirty (30) days of the request, or as otherwise mutually agreed. ANY TERMS OR CONDITIONS VENDOR INTENDS TO IMPOSE ON WSSI OR AFFILIATE, WITH RESPECT TO PAYMENT OR OTHER CONTRACT REQUIREMENTS SHALL BE CONSPICUOUSLY PRESENTED IN A WRITTEN AGREEMENT SIGNED BY PARTICIPANT AND VENDOR.

Vendor will neither work on nor share in savings directly related to existing or planned WSSI or Affiliate initiatives. Vendor shall only be entitled to compensation as stated in this Schedule for items not documented in writing by WSSI or Affiliates.

WSSI or Affiliates shall provide Vendor with information necessary to proceed with the audit; e.g., State and Federal Tax ID #s, Tax Exempt Status, Primary contact, Accounts Payable contact, facility contact, and list of facilities to conduct utility or property-level audits. WSSI or Affiliates shall not negotiate new rates, fees, or contracts with utility vendors during the Term of this Agreement without the written consent of Vendor.

[Signatures appear on following page]

IN WITNESS WHEREOF, the parties hereto have set forth their signatures as of the date set forth above.

Wyndham Vacation Ownership, Inc.

By: _____
Print Name: _Paul Adams_
Title: _SVP_

The Eric Ryan Corporation

By: _____
Print Name: _Mary A. DeCaro_
Title: _CFO_

**EXHIBIT B**

(

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GORSS MOTELS, INC., a Connecticut corporation, individually and as the representative of a class of similarly-situated persons, <br><br> Plaintiff, <br><br> v. <br><br> THE ERIC RYAN CORPORATION, a Pennsylvania corporation, and JOHN DOES 1-5, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. <br><br>    **CLASS ACTION** |

### CLASS ACTION COMPLAINT

Plaintiff, GORSS MOTELS, INC. ("Plaintiff"), brings this action on behalf of itself and all others similarly situated, through its attorneys, and except as to those allegations pertaining to Plaintiff or its attorneys, which allegations are based upon personal knowledge, alleges the following upon information and belief against Defendants, THE ERIC RYAN CORPORATION and JOHN DOES 1-5 ("Defendants"):

### PRELIMINARY STATEMENT

1.      This case challenges Defendants' practice of sending unsolicited facsimiles.

2.      The federal Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 USC § 227 ("JFPA" or the "Act"), and the regulations promulgated under the Act, prohibit a person or entity from faxing or having an agent fax advertisements without the recipient's prior express invitation or permission. The JFPA provides a private right of action and provides statutory damages of $500 per violation. Upon information and belief, Defendants have sent facsimile transmissions of unsolicited advertisements to

Plaintiff and the Class in violation of the JFPA, including, but not limited to, the facsimile transmission of three unsolicited advertisements on or about March 1, 2013, November 1, 2013, and December 1, 2013 ("the Faxes"), true and correct copies of which are attached hereto as Exhibit A, and made a part hereof. The Faxes describe the commercial availability or quality of Defendants' products, goods and services. Plaintiff is informed and believes, and upon such information and belief avers, that Defendants have sent, and continue to send, unsolicited advertisements via facsimile transmission in violation of the JFPA, including but not limited to those advertisements sent to Plaintiff.

3.      Unsolicited faxes damage their recipients. A junk fax recipient loses the use of its fax machine, paper, and ink toner. An unsolicited fax wastes the recipient's valuable time that would have been spent on something else. A junk fax interrupts the recipient's privacy. Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

4.      On behalf of itself and all others similarly situated, Plaintiff brings this case as a class action asserting claims against Defendants under the JFPA. Plaintiff seeks to certify a class including faxes sent to Plaintiff and other advertisements sent without proper opt-out language or without prior express invitation or permission, whether sent to Plaintiff or not.

5.      Plaintiff is informed and believes, and upon such information and belief avers, that this action is based upon a common nucleus of operative facts because the facsimile transmissions at issue were and are being done in the same or similar manner. This action is based on the same legal theory, namely liability under the JFPA. This action seeks relief expressly authorized by the JFPA: (i) injunctive relief enjoining Defendants, their employees,

2

agents, representatives, contractors, affiliates, and all persons and entities acting in concert with them, from sending unsolicited advertisements in violation of the JFPA; and (ii) an award of statutory damages in the minimum amount of $500 for each violation of the JFPA, and to have such damages trebled, as provided by § 227(b)(3) of the Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

7.      This court has personal jurisdiction over Defendants because Defendants transact business within this judicial district, have made contacts within this judicial district, and/or have committed tortious acts within this judicial district.

## PARTIES

8.      Plaintiff, GORSS MOTELS, INC., is a Connecticut corporation.

9.      On information and belief, Defendant THE ERIC RYAN CORPORATION is a Pennsylvania corporation.

10.     JOHN DOES 1-5 will be identified through discovery, but are not presently known.

3

## FACTS

11.     On information and belief, on or about March 1, 2013, November 1, 2013, and December 1, 2013, Defendants used a telephone facsimile machine, computer, or other device to send three unsolicited facsimiles to Plaintiff.  Copies of the facsimiles are attached hereto as Exhibit A.

12.     On information and belief, Defendants received some or all of the revenues from the sale of the products, goods and services advertised on Exhibit A, and Defendants profit and benefit from the sale of the products, goods and services advertised on Exhibit A.

13.     Plaintiff did not give prior express invitation or permission to Defendants to send the fax.

14.     On information and belief, Defendants faxed the same and other unsolicited facsimiles with opt-out language identical or substantially similar to the opt-out language of the fax advertisement attached hereto as Exhibit A to Plaintiff and at least 40 other recipients or sent the same and other advertisements by fax with the required opt-out language but without first receiving the recipients' express invitation or permission and without having an established business relationship as defined by the TCPA and its regulations.

15.     There is no reasonable means for Plaintiff (or any other class member) to avoid receiving unauthorized faxes. Fax machines are left on and ready to receive the urgent communications their owners desire to receive.

16.     Defendants' facsimile attached as Exhibit A does not display a proper opt-out notice as required by 47 C.F.R. § 64.1200.

## CLASS ACTION ALLEGATIONS

17.     In accordance with Fed. R. Civ. P. 23(b)(1), (b)(2) and (b)(3), Plaintiff brings this

4

class action pursuant to the JFPA, on behalf of the following class of persons:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability or quality of any property, goods, or services by or on behalf of Defendants, (3) from whom Defendants did not obtain "prior express invitation or permission" to send fax advertisements, and (4) with whom Defendants did not have an established business relationship, and/or (5) which contained an opt-out notice that is identical or substantially similar to the opt-out notice contained in the fax advertisements Defendants sent to Plaintiff, which are attached hereto as Exhibit A.

Excluded from the Class are the Defendants, their employees, agents and members of the Judiciary. Plaintiff seeks to certify a class which include but are not limited to the fax advertisements sent to Plaintiff. Plaintiff reserves the right to amend the class definition upon completion of class certification discovery.

18.     Class Size (Fed. R. Civ. P. 23(a)(1)): Plaintiff is informed and believes, and upon such information and belief avers, that the number of persons and entities of the Plaintiff Class is numerous and joinder of all members is impracticable. Plaintiff is informed and believes, and upon such information and belief avers, that the number of class members is at least forty.

19.     Commonality (Fed. R. Civ. P. 23 (a) (2)): Common questions of law and fact apply to the claims of all class members. Common material questions of fact and law include, but are not limited to, the following:

(a)     Whether the Defendants sent unsolicited fax advertisements;

(b)     Whether Defendants' faxes sent to other persons, not the Plaintiff, constitute advertisements;

(c)     Whether the Defendants' faxes advertised the commercial availability or quality of property, goods, or services;

5

(d)     The manner and method the Defendants used to compile or obtain the list of fax numbers to which they sent Exhibit A, other unsolicited faxed advertisements or other advertisements without the required opt-out language;

(e)     Whether the Defendants faxed advertisements without first obtaining the recipient's prior invitation or permission;

(f)     Whether the Defendants sent the faxed advertisements knowingly;

(g)     Whether the Defendants violated the provisions of 47 U.S.C. § 227 and the regulations promulgated thereunder;

(h)     Whether the faxes contain an "opt-out notice" that complies with the requirements of § (b)(1)(C)(iii) of the Act, and the regulations promulgated thereunder, and the effect of the failure to comply with such requirements;

(i)     Whether the Defendants should be enjoined from faxing advertisements in the future;

(j)     Whether the Plaintiff and the other members of the class are entitled to statutory damages; and

(k)     Whether the Court should award treble damages.

20.     Typicality (Fed. R. Civ. P. 23 (a) (3)):  The Plaintiff's claims are typical of the claims of all class members. The Plaintiff received the same or similar faxes as the faxes sent by or on behalf of the Defendants advertising products, goods and services of the Defendants during the Class Period. The Plaintiff is making the same claims and seeking the same relief for itself and all class members based upon the same federal statute. The Defendants have acted in the same or in a similar manner with respect to the Plaintiff and all the class members by sending

Plaintiff and each member of the class the same or similar faxes or faxes which did not contain the proper opt-out language or were sent without prior express invitation or permission.

21.     Fair and Adequate Representation (Fed. R. Civ. P. 23 (a) (4)): The Plaintiff will fairly and adequately represent and protect the interests of the class. It is interested in this matter, has no conflicts, and has retained experienced class counsel to represent the class.

22.     Need for Consistent Standards and Practical Effect of Adjudication (Fed. R. Civ. P. 23 (b) (1)): Class certification is appropriate because the prosecution of individual actions by class members would: (a) create the risk of inconsistent adjudications that could establish incompatible standards of conduct for the Defendants, and/or (b) as a practical matter, adjudication of the Plaintiff's claims will be dispositive of the interests of class members who are not parties.

23.     Common Conduct (Fed. R. Civ. P. 23 (b) (2)): Class certification is also appropriate because the Defendants have in the same or similar manner with respect to all class members thereby making injunctive and declaratory relief appropriate. The Plaintiff demands such relief as authorized by 47 U.S.C. § 227.

24.     Predominance and Superiority (Fed. R. Civ. P. 23 (b) (3)): Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

        (a)     Proof of the claims of the Plaintiff will also prove the claims of the class without the need for separate or individualized proceedings;

(b)      Evidence regarding defenses or any exceptions to liability that the Defendants may assert and attempt to prove will come from the Defendants' records and will not require individualized or separate inquiries or proceedings;

(c)      The Defendants have acted and are continuing to act pursuant to common policies or practices in the same or similar manner with respect to all class members;

(d)      The amount likely to be recovered by individual class members does not support individual litigation. A class action will permit a large number of relatively small claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs; and

(e)      This case is inherently manageable as a class action in that:

(i)      The Defendants identified persons to receive the fax transmissions and it is believed that the Defendants' and/or Defendants' agents' computers and business records will enable the Plaintiff to readily identify class members and establish liability and damages;

(ii)      Liability and damages can be established for the Plaintiff and the class with the same common proofs;

(iii)     Statutory damages are provided for in the statute and are the same for all class members and can be calculated in the same or a similar manner;

(iv)     A class action will result in an orderly and expeditious administration of claims and it will foster economics of time, effort and expense;

(v)      A class action will contribute to uniformity of decisions concerning the Defendants' practices; and

8

(vi)   As a practical matter, the claims of the class are likely to go unaddressed absent class certification.

**Claim for Relief for Violation of the JFPA, 47 U.S.C. § 227 *et seq.***

25.   The JFPA makes it unlawful for any person to "use any telephone facsimile machine, computer or other device to send, to a telephone facsimile machine, an unsolicited advertisement . . ." 47 U.S.C. § 227(b)(1)(C).

26.   The JFPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227 (a) (5).

27.   **Opt-Out Notice Requirements.** The JFPA strengthened the prohibitions against the sending of unsolicited advertisements by requiring, in § (b)(1)(C)(iii) of the Act, that senders of faxed advertisements place a clear and conspicuous notice on the first page of the transmission that contains the following among other things (hereinafter collectively the "Opt-Out Notice Requirements"):

(1)   A statement that the recipient is legally entitled to opt-out of receiving future faxed advertisements – knowing that he or she has the legal right to request an opt-out gives impetus for recipients to make such a request, if desired;

(2)   A statement that the sender must honor a recipient's opt-out request within 30 days and the sender's failure to do so is unlawful – thereby encouraging recipients to opt-out, if they did not want future faxes, by advising them that their opt-out requests will have legal "teeth";

9

(3)   A statement advising the recipient that he or she may opt-out with respect to all of his or her facsimile telephone numbers and not just the ones that receive a faxed advertisement from the sender – thereby instructing a recipient on how to make a valid opt-out request for all of his or her fax machines;

(4)   The opt-out language must be conspicuous.

The requirement of (1) above is incorporated from § (b)(D)(ii) of the Act. The requirement of (2) above is incorporated from § (b)(D)(ii) of the Act and the rules and regulations of the Federal Communications Commission (the "FCC") in ¶ 31 of its 2006 Report and Order (*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act, Junk Prevention Act of 2005*, 21 F.C.C.R. 3787, 2006 WL 901720, which rules and regulations took effect on August 1, 2006). The requirements of (3) above are contained in § (b)(2)(E) of the Act and incorporated into the Opt-Out Notice Requirements via § (b)(2)(D)(ii). Compliance with the Opt-Out Notice Requirements is neither difficult nor costly. The Opt-Out Notice Requirements are important consumer protections bestowed by Congress upon the owners of the telephone lines and fax machines giving them the right, and means, to stop unwanted faxed advertisements.

28.   **2006 FCC Report and Order.** The JFPA, in § (b)(2) of the Act, directed the FCC to implement regulations regarding the JFPA, including the JFPA's Opt-Out Notice Requirements and the FCC did so in its 2006 Report and Order, which in addition provides among other things:

A.   The definition of, and the requirements for, an established business relationship for purposes of the first of the three prongs of an exemption to liability under § (b)(1)(C)(i) of the Act and provides that the lack of an "established business

10

relationship" precludes the ability to invoke the exemption contained in § (b)(1)(C) of the Act (*See* 2006 Report and Order ¶¶ 8-12 and 17-20);

B.      The required means by which a recipient's facsimile telephone number must be obtained for purposes of the second of the three prongs of the exemption under § (b)(1)(C)(ii) of the Act and provides that the failure to comply with these requirements precludes the ability to invoke the exemption contained in § (b)(1)(C) of the Act (*See* 2006 Report and Order ¶¶ 13-16);

C.      The things that must be done in order to comply with the Opt-Out Notice Requirements for the purposes of the third of the three prongs of the exemption under § (b)(1)(C)(iii) of the Act and provides that the failure to comply with these requirements precludes the ability to invoke the exemption contained in § (b)(1)(C) of the Act (*See* 2006 Report and Order ¶¶ 24-34);

D.      The failure of a sender to comply with the Opt-Out Notice Requirements precludes the sender from claiming that a recipient gave "prior express invitation or permission" to receive the sender's fax (*See* Report and Order ¶ 48).

As a result thereof, a sender of a faxed advertisement who fails to comply with the Opt-Out Notice Requirements has, by definition, transmitted an unsolicited advertisement under the JFPA. This is because such a sender can neither claim that the recipients of the faxed advertisement gave "prior express invitation or permission" to receive the fax nor can the sender claim the exemption from liability contained in § (b)(C)(1) of the Act.

29.     **The Faxes.** Defendants sent the advertisements on or about March 1, 2013, November 1, 2013, and December 1, 2013, via facsimile transmission from telephone facsimile machines, computers, or other devices to the telephone lines and facsimile machines of Plaintiff

and members of the Plaintiff Class. The Faxes constituted advertisements under the Act.
Defendants failed to comply with the Opt-Out Requirements in connection with the Faxes. The
Faxes were transmitted to persons or entities without their prior express invitation or permission
and/or Defendants are precluded from asserting any prior express invitation or permission or that
Defendants had an established business relationship with Plaintiff and other members of the
class, because of the failure to comply with the Opt-Out Notice Requirements. By virtue thereof,
Defendants violated the JFPA and the regulations promulgated thereunder by sending the Faxes
via facsimile transmission to Plaintiff and members of the Class. Plaintiff seeks to certify a class
which includes these faxes and all others sent during the four years prior to the filing of this case
through the present.

    30.    **Defendants' Other Violations.** Plaintiff is informed and believes, and upon such
information and belief avers, that during the period preceding four years of the filing of this
Complaint and repeatedly thereafter, Defendants have sent via facsimile transmission from
telephone facsimile machines, computers, or other devices to telephone facsimile machines of
members of the Plaintiff Class other faxes that constitute advertisements under the JFPA that
were transmitted to persons or entities without their prior express invitation or permission
(and/or that Defendants are precluded from asserting any prior express invitation or permission
or that Defendants had an established business relationship because of the failure to comply with
the Opt-Out Notice Requirements in connection with such transmissions). By virtue thereof,
Defendants violated the JFPA and the regulations promulgated thereunder. Plaintiff is informed
and believes, and upon such information and belief avers, that Defendants may be continuing to
send unsolicited advertisements via facsimile transmission in violation of the JFPA and the
regulations promulgated thereunder, and absent intervention by this Court, will do so in the

12

future.

31.     The TCPA/JFPA provides a private right of action to bring this action on behalf of Plaintiff and the Plaintiff Class to redress Defendants' violations of the Act, and provides for statutory damages. 47 U.S.C. § 227(b)(3). The Act also provides that injunctive relief is appropriate. *Id.*

32.     The JFPA is a strict liability statute, so the Defendants are liable to the Plaintiff and the other class members even if their actions were only negligent.

33.     The Defendants knew or should have known that (a) the Plaintiff and the other class members had not given prior express invitation or permission for the Defendants or anybody else to fax advertisements about the Defendants' products, goods or services; (b) the Plaintiff and the other class members did not have an established business relationship; (c) Defendants transmitted advertisements;    (d) the Faxes did not contain the required Opt-Out Notice; and (e) Defendants' transmission of advertisements that did not contain the required opt-out notice or were sent without prior express invitation or permission was unlawful.

34.     The Defendants' actions caused damages to the Plaintiff and the other class members. Receiving the Defendants' junk faxes caused Plaintiff and the other recipients to lose paper and toner consumed in the printing of the Defendants' faxes. Moreover, the Defendants' faxes used the Plaintiff's and the other class members' telephone lines and fax machine. The Defendants' faxes cost the Plaintiff and the other class members time, as the Plaintiff and the other class members and their employees wasted their time receiving, reviewing and routing the Defendants' unauthorized faxes. That time otherwise would have been spent on the Plaintiff's and the other class members' business activities. The Defendants' faxes unlawfully interrupted the Plaintiff's and other class members' privacy interests in being left alone.

WHEREFORE, Plaintiff, GORSS MOTELS, INC., individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, THE ERIC RYAN CORPORATION and JOHN DOES 1-5, jointly and severally, as follows:

A.    That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint the Plaintiff as the representative of the class, and appoint the Plaintiff's counsel as counsel for the class;

B.    That the Court award actual monetary loss from such violations or the sum of five hundred dollars ($500.00) for each violation, whichever is greater, and that the Court award treble damages of $1,500.00 if the violations are deemed "willful or knowing";

C.    That Court enjoin the Defendants from additional violations; and

D.    That the Court award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

Respectfully submitted,

GORSS MOTELS, INC., individually and as the representative of a class of similarly-situated persons,

By:    s/Aytan Y. Bellin
       Aytan Y. Bellin  ct28454

**BELLIN & ASSOCIATES LLC**
85 Miles Avenue
White Plains, NY 10606
Telephone: 914-358-5345
Aytan.Bellin@bellinlaw.com

**And:**
Brian J. Wanca (*pro hac vice to be submitted*)
**ANDERSON + WANCA**
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: 847-368-1500
bwanca@andersonwanca.com

14

# EXHIBIT A



## Utility and Telecommunications
## Expense Management and Consulting

Contract Analysis & Negotiation, Tax Analysis & Recovery, Rebate & Incentives, Procurement, Utilities, Telecommunications, Bill Auditing

## The Eric Ryan Corporation

The Eric Ryan Corporation specializes in many sectors of the utility and telecommunications market. Our services are designed to provide clients with a no cost, no risk approach that allows them to choose from a variety of services and programs based on their business needs. Eric Ryan Corporation's high quality professional services have made us one of the largest, most-sought-after cost management firms in the country. Our services include:



## Telecommunications Services

- Telecommunications Bill Auditing
- Contract Analysis and Negotiation
- Local, Long Distance, and Internet Pricing
- 24x7 Help Desk
- Network Design
- Bill Approval and Bill Pay Services
- Expense Management Solutions



## Utility Services

- Utility Bill Auditing
- Energy Procurement
- Bill Approval and Bill Pay Services
- Utility Budgeting
- Expense/Energy Management Software
- Site Surveys
- Power Factor Correction
- Rebates and Incentives
- Renewable Energy

All services are provided by Eric Ryan Corporation and not Wyndham Worldwide.

## Sign Up Now For a Free Utility and Telecommunications Bill Review!

Eric Ryan Corporation and Wyndham Worldwide Strategic Sourcing have negotiated deeply-discounted rates for Wyndham Hotel Group. Call, e-mail or use our online *Wyndham Hotel Group - Specials Form* to connect with an Eric Ryan Corporation Service Associate and learn about the many ways Eric Ryan Corporation can help reduce your monthly utility and telecommunications expenses now!

With no up-front cost, no obligations and flexible "fee for service" options, Eric Ryan Corporation makes it easy for its hospitality clients to set and implement their own cost-cutting priorities for the benefit of their properties.

### To Find Out More...

call: **(800) 837-6406**

e-mail: sales@ericryan.com

online: http://www.ericryan.com/wyndham-specials/

- No Up-Front Cost, No Risk, No Hidden Fees
- Save Time and Effort
- Reduce Management Stress
- Retain Full Control Over Services
- Accurate Service Inventory and Reporting
- Helpful and Friendly Customer Service
- Simple Turn Key Process

*Eric Ryan Corporation*

E-mail: sales@ericryan.com

Phone: **(800) 837-6406**

Intl: **(724) 752-8900**



This facsimile contains confidential information intended only for the use by Wyndham Worldwide entities. If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile by error, please immediately notify us by emailing strategic.sourcing@wyn.com. To opt out from future faxes, email strategic.sourcing@wyn.com or call this toll-free number. (877) 754-4212.



## Eric Ryan Corporation (ERC) Billing Audits Help You Find & Fix Both Utility & Telecom Billing Errors

## Try the new ERC service of a
## "Bills-No-Contract" pre-audit review!

Before signing contracts and providing bills for an audit, ERC will conduct
a quick review of your current month's utility and telecom bills.

If possible opportunities for savings are identified,
ERC will recommend to proceed with a full contracted audit.

**www.ericryan.com**
**info@ericryan.com**
**Call us 1-800-837-6406**




This facsimile contains confidential information intended only for the use by Wyndham Worldwide entities. If the reader of this facsimile is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile by error, please notify us immediately via email at strategic.sourcing@wyn.com. To opt out from future faxes, email strategic.sourcing@wyn.com or call this toll-free number (877) 784-9212.



## Try the new ERC service of a "Bills-No-Contract" pre-audit review!

Before signing contracts and providing bills for an audit, ERC will conduct a quick review of your current month's utility and telecom bills.

If possible opportunities for savings are identified, ERC will recommend to proceed with a full contracted audit.

**www.ericryan.com**
**info@ericryan.com**
**Call us 1-800-837-6406**




JS-44  (Rev. 09/11)

Case 3:17-cv-00126-VAB   Document 1-1   Filed 01/27/17   Page 1 of 2

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| GORSS MOTELS, INC. | THE ERIC RYAN CORPORATION, a Pennsylvania corporation, and JOHN DOES 1-5. |

| **(b)** County of Residence of First Listed Plaintiff   Middlesex | County of Residence of First Listed Defendant   Lawrence County, PA |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Bellin & Associates LLC   914-358-5345<br>85 Miles Avenue White Plains, NY 10606 | Attorneys *(If Known)* |
|---|---|

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Med. Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

### V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 U.S.C. Sec. 227

Brief description of cause:
Violation of the Telephone Consumer Protection Act.

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☐ Yes  ☒ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

DATE
01/27/2017

SIGNATURE OF ATTORNEY OF RECORD
s/Aytan Y. Bellin ct28454

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 09/11)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a) Plaintiffs-Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdiction be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.    Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.    Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity.    Example:    U.S. Civil Statute: 47 USC 553
    Brief Description: Unauthorized reception of cable service

VII.    Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    Related Cases. This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.

**EXHIBIT C**



## CAFARDI FERGUSON WYRICK WEIS + STOTLER llc

November 29, 2018

**_Via Certified Mail, Return Receipt Requested_**
Mr. David S. Sager, Esq.
DLA Piper LLP
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078-2704

     RE:    Gorss v. Eric Ryan (No. 3:17-cv-00126 [DJS])
                  Pending in the United States District Court for the District of Connecticut

Dear Mr. Sager,

      This Firm continues to represent Eric Ryan Corporation, Inc. ("ERC") in the above-referenced litigation currently pending in the United States District Court for the District of Connecticut (the "Litigation"). Based upon our previous communications, it is my understanding that you represent Wyndham Worldwide Corporation ("Wyndham") and its subsidiary, Worldwide Sourcing Solutions, Inc. ("WSSI"). If this is no longer the case, please destroy this letter and disregard its contents.

      By this correspondence, ERC demands that Wyndham and/or WSSI indemnify it for costs and/or liability incurred as a result of the Litigation, including, but not limited to, attorneys' fees incurred defense of the Litigation. As discussed, the Litigation arises solely from the October 15, 2010 Worldwide Sourcing Agreement entered into between ERC and WSSI.

      ERC is currently engaged in settlement negotiations with Plaintiff's counsel in the Litigation. That same counsel has filed a Motion for Class Certification seeking certification as Class Counsel. Due to ERC's assertion that it is owed indemnification from Wyndham and/or WSSI, this correspondence shall also serve as an invitation for Wyndham and/or WSSI to participate in such settlement negotiations with Plaintiff's counsel so that it may protect its interest in any settlement amount agreed to for which ERC will then seek indemnification from Wyndham and/or WSSI.

      Contact me immediately with any questions you may have.

2805 Nicholson Road | Suite 2201 | Sewickley PA 15143 | T 412.515.8900 | F 412.515.8901



Very truly yours,

Cafardi Ferguson Wyrick Weis + Stotler LLC

By: _____

Christopher A. Cafardi, Esq.

# **EXHIBIT D**



**DLA Piper LLP (US)**
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey  07078-2704
www.dlapiper.com

David S. Sager
david.sager@dlapiper.com
T   973.520.2570
F   973.215.2604

*Partners Responsible for Short Hills Office:*
*Andrew P. Gilbert*
*Michael E. Helmer*

January 2, 2019

**BY E-MAIL AND OVERNIGHT DELIVERY**

Christopher A. Cafardi, Esq.
Cafardi Ferguson Wyrick Weis & Stotler LLC
2605 Nicholson Road, Suite 2201
Sewickley, Pennsylvania 15143

Re:    **Gorss Motels, Inc. v. The Eric Ryan Corporation**
       **Civil Action No. 3:17-cv-00126 (D. Conn.) (the "Action")**

Dear Mr. Cafardi:

On behalf of Wyndham Hotel Group, LLC ("WHG") and Worldwide Sourcing Solutions, Inc. ("WSSI" and, with WHG, "Wyndham"), I am writing in response to your letter demanding indemnification from Wyndham on behalf of your client, The Eric Ryan Corporation ("ERC").  We do not believe that the Action has any merit, and, in any event, we disagree that Wyndham has any obligation to indemnify ERC or participate in settlement discussions with plaintiff.

The Worldwide Sourcing Agreement ("Agreement") between WSSI and ERC, as amended, does not provide any basis for indemnification to ERC, nor does it impose any obligation on WSSI to become involved in any way in the Action.  That said, we believe that ERC and Wyndham share a joint interest in demonstrating that plaintiff's claims lack merit for reasons articulated in motions filed by other vendors and in various court decisions, including the November 15, 2018 Order in the *Safemark* matter granting Safemark's motion for summary judgment.  Wyndham remains willing to work with ERC in advancing these arguments without prejudice to either party's rights, but Wyndham will not agree to provide indemnification or participate in settlement discussions with plaintiff's counsel because it sees no legal, strategic, or practical reason to do so.

Very truly yours,

**DLA Piper LLP (US)**

David S. Sager
Partner

cc:    Marc Merriweather, Group Vice President - Litigation, Wyndham Worldwide Corporation

**EXHIBIT E**

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

CLOSED,EFILE

# U.S. District Court
## District of Connecticut (New Haven)
### CIVIL DOCKET FOR CASE #: 3:17-cv-00126-DJS

Gorss Motels Inc. v. Eric Ryan Corporation et al
Assigned to: Judge Dominic J. Squatrito
Cause: Telecommunications Act

Date Filed: 01/27/2017
Date Terminated: 05/26/2020
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Gorss Motels Inc.**
*a Connecticut Corporation, individually
and as the representative of a class of
similarly situated persons*

represented by **Aytan Y. Bellin**
Bellin & Associates, LLC
50 Main Street, Suite 1000
White Plains, NY 10606
914-358-5345
Fax: 212-571-0284
Email: aytan.bellin@bellinlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Michael Kelly**
Anderson & Wanca
3701 Algonquin Road
Suite 500
Rolling Meadows, IL 60008
847-368-1500
Fax: 847-368-1501
Email: rkelly@andersonwanca.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eric Ryan Corporation**
*a Pennsylvania corporation*

represented by **Christopher A. Cafardi**
Cafardi Ferguson Wyrick Weis &
Stotler, LLC
2605 Nicholson Rd., Suite 2101
Sewickley, PA 15143
412-515-8900
Fax: 412-515-8901

Email: ccafardi@cfwws.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan D. DeMotte**
Cafardi Ferguson Wyrick Weis &
Stotler, LLC
2605 Nicholson Rd., Suite 2101
Sewickley, PA 15143
412-515-8900
Fax: 412-515-8901
Email: rdemotte@cfwws.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey J. White**
Robinson & Cole, LLP-HTFD
280 Trumbull St.
Hartford, CT 06103
860-275-8252
Fax: 860-275-8299
Email: jwhite@rc.com
*TERMINATED: 02/22/2019*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Shapiro**
Aeton Law Partners LLP
311 Centerpoint Drive
Middletown, CT 06457
860-724-2160
Fax: 860-724-2161
Email: jms@aetonlaw.com
*ATTORNEY TO BE NOTICED*

**Kathleen Elizabeth Dion**
Robinson & Cole, LLP-HTFD
280 Trumbull St.
Hartford, CT 06103
860-275-8231
Fax: 860-275-8299
Email: kdion@rc.com
*TERMINATED: 02/22/2019*
*ATTORNEY TO BE NOTICED*

**Defendant**
**John Does**
*1-5*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/27/2017 | 1 | COMPLAINT against John Does 1-5, The Eric Ryan Corporation ( Filing fee $400 receipt number 0205-4278710.), filed by Gorss Motels Inc.. (Attachments: # 1 Civil Cover Sheet)(Bellin, Aytan) (Entered: 01/27/2017) |
| 01/27/2017 | | Request for Clerk to issue summons as to John Does 1-5, The Eric Ryan Corporation. (Bellin, Aytan) (Entered: 01/27/2017) |
| 01/27/2017 | 2 | Corporate Disclosure Statement by Gorss Motels Inc.. (Bellin, Aytan) (Entered: 01/27/2017) |
| 01/27/2017 | 3 | MOTION to Certify Class (), MOTION to Stay () by Gorss Motels Inc..Responses due by 2/17/2017 (Bellin, Aytan) (Entered: 01/27/2017) |
| 01/27/2017 | 4 | Memorandum in Support re 3 MOTION to Certify Class MOTION to Stay filed by Gorss Motels Inc.. (Bellin, Aytan) (Entered: 01/27/2017) |
| 01/27/2017 | | Judge Victor A. Bolden added. (Walker, A) (Entered: 01/30/2017) |
| 01/27/2017 | 5 | Order on Pretrial Deadlines: Motions to Dismiss due on 4/27/2017. Amended Pleadings due by 3/28/2017. Discovery due by 7/29/2017. Dispositive Motions due by 8/28/2017.<br>Signed by Clerk on 1/27/2017.(Fazekas, J.) (Entered: 01/30/2017) |
| 01/27/2017 | 6 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Victor A. Bolden on 1/27/2017.(Fazekas, J.) (Entered: 01/30/2017) |
| 01/27/2017 | 7 | STANDING PROTECTIVE ORDER<br>Signed by Judge Victor A. Bolden on 1/27/2017.(Fazekas, J.) (Entered: 01/30/2017) |
| 01/30/2017 | 8 | NOTICE TO COUNSEL/PRO SE PARTIES : Counsel or pro se parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 6 Electronic Filing Order, 1 Complaint filed by Gorss Motels Inc., 7 Standing Protective Order, 4 Memorandum in Support of Motion filed by Gorss Motels Inc., 5 Order on Pretrial Deadlines, 2 Corporate Disclosure Statement filed by Gorss Motels Inc., 3 MOTION to Certify Class MOTION to Stay filed by Gorss Motels Inc.<br>Signed by Clerk on 1/27/2017.(Fazekas, J.) (Entered: 01/30/2017) |
| 01/30/2017 | 9 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *John Does, Eric Ryan Corporation* with answer to complaint due within *21* days. Attorney *Aytan Y. Bellin* *Bellin & Associates LLC* *85 Miles Avenue* *White Plains, NY 10606*. (Fazekas, J.) (Entered: 01/30/2017) |
| 02/21/2017 | 10 | NOTICE of Appearance by Kathleen Elizabeth Dion on behalf of Eric Ryan Corporation (Dion, Kathleen) (Entered: 02/21/2017) |
| 02/21/2017 | 11 | NOTICE of Appearance by Jeffrey J. White on behalf of Eric Ryan Corporation (White, Jeffrey) (Entered: 02/21/2017) |

| 02/22/2017 | 12 | MOTION for Extension of Time until March 27, 2017 to Respond to Complaint 1 Complaint by Eric Ryan Corporation. (Dion, Kathleen) (Entered: 02/22/2017) |
| 02/23/2017 | 13 | ORDER granting 12 Motion for Extension of Time until 3/27/2017 for Defendant Eric Ryan Corp. to respond to Complaint. Signed by Judge Victor A. Bolden on 2/23/2017. (Chen, C.) (Entered: 02/23/2017) |
| 02/23/2017 | | Set Deadlines/Hearings: Rule 26 Meeting Report due by 4/6/2017 (Perez, J.) (Entered: 02/23/2017) |
| 03/17/2017 | 14 | MOTION for Attorney(s) Ryan D. DeMotte to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4333833) by Eric Ryan Corporation. (Attachments: # 1 Exhibit A)(Dion, Kathleen) (Entered: 03/17/2017) |
| 03/17/2017 | 15 | MOTION for Attorney(s) Christopher A. Cafardi to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4333851) by Eric Ryan Corporation. (Attachments: # 1 Exhibit A)(Dion, Kathleen) (Entered: 03/17/2017) |
| 03/17/2017 | 16 | MOTION to Stay *of Litigation Pending Decision by D.C. Circuit on the Viability of the FCC's "Solicited Fax" Rule* by Eric Ryan Corporation.Responses due by 4/7/2017 (Attachments: # 1 Affidavit of Kathleen Barillo, # 2 Affidavit of Jeffrey J. White)(Dion, Kathleen) (Entered: 03/17/2017) |
| 03/20/2017 | 17 | ORDER granting 14 Motion to Appear Pro Hac Vice for Ryan D. DeMotte, Certificate of Good Standing due by 5/19/2017. Signed by Clerk on 3/20/2017. (Fazekas, J.) (Entered: 03/20/2017) |
| 03/20/2017 | 18 | ORDER granting 15 Motion to Appear Pro Hac Vice for Christopher A. Cafardi, Certificate of Good Standing due by 5/19/2017. Signed by Clerk on 3/20/2017. (Fazekas, J.) (Entered: 03/20/2017) |
| 03/23/2017 | 19 | MOTION for Extension of Time by Eric Ryan Corporation. (Dion, Kathleen) (Entered: 03/23/2017) |
| 03/24/2017 | 20 | ORDER granting 19 Motion for Extension of Time for Defendants to file a response to Plaintiff's Complaint and for the parties to file a Rule 26(f) Report until the Court has ruled on the pending 16 Motion to Stay. If the Court denies the Motion to Stay, Defendants will have 14 days to file a response to the Complaint and the parties will have 14 days to file a Rule 26(f) Report. Signed by Judge Victor A. Bolden on 3/24/2017. (Chen, C.) (Entered: 03/24/2017) |
| 04/04/2017 | 21 | NOTICE of Appearance by Ryan Michael Kelly on behalf of Gorss Motels Inc. (Kelly, Ryan) (Entered: 04/04/2017) |
| 04/06/2017 | 22 | ORDER finding as moot 16 Motion to Stay, in light of the D.C. Circuit Court's decision in *Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, No. 14-1234, 2017 WL 1192909 (D.C. Cir. Mar. 31, 2017). Signed by Judge Victor A. Bolden on 4/6/2017. (Chen, C.) (Entered: 04/06/2017) |
| 04/06/2017 | 23 | SCHEDULING ORDER: In light of the Court's 22 Order finding as moot the Motion to Stay and the Court's 20 Order granting Extension of Time pending resolution of the Motion to Stay, the parties' Rule 26 Meeting Report is due by |

| | | |
|---|---|---|
| | | 4/21/2017 and Defendant shall respond to Plaintiff's Complaint by 4/21/2017. Signed by Judge Victor A. Bolden on 4/6/2017. (Chen, C.) (Entered: 04/06/2017) |
| 04/10/2017 | | Answer deadline updated for Eric Ryan Corporation to 4/21/2017. (Perez, J.) (Entered: 04/10/2017) |
| 04/21/2017 | 24 | Joint REPORT of Rule 26(f) Planning Meeting. (Kelly, Ryan) (Entered: 04/21/2017) |
| 04/21/2017 | 25 | ANSWER to 1 Complaint with Affirmative Defenses by Eric Ryan Corporation.(Dion, Kathleen) (Entered: 04/21/2017) |
| 04/24/2017 | 26 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Rule 16 Telephonic Status Conference set for 5/8/2017 11:30 AM before Judge Victor A. Bolden. Once all parties are on the line, Counsel shall call Chambers at 203-579-5562. (Chen, C.) (Entered: 04/24/2017) |
| 05/08/2017 | 27 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 5/8/2017 11:30 AM* Telephonic Rule 16 Status Conference set for 5/8/2017 03:00 PM before Judge Victor A. Bolden. Once all parties are on the line, Counsel shall call Chambers at 203-579-5562. (Chen, C.) (Entered: 05/08/2017) |
| 05/08/2017 | 28 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. *RESET FROM 5/8/2017 03:00 PM* Rule 16 Telephonic Status Conference set for 5/11/2017 03:00 PM before Judge Victor A. Bolden. (Chen, C.) (Entered: 05/08/2017) |
| 05/11/2017 | 29 | ENTERED IN ERROR: Minute Entry for proceedings held before Judge Victor A. Bolden: Telephonic Status Conference held on 5/11/2017. 7 minutes. (Court Reporter S. Montini.) (Chen, C.) Modified on 5/12/2017 (Perez, J.). (Entered: 05/11/2017) |
| 05/11/2017 | 30 | Minute Entry for proceedings held before Judge Victor A. Bolden: Rule 16 TelephonicStatus Conference held on 5/11/2017. 28 minutes. (Court Reporter S. Montini.) (Chen, C.) (Entered: 05/11/2017) |
| 05/11/2017 | 31 | SCHEDULING ORDER: Post-Discovery Telephonic Status Conference set for 4/12/2018 02:00 PM before Judge Victor A. Bolden; Discovery due by 3/30/2018; Dispositive Motions due by 5/25/2018; Class Certification Motion due by 5/25/2018; Plaintiff to Designate Expert Witnesses by 1/12/2018; Depositions of Plaintiff Experts by 3/2/2018; Defendant to Designate Expert Witnesses by 2/16/2018; Depositions of Defendant Experts by 3/30/2018; Damages Analysis by 1/5/2018; Joint Trial Memorandum due 30 days after the Court rules on dispositive motions; Trial Ready date is 30 days after filing of Joint Trial Memorandum. |

| | | |
|---|---|---|
| | | The Court reserves judgment on whether Plaintiffs may file Dispositive Motions after class certification is granted, should class certification be granted. Signed by Judge Victor A. Bolden on 5/11/2017. (Chen, C.) (Entered: 05/11/2017) |
| 05/12/2017 | 32 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Post-Discovery Telephonic Status Conference set for 4/12/2018 02:00 PM before Judge Victor A. Bolden. Once all parties are on the line, Counsel shall call Chambers at 203-579-5562. (Chen, C.) (Entered: 05/12/2017) |
| 05/15/2017 | 33 | Docket Entry Correction: Minute entry 29 docketed on wrong case. (Perez, J.) (Entered: 05/15/2017) |
| 05/17/2017 | 34 | ORDER denying without prejudice 3 Motion to Certify Class; denying without prejudice 3 Motion to Stay. The Court has already set a schedule for when Plaintiff should file its Motion for Class Certification in the 31 SCHEDULING ORDER. Any other issues raised in these motions can be taken up at a later date, if needed. Signed by Judge Victor A. Bolden on 5/17/2017. (Chen, C.) (Entered: 05/17/2017) |
| 05/24/2017 | | ORDER Revoking Visiting Attorney Status of Attorney Ryan D. DeMotte for failure to comply with Local Rule 83.1(d)(4) requiring the filing of a Certificate of Good Standing. The Clerk of the Court shall examine the Courts docket and revoke said attorneys visiting attorney status in all cases in which said attorney has filed an appearance. Signed by Clerk on 5/24/2017.(Perez, J.) (Entered: 05/24/2017) |
| 05/24/2017 | | ORDER Revoking Visiting Attorney Status of Attorney Christopher A. Cafardi for failure to comply with Local Rule 83.1(d)(4) requiring the filing of a Certificate of Good Standing. The Clerk of the Court shall examine the Courts docket and revoke said attorneys visiting attorney status in all cases in which said attorney has filed an appearance. Signed by Clerk on 5/24/2017.(Perez, J.) (Entered: 05/24/2017) |
| 05/25/2017 | 35 | MOTION for Attorney(s) Christopher A. Cafardi to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4416674) by Eric Ryan Corporation. (Attachments: # 1 Exhibit A)(Dion, Kathleen) (Entered: 05/25/2017) |
| 05/25/2017 | 36 | MOTION for Attorney(s) Ryan D. DeMotte to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 0205-4416703) by Eric Ryan Corporation. (Attachments: # 1 Exhibit A)(Dion, Kathleen) (Entered: 05/25/2017) |
| 05/26/2017 | 37 | ORDER granting 35 Motion to Appear Pro Hac Vice for Christopher A. Cafardi. Signed by Clerk on 5/26/2017. (Fazekas, J.) (Entered: 05/26/2017) |
| 05/26/2017 | 38 | ORDER granting 36 Motion to Appear Pro Hac Vice for Ryan D. DeMotte . Signed by Clerk on 5/26/2017. (Fazekas, J.) Modified on 5/26/2017 to edit text (Fazekas, J.). (Entered: 05/26/2017) |
| 12/04/2017 | 39 | |

| | | |
|---|---|---|
| | | ORDER OF TRANSFER. Case reassigned to Judge Dominic J. Squatrito for all further proceedings.<br>Signed by Clerk on 12/4/2017.(Walker, A) (Entered: 12/04/2017) |
| 12/05/2017 | 40 | ORDER. This case was recently transferred to the undersigned. The telephone conference set out in 31 Scheduling Order for April 12, 2018, is hereby cancelled. All other scheduled dates shall remain in full force and effect. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 12/5/17.(Pike, C.) (Entered: 12/05/2017) |
| 01/04/2018 | 41 | MOTION for Extension of Time until 1-26-18 *for* Plaintiff Gorss Motels, Inc. to provide its Damage Analysis and Designation of Expert Witnesses 31 Scheduling Order,,, by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 01/04/2018) |
| 01/08/2018 | 42 | ORDER granting 41 Motion for Extension of Time until January 26, 2018 to provide its Damage Analysis and Designation of Expert Witnesses. Signed by Judge Dominic J. Squatrito on 1/8/18. (Pike, C.) (Entered: 01/08/2018) |
| 02/15/2018 | 43 | MOTION for Extension of Time by Eric Ryan Corporation. (White, Jeffrey) (Entered: 02/15/2018) |
| 02/16/2018 | 44 | ORDER granting 43 Motion for Extension of Time. The defendant shall designate its expert witnesses by March 16, 2018. Signed by Judge Dominic J. Squatrito on 2/16/2018. (Ring, T.) (Entered: 02/16/2018) |
| 02/28/2018 | 45 | MOTION for Extension of Time until March 23, 2018 Deadline to Depose Plaintiff's Expert by Eric Ryan Corporation. (Dion, Kathleen) (Entered: 02/28/2018) |
| 03/01/2018 | 46 | ORDER granting 45 Motion for Extension of Time until March 23,2018 to depose plaintiff's expert. All other scheduled dates shall not be modified by this Order. Signed by Judge Dominic J. Squatrito on 3/1/18. (Pike, C.) (Entered: 03/01/2018) |
| 03/29/2018 | 47 | MOTION for Extension of Time until May 25, 2018 To Complete Discovery 31 Scheduling Order,,, by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 03/29/2018) |
| 04/10/2018 | 48 | Memorandum in Opposition re 47 MOTION for Extension of Time until May 25, 2018 To Complete Discovery 31 Scheduling Order,,, filed by Eric Ryan Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Dion, Kathleen) (Entered: 04/10/2018) |
| 04/24/2018 | 49 | ORDER denying 47 Motion for Extension of Time. The plaintiff has failed to make a "particularized showing that the time limitation in question [could] not reasonably be met despite the diligence of the party seeking the extension." L. Civ. R. 7 (b)1. In its March 29, 2018 motion, plaintiff cites a need to obtain information from third-party Wyndham Hotel Group to be used by plaintiff's expert witness, but, according to the defendant, Wyndham served its responses and objections to the plaintiff's subpoena in October 2017 and the plaintiff took no action to enforce that subpoena in the intervening five month period. Also, plaintiff characterizes its motion as the first "to extend the deadline to complete discovery in the May 11, 2017 scheduling order." Doc. # 47. The Court notes, |

|            |    | however, that a prior extension to January 26, 2018 was requested and granted for plaintiff "to provide its Damage Analysis and Designation of Expert Witnesses." Doc. # 41. These are the very same reasons given as the good cause supporting the motion that is the subject of this ruling. Signed by Judge Dominic J. Squatrito on 4/24/2018. (Ring, T.) (Entered: 04/24/2018) |
|------------|----|---|
| 05/22/2018 | 50 | Joint MOTION for Extension of Time until June 22, 2018 to File Motion for Class Certification and Dispositive Motion deadline be stricken by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 05/22/2018) |
| 05/23/2018 | 51 | ORDER granting 50 Motion for Extension of Time until June 22, 2018 to file a class certification. Dispositive motions shall be filed 30 days after the ruling on the class certification. Signed by Judge Dominic J. Squatrito on 5/23/18. (Pike, C.) (Entered: 05/23/2018) |
| 06/22/2018 | 52 | MOTION to Certify Class by Gorss Motels Inc..Responses due by 7/13/2018 (Attachments: # 1 Memorandum in Support, # 2 Appendix of Exhibits, # 3 Exhibit A - 3.01.13 Fax, # 4 Exhibit B - Barillaro Dep, # 5 Exhibit C - Venezie Dep, # 6 Exhibit D - Pfeiffer Dep, # 7 Exhibit E - 2.22.13 email w/ fax, # 8 Exhibit F - Clark Dep, # 9 Exhibit G - Gorss Dep, # 10 Exhibit H - Def. Ans. RFA, # 11 Exhibit I - Df. Ans. Interrogs, # 12 Exhibit J - A+W Resume, # 13 Exhibit K - Bellin Decl.)(Kelly, Ryan) (Entered: 06/22/2018) |
| 06/22/2018 | 53 | MOTION to Seal Part of Ex. E to Pltf. Motion/Memorandum in Support of Class Certification by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 06/22/2018) |
| 06/22/2018 | 54 | Sealed Document: Part of Exhibit E to Plaintiff's Memorandum in Support of Moton for Class Certification by Gorss Motels Inc. re 53 MOTION to Seal Part of Ex. E to Pltf. Motion/Memorandum in Support of Class Certification, 52 MOTION to Certify Class . (Kelly, Ryan) (Entered: 06/22/2018) |
| 06/25/2018 | 55 | ORDER granting 53 Motion to Seal. The Clerk shall place under seal 54 as requested in 53 . Signed by Judge Dominic J. Squatrito on 6/25/18. (Pike, C.) (Entered: 06/25/2018) |
| 07/13/2018 | 56 | Memorandum in Opposition re 52 MOTION to Certify Class filed by Eric Ryan Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Dion, Kathleen) (Entered: 07/13/2018) |
| 07/27/2018 | 57 | REPLY to Response to 52 MOTION to Certify Class filed by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 07/27/2018) |
| 11/30/2018 | 58 | Notice of Additional Authority *in Support of Defendant's Opposition* re 52 MOTION to Certify Class filed by Eric Ryan Corporation. (Attachments: # 1 Exhibit A)(Dion, Kathleen) (Entered: 11/30/2018) |
| 12/05/2018 | 59 | RESPONSE re 58 Notice of Additional Authority by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 12/05/2018) |
| 02/21/2019 | 60 | NOTICE of Appearance by Jonathan M. Shapiro on behalf of Eric Ryan Corporation (Shapiro, Jonathan) (Entered: 02/21/2019) |
| 02/21/2019 | 61 | MOTION for Jeffrey J. White to Withdraw as Attorney by Eric Ryan Corporation. (White, Jeffrey) (Entered: 02/21/2019) |

| | | |
|---|---|---|
| 02/21/2019 | 62 | MOTION for Kathleen E. Dion to Withdraw as Attorney by Eric Ryan Corporation. (Dion, Kathleen) (Entered: 02/21/2019) |
| 02/22/2019 | 63 | ORDER granting 61 Motion to Withdraw as Attorney. Attorney Jeffrey J. White terminated; granting 62 Motion to Withdraw as Attorney. Attorney Kathleen Elizabeth Dion terminated. Signed by Judge Dominic J. Squatrito on 2/22/19. (Pike, C.) (Entered: 02/22/2019) |
| 03/28/2019 | 65 | RULING denying 52 Motion For Class Certification. In accordance with the Court's previous Order (ECF No. 51), dispositive motions shall be filed by 4/29/2019. So ordered by Judge Dominic J. Squatrito on 3/28/2019. (Pipech, L.) (Entered: 03/29/2019) |
| 03/29/2019 | 64 | NOTICE by Eric Ryan Corporation re 56 Memorandum in Opposition to Motion *Supplemental Authority* (Attachments: # 1 Exhibit A)(Shapiro, Jonathan) (Entered: 03/29/2019) |
| 03/29/2019 | | Set Deadlines/Hearings: Dispositive Motions due by 4/29/2019 (Pike, C.) (Entered: 03/29/2019) |
| 04/17/2019 | 66 | MOTION to Stay *(Unopposed)* by Gorss Motels Inc..Responses due by 5/8/2019 (Kelly, Ryan) (Entered: 04/17/2019) |
| 04/18/2019 | 67 | ORDER granting 66 Motion to Stay. The parties shall notify the Court when the Second Circuit acts on the plaintiff's petition for permission to appeal. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 4/18/19. (Pike, C.) (Entered: 04/18/2019) |
| 04/18/2019 | | Case Stayed. See 67 order. (Bozek, M.) (Entered: 04/19/2019) |
| 07/02/2019 | 68 | MANDATE of USCA issued on 7/2/2019: DENIED because an immediate appeal is not warranted re: Gorss Motels, Inc.'s request for leave to appeal the district court's order denying plaintiff's motion for class certification.(Pipech, L.) (Entered: 07/08/2019) |
| 07/16/2019 | 69 | ORDER. A Mandate of USCA was issued on 7/2/19, see 68 . The Court issued an Order, see 67 directing the parties to advise the Court when the Second Circuit acts on plaintiff's Petition for Permission to Appeal. The parties failed to do that. Therefore, the stay is lifted and a dispositive motion is due on August 9, 2019 and if no dispositive motion is filed, the parties shall file their joint trial memorandum by August 9, 2019. This case shall be trial ready September, 2019. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 7/16/19.(Pike, C.) (Entered: 07/16/2019) |
| 07/18/2019 | 70 | MOTION for Extension of Time until October 11, 2019 To File Dispositive Motions 69 Order,, by Eric Ryan Corporation. (Shapiro, Jonathan) (Entered: 07/18/2019) |
| 07/19/2019 | 71 | ORDER granting in part 70 Motion for Extension of Time. A dispositive motion shall be filed by September 9, 2019 and if no dispositive motion is filed, the parties shall file their joint trial memorandum by September 9, 2019. This case shall be trial ready October, 2019. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 7/19/19. (Pike, C.) (Entered: 07/19/2019) |
| | | |

| 07/19/2019 | | Set Deadlines/Hearings: Dispositive Motions due by 9/9/2019 Trial Brief due by 9/9/2019 Trial Ready Date 10/2019 (Pike, C.) (Entered: 07/19/2019) |
|---|---|---|
| 09/09/2019 | 72 | MOTION for Summary Judgment by Gorss Motels Inc..Responses due by 9/30/2019 (Attachments: # 1 Memorandum in Support)(Kelly, Ryan) (Entered: 09/09/2019) |
| 09/09/2019 | 73 | Statement of Material Facts re 72 MOTION for Summary Judgment *(Local Rule 56(A)(1)* filed by Gorss Motels Inc.. (Attachments: # 1 Appendix of Exhibits, # 2 Exhibit 1 - 5, # 3 Exhibit 6 - 7, # 4 Exhibit 8 - 12)(Kelly, Ryan) (Entered: 09/09/2019) |
| 09/09/2019 | 74 | MOTION to Seal *(Unopposed)* Exhibit 12 to Motion for Summary Judgment (Site Contact Form) by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 09/09/2019) |
| 09/09/2019 | 75 | Sealed Document: Exhibit 12 to Plaintiff's Motion for Summary Judgment - Site Contact Form by Gorss Motels Inc. re 74 MOTION to Seal *(Unopposed)* Exhibit 12 to Motion for Summary Judgment (Site Contact Form), 73 Statement of Material Facts, . (Kelly, Ryan) (Entered: 09/09/2019) |
| 09/09/2019 | 76 | MOTION for Summary Judgment by Eric Ryan Corporation.Responses due by 9/30/2019 (Attachments: # 1 Memorandum in Support)(Shapiro, Jonathan) (Entered: 09/09/2019) |
| 09/09/2019 | 77 | Statement of Material Facts re 76 MOTION for Summary Judgment filed by Eric Ryan Corporation. (Attachments: # 1 Appendix of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(Shapiro, Jonathan) (Entered: 09/09/2019) |
| 09/09/2019 | 78 | MOTION to Seal Exhibits C & E to Exhibit 3 and Exhibit 8 to Rule 56 Statement of Material Facts by Eric Ryan Corporation. (Shapiro, Jonathan) (Entered: 09/09/2019) |
| 09/09/2019 | 79 | Sealed Document: Exhibit C to Exhibit 3 application to Wyndham dated July 22, 2014 by Eric Ryan Corporation re 78 MOTION to Seal Exhibits C & E to Exhibit 3 and Exhibit 8 to Rule 56 Statement of Material Facts . (Shapiro, Jonathan) (Entered: 09/09/2019) |
| 09/09/2019 | 80 | Sealed Document: Exhibit C to Exhibit 3 Site Contact Form by Eric Ryan Corporation re 78 MOTION to Seal Exhibits C & E to Exhibit 3 and Exhibit 8 to Rule 56 Statement of Material Facts . (Shapiro, Jonathan) (Entered: 09/09/2019) |
| 09/09/2019 | 81 | Sealed Document: Exhibit 8 Worldwide Sourcing Agreement by Eric Ryan Corporation re 78 MOTION to Seal Exhibits C & E to Exhibit 3 and Exhibit 8 to Rule 56 Statement of Material Facts . (Shapiro, Jonathan) (Entered: 09/09/2019) |
| 09/12/2019 | 82 | ORDER denying without prejudice 78 Motion to Seal. The defendants shall refile a corrected Motion to Seal on or before September 18, 2019. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 9/12/19. (Pike, C.) (Entered: 09/12/2019) |

| 09/12/2019 | | Set Deadlines/Hearings: Amended Pleadings due by 9/18/2019 (Pike, C.) (Entered: 09/12/2019) |
| 09/16/2019 | 83 | MOTION to Seal *Corrected* Exhibits C & E to Exhibit 3 to Rule 56 Statement of Material Facts by Eric Ryan Corporation. (Shapiro, Jonathan) (Entered: 09/16/2019) |
| 09/16/2019 | 84 | Sealed Document: Exhibit C to Exhibit 3 Site Contract Form by Eric Ryan Corporation re 78 MOTION to Seal Exhibits C & E to Exhibit 3 and Exhibit 8 to Rule 56 Statement of Material Facts, 83 MOTION to Seal *Corrected* Exhibits C & E to Exhibit 3 to Rule 56 Statement of Material Facts . (Shapiro, Jonathan) (Entered: 09/16/2019) |
| 09/16/2019 | 85 | Sealed Document: Exhibit E to Exhibit 3 Site Contract Form by Eric Ryan Corporation re 78 MOTION to Seal Exhibits C & E to Exhibit 3 and Exhibit 8 to Rule 56 Statement of Material Facts, 83 MOTION to Seal *Corrected* Exhibits C & E to Exhibit 3 to Rule 56 Statement of Material Facts . (Shapiro, Jonathan) (Entered: 09/16/2019) |
| 09/17/2019 | 86 | ORDER granting 83 Motion to Seal documents 84 and 85. These documents shall remain sealed. The Court also advises the clerk to keep documents 79, 80 and 81 sealed as well. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 9/17/19. (Pike, C.) (Entered: 09/17/2019) |
| 09/30/2019 | 87 | Memorandum in Opposition re 76 MOTION for Summary Judgment filed by Gorss Motels Inc.. (Attachments: # 1 Appendix of Exhibits, # 2 Exhibit 1 through 5, # 3 Exhibit 6 and 7, # 4 Exhibit 8 through 13)(Kelly, Ryan) (Entered: 09/30/2019) |
| 09/30/2019 | 88 | Statement of Material Facts re 76 MOTION for Summary Judgment - *Plaintiff's Response to Defendant's Statement of Undisputed Material Facts* filed by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 09/30/2019) |
| 09/30/2019 | 89 | Memorandum in Opposition re 72 MOTION for Summary Judgment filed by Eric Ryan Corporation. (Attachments: # 1 Statement of Material Facts in opposition to summary judgment)(Shapiro, Jonathan) (Entered: 09/30/2019) |
| 10/14/2019 | 90 | REPLY to Response to 76 MOTION for Summary Judgment filed by Eric Ryan Corporation. (Shapiro, Jonathan) (Entered: 10/14/2019) |
| 10/14/2019 | 91 | RESPONSE re 88 Statement of Material Facts filed by Eric Ryan Corporation. (Shapiro, Jonathan) (Entered: 10/14/2019) |
| 10/14/2019 | 92 | REPLY to Response to 72 MOTION for Summary Judgment filed by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 10/14/2019) |
| 10/14/2019 | 93 | Statement of Material Facts re 72 MOTION for Summary Judgment - *PLAINTIFF'S LOCAL RULE 56(a)(2) RESPONSE TO DEFENDANT'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS* filed by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 10/14/2019) |
| 10/28/2019 | 94 | ORDER denying without prejudice 74 Motion to Seal. The Rules of this Court provide that an Order to seal a document must be based upon a demonstration that "sealing is supported by clear and compelling reasons and is narrowly |

|  |  |  |
|---|---|---|
|  |  | tailored to serve those reasons.... No document shall be sealed merely by stipulation of the parties." L. Civ. R. 5(e)3. The plaintiff's motion states only that the document in question was "labeled as Confidential when produced" and that "[t]he parties concur that this document should be filed under seal." The plaintiff may renew its motion to seal. Any renewed motion shall be filed by November 12, 2019, and shall address the considerations specified in Local Rule 5(e)3. Signed by Judge Dominic J. Squatrito on 10/28/2019. (Ring, T.) (Entered: 10/28/2019) |
| 11/11/2019 | 95 | NOTICE by Gorss Motels Inc. *of Withdrawal of Motion Doc. 74* (Kelly, Ryan) (Entered: 11/11/2019) |
| 11/11/2019 | 96 | NOTICE by Gorss Motels Inc. re 72 MOTION for Summary Judgment , 73 Statement of Material Facts, *of Filing of Exhibit 12* (Attachments: # 1 Exhibit Ex. 12 to Pltf's Motion for summary Judgment - Site Contact Form)(Kelly, Ryan) (Entered: 11/11/2019) |
| 02/20/2020 | 97 | NOTICE by Gorss Motels Inc. re 72 MOTION for Summary Judgment , 87 Memorandum in Opposition to Motion *NOTICE OF SUPPLEMENTAL AUTHORITY* (Attachments: # 1 Exhibit 1- Gorss v. Sprint)(Kelly, Ryan) (Entered: 02/20/2020) |
| 02/26/2020 | 98 | Notice of Additional Authority re 72 MOTION for Summary Judgment filed by Gorss Motels Inc.. (Attachments: # 1 Exhibit 1 - Seventh Circuit's Opinion in Physicians Healthsource, Inc. v. A-S Medication Solutions, Inc.)(Kelly, Ryan) (Entered: 02/26/2020) |
| 05/21/2020 | 99 | RULING ON MOTIONS FOR SUMMARY JUDGMENT granting 72 Motion for Summary Judgment; denying 76 Motion for Summary Judgment. Judgment shall enter in favor of the plaintiff, Gorss Motels, Inc., against the defendant, EricRyan Corporation, in the amount of $1,500.00 and the Clerk shall close the file. Signed by Judge Dominic J. Squatrito on 5/21/2020. (Velez, F.) (Entered: 05/21/2020) |
| 05/26/2020 | 100 | JUDGMENT entered in favor of the plaintiff, Gorss Motels Inc., against defendant, Eric Ryan Corporation, in the amount of $1,500.00. For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms. Signed by Clerk on 5/26/2020. (Velez, F.) (Entered: 05/26/2020) |
| 05/26/2020 |  | JUDICIAL PROCEEDINGS SURVEY - FOR COUNSEL ONLY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey (Velez, F.) (Entered: 05/26/2020) |

| 06/19/2020 | 101 | NOTICE OF APPEAL as to 65 Order on Motion to Certify Class, 100 Judgment, 99 Order on Motion for Summary Judgment,,, by Gorss Motels Inc.. Filing fee $ 505, receipt number ACTDC-5927536. (Kelly, Ryan) (Entered: 06/19/2020) |
| 06/22/2020 | 102 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 101 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Robin D. Tabora, Clerk. Documents manually filed not included in this transmission: None. (Velez, F.) (Entered: 06/22/2020) |
| 10/05/2020 | 103 | MANDATE of USCA dated 10/5/2020 101 Notice of Appeal filed by Gorss Motels Inc. The parties in the above-referenced case have filed a stipulation withdrawing this appeal pursuant to FRAP 42. The stipulation is hereby "So Ordered". (Velez, F.) (Entered: 10/06/2020) |
| 11/10/2020 | 104 | STIPULATION of Dismissal of Case *[JOINT]* by Gorss Motels Inc.. (Kelly, Ryan) (Entered: 11/10/2020) |
| 11/12/2020 | 105 | SO ORDERED 104 Stipulation of Dismissal with prejudice. Signed by Judge Dominic J. Squatrito on 11/12/20. (Pike, Corinne) (Entered: 11/12/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/10/2020 09:45:25 | | | |
| PACER Login: | matscherzm | Client Code: | Eric Ryan |
| Description: | Docket Report | Search Criteria: | 3:17-cv-00126-DJS |
| Billable Pages: | 9 | Cost: | 0.90 |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GORSS MOTELS, INC.,                    :
    Plaintiff,                     :
                                   :
v.                                     :            No. 3:17cv126 (DJS)
                                   :
THE ERIC RYAN CORPORATION,             :
ET AL.                                 :
    Defendants.                    :

RULING ON MOTION FOR CLASS CERTIFICATION

The plaintiff, Gorss Motels, Inc. ("Gorss"), brings this action individually and on behalf of a proposed class against the defendant, The Eric Ryan Corporation ("Eric Ryan"),[1] claiming violations of the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227 ("TCPA"). Gorss alleges that Eric Ryan sent unsolicited advertisements to Gorss and members of the proposed class in violation of the TCPA, including three unsolicited facsimiles ("faxes") sent during the time period between March 1, 2013, and December 1, 2013. Gorss has filed a motion for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3). For the reasons stated below, Gorss's motion is denied.

I.  BACKGROUND

Gorss formerly operated a Super 8 Motel in Connecticut as a franchisee of Wyndham Hotel Group ("Wyndham"). Eric Ryan provides various telecommunications and utility services, including utility and telecommunications bill auditing.

Worldwide Sourcing Solutions, Inc. ("WSSI"), a subsidiary of Wyndham, enters into agreements with third parties, known as approved suppliers, whereby the approved suppliers

---

[1] The Complaint also names as defendants "JOHN DOES 1-5 [who] will be identified through discovery, but are not presently known." (Doc. # 1, at 3, ¶ 10).

1

obtain access to Wyndham franchisees for the purpose of advertising the approved suppliers'
services at discounted rates. Eric Ryan entered into such a contract and was an approved supplier
at all times pertinent to this action. Pursuant to the contract between WSSI and Eric Ryan, WSSI
promoted Eric Ryan's services to Wyndham franchisees. Eric Ryan paid for these promotional
services, which included fax advertising. Wyndham provided  Eric Ryan with marketing
guidelines, including content for five faxes. WSSI provided approved suppliers, including Eric
Ryan, with the fax numbers of Wyndham franchisees.

According to Gorss, Eric Ryan successfully sent 3,338 faxes (including one to Gorss) on
March 1, 2013, advertising the commercial availability of its services. Among other things, the
fax stated: "Sign Up Now For a Free Utility and Telecommunications Bill Review. . . .With no
up-front cost, no obligations and flexible 'fee for service' options, Eric Ryan Corporation makes
it easy for its hospitality clients to set and implement their own cost-cutting priorities for the
benefit of their properties." (Doc. # 52-3, at 2). The fax provided contact information where
prospective clients could obtain further information about Eric Ryan's services. At the bottom of
the fax, in small print, was the following sentence: "To opt out from future faxes, email
strategic.sourcing@wyn.com or call this toll-free number: (877) 784-4212." (*Id.*).

Gorss alleges that the fax sent by Eric Ryan on March 1, 2013 violated the TCPA
because that fax was unsolicited and did not contain the proper opt-out language required by
pertinent regulations of the Federal Communications Commission ("FCC"). Gorss alleges in its
Complaint that "a sender of a faxed advertisement who fails to comply with the Opt-
Out Notice Requirements has, by definition, transmitted an unsolicited advertisement under the

2

JFPA [Junk Fax Protection Act]." (Doc. # 1, at 11, ¶ 28). Gorss further alleges that Eric Ryan is "precluded from asserting any prior express invitation or permission . . . because of the failure to comply with the Opt-Out Notice Requirements." (*Id.* at 12, ¶ 29).

Pursuant to Fed. R. Civ. P. 23, Gorss seeks certification of the following class:

> All persons or entities who were successfully sent a facsimile on or about March 1, 2013, stating: "The Eric Ryan Corporation," Sign Up for a Free Utility and Telecommunications Bill Review," and "To Find Out More, call (800) 837-6406, email: sales@ericryan.com, online: http://www.ericryan.com/wyndham-specials/."

(Doc. # 52, at 2, ¶ 5).

## DISCUSSION

"The 'party seeking class certification must affirmatively demonstrate . . . compliance with the Rule,' and a district court may only certify a class if it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met." *St. Stephen's School v. PricewaterhouseCoopers Accountants N.V.*, 570 F. App'x 37, 39 (2d Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of rule 23's requirements has been met.").

A party seeking class certification must satisfy all of the prerequisites specified in Rule 23(a) and one of the three requirements of Rule 23(b). *See* Fed. R. Civ. P. 23(a) and (b). Pursuant to Rule 23(a), a class action requires that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

3

and (4) the representative parties will fairly and adequately protect the interests of the class."
Fed. R. Civ. P. 23 (a).

With regard to Rule 23(b), Gorss specifies that it is moving for class certification
pursuant to Rule 23(b)(3), which requires "that the questions of law or fact common to class
members predominate over any questions affecting only individual members, and that a class
action is superior to other available methods for fairly and efficiently adjudicating the
controversy." Fed. R. Civ. P. 23(b)(3).  The predominance requirement of Rule 23(b)(3) "is far
more demanding" than the commonality requirement of Rule 23(a). *Amchem Products v.
Windsor*, 521 U.S. 591, 623-24 (1997). For purposes of ruling on the pending motion, the Court
will focus on Rule 23(b)(3)'s "far more demanding" requirement of predominance.

"The predominance requirement is satisfied if resolution of some of the legal or factual
questions that qualify each class member's case as a genuine controversy can be achieved
through generalized proof, and if these particular issues are more substantial than the issues
subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d
108, 118 (2d Cir. 2013) (internal quotation marks omitted). As is the case with all of Rule 23's
requirements, Rule 23(b)(3) "requires the party seeking certification to show that 'questions of
law or fact common to class members predominate over any questions affecting only individual
members' and that class treatment would be superior to individual litigation." *Myers*, 624 F.3d at
547 (quoting Fed. R. Civ. P. 23(b)(3)).

Gorss asserts that there are "four class-wide questions to be decided on the merits: (1)
whether the [March 1, 2013] Fax is an 'advertisement' as defined by the TCPA . . . ; (2) whether
ERC [Eric Ryan] is a 'sender' of the Fax . . . ; (3) whether the opt-out notice on the Fax complies
with FCC requirements; and (4) whether ERC 'willfully or knowingly' violated the TCPA,

allowing the Court to treble statutory damages." (Doc. 52-1, at 3). The Court must determine whether Gorss has met its burden of establishing that these questions predominate over other questions which would require individualized proof.

Eric Ryan argues that "in offering up these [4] 'common' questions, Gorss ignores the most essential question - - whether the Fax was solicited or unsolicited as to any recipient - - which will be driving the issue of potential TCPA liability." (Doc. # 56, at 7-8). Eric Ryan goes on to argue that the question of whether or not a fax recipient gave permission for the transmission of the fax is "central to the litigation" and would require the assessment of extensive, individualized evidence. (*Id.* at 11).

Eric Ryan points out that "Gorss does not distinguish between solicited and unsolicited faxes in its class definition." (*Id.* at 8). Gorss's claims are based in part on its contention that there is no need to distinguish between solicited and unsolicited faxes, because "a sender of a faxed advertisement who fails to comply with the Opt-Out Notice Requirements has, by definition, transmitted an unsolicited advertisement under the JFPA [Junk Fax Protection Act]." (Doc. # 1, at 11, ¶ 28). Gorss's claim in that regard relies on the FCC's 2006 Solicited Fax Rule, which required solicited fax advertisements, i.e., those sent to a recipient who has provided prior express invitation or permission to the sender, to include an opt-out notice that complied with the opt-out requirements for unsolicited fax advertisements. (Doc. # 52-1, at 22-23).

In 2017, the D.C. Circuit determined that the TCPA did not authorize the FCC to require opt-out notices on solicited faxes and held "that the FCC's 2006 Solicited Fax Rule is unlawful to the extent that it requires opt-out notices on solicited faxes." *Bais Yaakov of Spring Valley v. Federal Communications Commission,* 852 F.3d 1078, 1083 (D.C. Cir. 2017), *cert. denied,* 138 S. Ct. 1043 (2018). As a result of the decision in *Bais Yaakov,* on March 2, 2019, the FCC

5

eliminated its rule requiring opt-out notices on fax advertisements sent with the recipient's prior express permission or consent. *See* 84 Fed. Reg. 10266 (March 20, 2019).

Eric Ryan contends that after *Bais Yaakov*, "individuals that have consented to receiving fax advertisements no longer have a cause of action based on defective optout language." (Doc. # 56, at 10). Gorss argues that *Bais Yaakov* is not binding on this Court because it was decided in a different circuit. In a recent ruling on a motion for class certification in a similar case within this District, Judge Arterton made the following observations: "Under *Bais Yaakov*, solicited and unsolicited faxes are once again subject to different requirements regarding the inclusion of opt-out language. The applicability of *Bais Yaakov* to this case therefore determines whether the Court would be asked to make individualized, fact-based determinations regarding each proposed class member's consent to receive the Fax." *Gorss Motels, Inc. v. AT&T Mobility LLC*, Civil No. 3:17cv403 (JBA), 2019 U.S. Dist. LEXIS 24726, at *11 (D. Conn. Feb. 14, 2019).

Gorss argues that the Hobbs Act prevents this Court from passing on the validity of the FCC's regulations, including the Solicited Fax Rule. "Under the Hobbs Act, the courts of appeals 'ha[ve] exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders' of the FCC . . . ." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 476 n.3 (2d Cir. 2018) (quoting 28 U.S.C. § 2342(1)). The Second Circuit went on to note that "[w]hen agency regulations are challenged in more than one court of appeals . . 28 U.S.C. § 2112 requires that the multidistrict litigation panel consolidate the petitions and assign them to a single circuit. Challenges to the [order at issue] were assigned to the D.C. Circuit, which thereby became the sole forum for addressing . . the validity of the FCC's order." *Id.* (internal quotation marks omitted). The decision in *Bais Yaakov* resulted from challenges to the Solicited Fax Rule in more than one circuit that were consolidated and assigned to the D.C. Circuit.

In *Bais Yaakov of Spring Valley v. Educational Testing Service*, No. 13-CV-4577

(KMK), 2018 U.S. Dist. LEXIS 96161, at *10-11 (S.D.N.Y. June 6, 2018), one of the district

courts in this Circuit considered and rejected the argument that "notwithstanding the D.C.

Circuit's decision in *Bais Yaakov*, this Court must continue to treat the Solicited Fax Rule as

valid until either the Second Circuit or the Supreme Court rules otherwise." That court went on

to state that "[t]he D.C. Circuit's opinion is intended to result in uniform, nationwide

interpretation of the Solicited Fax Rule for *all* circuits pursuant to the Hobbs Act. Therefore, this

Court is duty bound to follow such binding precedent." *Id.* at *14 (internal quotation marks and

citation omitted).

Both the Fourth and Ninth Circuits have held that a circuit court decision  resolving a

challenge to an FCC rule that results from the consolidation of multi-district cases in a single

circuit is binding nationwide. *See GTE South, Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir.

1999); *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008). More specifically,

courts outside the D.C. Circuit have held that they were bound by the  D.C. Circuit's decision in

*Bais Yaakov*. *See Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d

460, 467 (6th Cir. 2017) (internal quotation marks omitted) ("its [the D.C. Circuit's] decision

striking down the Solicited Fax Rule became binding outside of the [D.C. Circuit]"); *Raitport v.

Harbour Capital Corp.*, 312 F. Supp. 3d 225, 233 (D.N.H. 2018) (the D.C. Circuit "invalidated

the Solicited Fax Rule, and its holding is binding upon this court").

Most recently, Judge Arterton concluded that "[i]n light of the position of the Second

Circuit regarding the binding effect of consolidated appeals of FCC regulations, the text of the

statute, the reasoning of the *Bais Yaakov* decision, and the position of other courts which have

addressed this issue, the Court will similarly join those that have concluded that they are bound

by the holding of *Bais Yaakov*." *AT&T Mobility LLC,* 2019 U.S. Dist. LEXIS 24726, at *14. This Court likewise concludes that it is bound by the decision of the D.C. Circuit in *Bais Yaakov*. "Thus, the Solicited Fax Rule does not control here . . . . Before addressing legal questions common to the proposed class, the Court will therefore have to determine whether each of the several thousand potential class members consented to receive the Fax." *Id.*

Although Gorss argues that Eric Ryan has failed to demonstrate that there is a valid question as to whether or not the recipients of the fax in question provided prior consent for its transmission, Eric Ryan has identified:

> issues . . . [which] would demand individualized review and would necessarily devolve into evidentiary mini-trials:
> - whether franchisees consented to receiving the Fax by providing their fax number to Wyndham or otherwise;
> - whether individual franchise agreements expressly provide consent for the franchisee to be contacted by fax;
> - whether putative class members contacted or were actual direct customers of Eric Ryan, and provided Eric Ryan with their fax numbers, thereby providing additional consent; and
> - whether there are records that exist showing individual franchisees agreed to participate in WSSI marketing programs, thereby providing consent.

(Doc. # 56, at 13-14). "In response, Plaintiff has not proffered any viable method of determining individual consent which does not require individualized, fact-based 'mini-trials' for each potential class member, nor has the Plaintiff made any persuasive showing that these mini-trials would not come to predominate this litigation if a class were certified." *AT&T Mobility LLC,* 2019 U.S. Dist. LEXIS 24726, at *15. Consequently, the Court concludes that Gorss has not met its burden "to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Myers*, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)). *See Raitport*, 312 F. Supp. 3d at 237 ("The fact that [plaintiff's] original proposed

8

class and two subclasses fail to distinguish between those recipients who gave . . . permission and those who did not, . . . precludes common questions of fact from predominating.").

Because the Court has found that Gorss failed to meet its burden under Rule 23(b)(3), the Court does not find it necessary to address the other issues raised by Eric Ryan in opposition to the motion for class certification, i.e., ascertainability of the proposed class (to the extent that issue differs from the predominance requirement) and adequacy of class representation.

## CONCLUSION

For the reasons stated above, Gorss's motion for class certification (**doc. # 52**) is **DENIED**.

In accordance with the Court's previous Order (doc. # 51), dispositive motions shall be filed by April 29, 2019.

SO ORDERED this     28th      day of March , 2019.

_____/s/ DJS_____
            Dominic J. Squatrito
            United States District Judge

9